EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| **THOMAS WAYNE BIGGS** | ) |
|     *Movant* | ) |
| | ) |
| v. | ) **Case No. 1:23-mc-10** |
| | ) |
| **NATIONAL RIFLE ASSOCIATION** | ) **FILED UNDER SEAL** |
| **OF AMERICA** | ) |
|     *Respondent* | ) |
| | ) |

## MOTION TO QUASH THIRD-PARTY SUBPOENA

This Motion to Quash concerns a third-party subpoena issued by Respondent National Rifle Association of America ("NRA") commanding Movant Thomas Wayne Biggs ("Mr. Biggs") to produce documents and appear for a remote deposition in the matter of *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Civil Action No. 3:22-CV-1944 (N.D. TX) (the "Texas Litigation") on June 20, 2023. For the reasons stated below, and as articulated more fully in the Brief in Support, Mr. Biggs respectfully moves this Court to quash the Subpoena:

### JURISDICTION AND VENUE

1.    Under Rule 45 of the Federal Rules of Civil Procedure, a motion to quash a subpoena is properly brought in "the court for the district where compliance is required." Fed. R. Civ. P. 45(d)(3). Although the Subpoena issued from the Northern District of Texas, it commands Mr. Biggs to appear for a deposition and produce documents in Fairfax, Virginia, which is located within the territory of the United States District Court for the Eastern District of Virginia, Alexandria Division. This Court is therefore the proper venue to hear this Motion.

### GROUNDS FOR RELIEF

1.    Mr. Biggs is an attorney licensed to practice in the Commonwealth of Virginia.

2.      His client, Anthony Makris ("Mr. Makris"), is a named defendant in the Texas Litigation.

3.      Although Mr. Biggs has not entered an appearance in the Texas Litigation, he nevertheless continues to counsel and advise Mr. Makris with respect to the Texas Litigation. Mr. Biggs also represents Mr. Makris and his company Under Wild Skies, Inc. ("UWS"), in related litigation against NRA in the matter of *Under Wild Skies, Inc. v. National Rifle Association of America*, Case No. CL 2019-12530 (Fairfax Cnty. Cir. Ct.), now pending appeal by both parties in the Court of Appeals of Virginia (Record Nos. 1956-22-4 and 1965-22-4) (the "UWS Litigation").

4.      The issues raised in the Texas Litigation are intimately and inextricably intertwined with the UWS Litigation. Summarized, NRA contends that the UWS Litigation was subject to a Confidential Settlement Agreement ("CSA") between NRA and its former public relations firm, Ackerman McQueen and its subsidiary, Mercury Group.  Neither Mr. Makris nor UWS were parties or signatories to the CSA.

5.      Through the Subpoena directed to Mr. Biggs, NRA plainly and knowingly seeks to depose and obtain documents from an opposing party's attorney.

6.      Yet NRA unquestionably has other, less intrusive, means of obtaining the information sought.

7.      The materials and information sought are either already in NRA's possession, irrelevant, privileged, or otherwise protected from disclosure. And none of the subject matter identified in the Subpoena is crucial to NRA's case.

8.      Additionally, all three categories of "documents on which deposition testimony is sought" are overbroad, not reasonably particularized, and designed to impose undue burden and expense upon Mr. Biggs and Mr. Makris.

9.    NRA cannot articulate any cognizable basis for subpoenaing Mr. Makris's attorney.

Nor can NRA demonstrate any compelling need to obtain the requested discovery from Mr. Biggs.

10.    Mr. Biggs now moves to quash the Subpoena.

## REQUEST FOR RELIEF

11.    For the foregoing reasons, Mr. Biggs requests that the Subpoena be quashed. Additionally, NRA and its attorneys must be sanctioned pursuant to Rule 45(d)(1). That Rule requires that a party or attorney responsible for the issuance of a subpoena take reasonable steps to avoid undue burden and expense to the person subject to the Subpoena and mandates the imposition of a sanction for failure to comply. Here, NRA and its attorneys issued the Subpoena knowing that Mr. Biggs remained Mr. Makris's attorney. The frivolous scope of the Subpoena, which seeks only documents and information that are either irrelevant to the Texas Litigation; protected from disclosure; or already in NRA's possession, reveals NRA's bad faith motive. Mr. Biggs has now unnecessarily incurred the burden and expense of filing this Motion to Quash. NRA and its attorneys must be sanctioned accordingly.

Respectfully submitted,
Thomas Wayne Biggs II
By counsel

_____/s/_____
Skyler R. Peacock, Esq. (VSB No. 87894)
Dycio & Biggs
10533 Main Street
Fairfax, Virginia 22030
(703) 383-0100
(703) 383-0101 (FAX)
speacock@dyciolaw.com

## CERTIFICATE OF CONFERENCE

On June 7, 2023, counsel for Mr. Biggs met and conferred with counsel for NRA in a good faith effort to resolve this matter without Court intervention but the conference was unsuccessful.

/s/
_____
Skyler R. Peacock, Esq.

## CERTIFICATE OF SERVICE

On June 9, 2023, the foregoing Motion to Quash, together with the Brief in Support and the exhibits attached thereto, were filed with the Clerk of Court for the U.S. District Court, Eastern District of Virginia. Service is being effected by electronic mail to NRA counsel, Ramon Hernandez, in the Texas Litigation and also to known Virginia counsel for NRA, James Hundley and Robert Cox.

/s/
_____
Skyler R. Peacock, Esq.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | |
|---|---|
| **THOMAS WAYNE BIGGS** | ) |
| *Movant* | ) |
| | ) |
| v. | ) **Case No. 1:23-mc-10** |
| | ) |
| **NATIONAL RIFLE ASSOCIATION** | ) **FILED UNDER SEAL** |
| **OF AMERICA** | ) |
| *Respondent* | ) |
| | ) |

## BRIEF IN SUPPORT OF
## <u>MOTION TO QUASH THIRD-PARTY SUBPOENA</u>

Skyler R. Peacock, Esq. (VSB No. 87894)
Dycio & Biggs
10533 Main Street
Fairfax, Virginia 22030
(703) 383-0100
(703) 383-0101 (FAX)
speacock@dyciolaw.com

*Counsel for Thomas Wayne Biggs II*

## TABLE OF CONTENTS

INTRODUCTION.............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

ARGUMENT..................................................................................................................... 9

I.  NRA's attempt to depose Mr. Biggs fails the *Shelton* test. ....................................... 9

   A.  Mr. Biggs is counsel for an opposing party........................................................... 9

   B.  NRA has other means of obtaining the information sought from Mr.
      Biggs. ................................................................................................................... 10

   C.  The Subpoena seeks privileged and irrelevant information................................. 10

   D.  The information NRA seeks is not crucial to the preparation of its
      case....................................................................................................................... 11

II.  The burden of obtaining discovery from Mr. Biggs, a non-party to the
    Texas Litigation, outweighs any benefit. ................................................................. 11

   A.  Legal Standard ................................................................................................... 12

   B.  Obtaining discovery from Mr. Biggs will not benefit NRA. ............................. 12

   C.  Compliance with NRA's subpoena will impose undue burden and
      expense................................................................................................................. 13

CONCLUSION .............................................................................................................. 15

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Allen v. Brown Advisory, LLC*, Civil Action No. 3:20-mc-00008, 2020 U.S. Dist.
LEXIS 170513 (W.D. Va. Sep. 17, 2020) ................................................................................. 9, 10

*Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) ....................................................... 12

*Ford Motor Co. v. Nat'l Indem. Co.*, Civil Action No. 3:12cv839, 2013 U.S. Dist.
LEXIS 102985 (E.D. Va. July 22, 2013) ................................................................................... 1, 9

*Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986) ......................................................... 9

*Va. Dep't of Corr. v. Jordan*, 921 F.3d 180 (4th Cir. 2019) ........................................... 2, 12, 13, 14

*Weinman v. Cable*, 427 F.3d 49 (1st Cir. 2005)............................................................................. 12

<u>Rules</u>

Fed. R. Civ. P 26(b)(1)................................................................................................................... 12

Fed. R. Civ. P. 45(d)(1) ................................................................................................................. 15

Fed. R. Civ. P. 45(d)(3)(A)(iv)...................................................................................................... 13

## INTRODUCTION

This Motion to Quash concerns a third-party subpoena issued by Respondent National Rifle Association of America ("NRA") commanding Movant Thomas Wayne Biggs ("Mr. Biggs") to produce documents and appear for a remote deposition in the matter of *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Civil Action No. 3:22-CV-1944 (N.D. TX) (the "Texas Litigation") on June 20, 2023.[1] Mr. Biggs is an attorney licensed to practice in the Commonwealth of Virginia. His client, Anthony Makris ("Mr. Makris"), is a named defendant in the Texas Litigation. Although Mr. Biggs has not entered an appearance in the Texas Litigation, he nevertheless continues to counsel and advise Mr. Makris with respect to the Texas Litigation. Mr. Biggs also represents Mr. Makris and his company Under Wild Skies, Inc. ("UWS"), in related litigation against NRA in the matter of *Under Wild Skies, Inc. v. National Rifle Association of America*, Case No. CL 2019-12530 (Fairfax Cnty. Cir. Ct.), now pending appeal by both parties in the Court of Appeals of Virginia (Record Nos. 1956-22-4 and 1965-22-4) (the "UWS Litigation"). The issues raised in the Texas Litigation are intimately and inextricably intertwined with the UWS Litigation.

It is well understood that attempts to subpoena an opposing party's attorney are both extraordinary and disfavored. In order to prevail on such an effort, the requesting party must first demonstrate that the information sought is: (1) not obtainable by other means; (2) relevant and not privileged; and (3) crucial to the preparation of the requesting party's case. *See Ford Motor Co. v. Nat'l Indem. Co.*, Civil Action No. 3:12cv839, 2013 U.S. Dist. LEXIS 102985, at *7-8 (E.D. Va. July 22, 2013). Moreover, in all cases where a party seeks discovery from a nonparty, the scope of discovery is narrowly construed and demands more than a showing that the documents and

---

[1] A copy of the Subpoena is attached as **Exhibit A**.

information sought are minimally relevant to the pending litigation. *See Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019).

Through the Subpoena directed to Mr. Biggs, NRA plainly and knowingly seeks to depose and obtain documents from an opposing party's attorney. Yet NRA unquestionably has other, less intrusive, means of obtaining the information sought. The materials and information sought are either already in NRA's possession, irrelevant, privileged, or otherwise protected from disclosure. And none of the subject matter identified in the Subpoena is crucial to NRA's case. Additionally, all three categories of "documents on which deposition testimony is sought" are overbroad, not reasonably particularized, and designed to impose undue burden and expense upon Mr. Biggs and Mr. Makris.

NRA cannot articulate any cognizable basis for subpoenaing Mr. Makris's attorney. Nor can NRA demonstrate any compelling need to obtain the requested discovery from Mr. Biggs. For those reasons, explained more fully below, Mr. Biggs moves to quash the Subpoena.

## BACKGROUND

NRA's attempt to subpoena Mr. Biggs does not arise in a vacuum. Rather, it is a predictable, antagonistic next step culminating from a decades-long history between NRA and Mr. Makris.

Prior to instituting the Texas Litigation, NRA originally proceeded against Ackerman McQueen, Inc. ("Ackerman"), and its subsidiary, Mercury Group, Inc. ("Mercury"), in a separate action brought in the Northern District of Texas, styled *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Civil Action No. 3:19-cv-02074 (the "2019 Litigation"). Mr. Makris, a former executive of Ackerman and Mercury, was not a named party in that dispute. On March 21, 2022, following the negotiation and execution of a Confidential Settlement Agreement

2

(the "CSA")[2], the parties submitted a Stipulation of Dismissal that dismissed the 2019 Litigation with prejudice.

While the 2019 Litigation was still pending, NRA was also engaged in a lawsuit with UWS in the Fairfax County Circuit Court of Virginia—the UWS Litigation. Mr. Makris is the sole-shareholder of UWS. Mr. Biggs represented both Mr. Makris and UWS as the lead trial attorney throughout the UWS Litigation.

NRA and Mr. Makris have a lengthy and tumultuous history. For more than 20 years, UWS produced a hunting show sponsored by NRA that frequently showcased various NRA executives participating in exotic hunting excursions across the world. The relationship between UWS and NRA eventually soured over a contract dispute, which resulted in both parties asserting claims against the other in the UWS Litigation.[3] Notably, NRA was represented in the UWS Litigation by the same law firm and many of the same attorneys as in the 2019 Litigation and the Texas Litigation.[4] Those attorneys were present throughout the UWS Litigation, participating in all aspects of discovery, motions practice, and the trial.

Late in the UWS Litigation, with the trial looming on the horizon, NRA sought to dispose of the case on the grounds that the terms of the CSA foreclosed UWS's claims against NRA. As its title suggests, the CSA purports to be a confidential document not intended for broad dissemination or public disclosure. Neither Mr. Makris nor UWS were parties to or signatories of the CSA. Nor was Mr. Makris or Mr. Biggs involved in any way with the negotiation or execution

---

[2] A copy of the CSA is attached as **Exhibit B**.

[3] Copies of the UWS Amended Complaint and NRA's Answer and Counterclaims are attached as **Exhibit C** and **Exhibit D**, respectively.

[4] *See, e.g.*, Order Granting *Pro Hac Vice* Admission for William A. Brewer IV, Esq., attached as **Exhibit E**; Order Granting *Pro Hac Vice* Admission for Ramon Hernandez, Esquire, attached as **Exhibit F**.

3

of the CSA.[5] Indeed, Mr. Makris and Mr. Biggs had no knowledge of any of the terms of the CSA until NRA produced a heavily redacted copy in the UWS Litigation.

NRA produced the redacted CSA in support of its effort to dismiss the UWS Litigation on a plea in bar, claiming that the CSA included a provision releasing NRA from liability to UWS. Specifically, NRA argued that UWS is an "affiliate" or "related company" of Ackerman and Mercury and that the CSA's release provision applied to all such affiliates and related companies. UWS moved to strike the plea in bar, arguing that UWS was not subject to any release under the CSA because neither UWS nor Mr. Makris was a party to that agreement, nor was UWS an affiliate or related company of Ackerman or Mercury. The Fairfax County Circuit Court agreed with UWS, on the grounds that UWS was not a signatory to the CSA, and granted the motion to strike the plea in bar.[6] The UWS Litigation then proceeded to trial before a jury in September, 2022, which concluded with a verdict in favor of UWS for \$550,000.[7]

Shortly after the verdict in the UWS Litigation (currently on appeal from both sides), NRA initiated the Texas Litigation, alleging that Ackerman and Mercury breached the CSA by failing to dismiss the UWS Litigation. NRA subsequently named Mr. Makris as a defendant and asserted additional claims against him.[8] All of NRA's claims in the Texas Litigation derive from arguments that NRA raised and lost in the UWS Litigation. In response, Ackerman and Mercury filed a motion

---

[5] The same is not true of NRA's counsel here. The Court should note that Cecelia L. Fanelli, Esq., NRA counsel involved in opposing this Motion, negotiated and executed the CSA on behalf of NRA. *See* CSA at 9.

[6] A copy of the Circuit Court's Order granting the Motion to Strike the Plea in Bar is attached as **Exhibit G**.

[7] A copy of the Final Order in the UWS Litigation is attached as **Exhibit H**.

[8] A copy of NRA's Second Amended Complaint in the Texas Litigation is attached as **Exhibit I**.

for summary judgment and Mr. Makris filed a motion to dismiss.[9] Both motions presented pure questions of law. For the purpose of authenticating and contextualizing the documents relied upon in those dispositive motions for the Texas court, Mr. Biggs provided a declaration describing the proceedings and outcome of the UWS Litigation—information already available to, and understood by, NRA and its counsel.[10]

In a blatant act of retaliation, NRA then served Mr. Biggs on May 26, 2023, with a subpoena to testify and produce documents for a deposition in the Texas Litigation.[11] The Subpoena identified the following three categories of "documents on which deposition testimony is sought":

1.   All Documents relating to the declarations [Mr. Biggs] submitted to the Court (i) in support of Anthony Makris' Motion to Dismiss and (ii) in support of the Motion for Summary Judgment filed by Ackerman and Mercury.

2.   All Documents relating to the claims and defenses raised in the UWS Litigation, the documents produced in discovery conducted in the UWS Litigation, and the deposition and trial testimony presented in the UWS Litigation.

3.   All Documents relating to the CSA, including but not limited to the negotiation and execution of the CSA.

Following service of the Subpoena, on June 1, 2023, counsel for Mr. Biggs emailed NRA's counsel demanding withdrawal of the Subpoena because NRA improperly sought to depose an opposing party's attorney regarding documents and information that are either irrelevant to the

---

[9] Copies of Ackerman and Mercury's Motion for Summary Judgment and Mr. Makris's Motion to Dismiss are attached as **Exhibit J** and **Exhibit K**, respectively.

[10] A copy of Mr. Biggs's declaration is attached as **Exhibit L**.

[11] As evidenced by the terms of the CSA, NRA has a documented animus toward Mark R. Dycio, Esq., a partner at Dycio & Biggs. Despite the fact that Mr. Dycio was not implicated in any of the claims NRA asserted in the 2019 Litigation, NRA insisted that the CSA resolving the 2019 Litigation include an express carveout, in all caps, providing that "FOR THE AVOIDANCE OF DOUBT, THIS AGREEMENT DOES NOT RELEASE THE NRA'S PENDING OR FUTURE CLAIMS AGAINST ATTORNEY MARK DYCIO." *See* CSA at 4.

Texas Litigation, already in NRA's possession, privileged, or otherwise protected from disclosure.[12] The email also challenged the lack of particularity and overbreadth of the categories identified in the Subpoena. NRA's counsel delivered a letter in response that same day, refusing to withdraw the Subpoena.[13]

In support of its refusal to withdraw the Subpoena, NRA argued that it properly sought Mr. Biggs's deposition because: (1) Mr. Makris's Initial Disclosure identified Mr. Biggs as an individual likely to have discoverable information; (2) by submitting a declaration in support of Mr. Makris's motion to dismiss and the other Defendants' motion for summary judgment, Mr. Biggs made himself the "chief witness for all Defendants with respect to the pending dispositive motions"; and (3) Mr. Biggs did not qualify as an opposing party's attorney because he had not entered an appearance in the Texas Litigation.

To be sure, Mr. Makris did identify Mr. Biggs in his Initial Disclosure.[14] Mr. Makris also identified: (1) James S. Robertson, III, who is Mr. Makris's counsel of record in the Texas Litigation and "has knowledge of the attorney fees and expenses incurred by Anthony Makris in [the Texas Litigation]" and (2) NRA attorneys Ramon Hernandez, Cecelia L. Fanelli, and William Brewer, who were "involved in [the] CSA and [the UWS Litigation]." The Initial Disclosure further identified the following documents, located in Mr. Makris's and NRA's possession, that might support Mr. Makris's claims and defenses in the Texas Litigation:

1.     [D]ocuments produced in discovery in the [UWS Litigation];

2.     Transcripts of deposition and trial testimony in the [UWS Litigation]; and

---

[12] A copy of the June 1, 2023, email to NRA counsel is attached as **Exhibit M**.

[13] A copy of NRA's June 1, 2023, response letter is attached as **Exhibit N**.

[14] A copy of Mr. Makris's Rule 26(a)(1) Initial Disclosure in the Texas Litigation is attached as **Exhibit O**.

3. Pleadings and other documents filed in the [UWS Litigation].

On July 7, 2023, counsel for Mr. Biggs and counsel for NRA convened telephonically to meet and confer regarding Mr. Biggs's demand for withdrawal of the Subpoena. During the conference, Mr. Biggs pointed out that NRA's attempt to depose an opposing party's attorney was improper and that the materials sought through the subpoena were either already in NRA's possession, irrelevant, privileged, or otherwise protected from disclosure. Additionally, Mr. Biggs explained that NRA's request for the entire record from the UWS Litigation, and all related documents, inherently imposed undue burden and expense.

For its part, NRA again maintained that it properly sought to depose Mr. Biggs because he was identified in Mr. Makris's Initial Disclosure and because he provided a declaration in support of the Texas Defendants' dispositive motions—although NRA's counsel struggled to articulate why any of the information sought was relevant to the preparation of its case. NRA's counsel conceded, however, that much of its interest in deposing Mr. Biggs would be abated if Mr. Biggs was deleted from Mr. Makris's Initial Disclosure. The parties also discussed the effect of revising Mr. Biggs's declaration to omit any perceived argument or characterization regarding the authenticated documents. NRA's counsel remained noncommittal as to either potential resolution. When pressed on NRA's need for the entire record of the UWS Litigation, and all documents related to the UWS Litigation, NRA's counsel failed to offer any discernible justification for its expansive request.

Mr. Biggs followed up on the meet and confer by email on July 8, 2023, summarizing the discussion.[15] The email noted for NRA's counsel, among other things, that Mr. Makris had now deleted Mr. Biggs from the Initial Disclosure.[16] Mr. Biggs also explained that NRA's reliance on

---

[15] A copy of Mr. Biggs's July 8, 2023, email to NRA counsel is attached as **Exhibit P**.

[16] A copy of Mr. Makris's First Supplemental Initial Disclosure is attached as **Exhibit Q**.

Mr. Biggs's declaration as a justification for proceeding with the deposition and document requests was misplaced, given that the dispositive motions raised only questions of law that could not be resolved based on any argument or characterization included in the declaration. And Mr. Biggs again raised the issue of the undue burden imposed by NRA's demand for the entire record of the UWS Litigation and all related documents—which NRA failed to appreciably address during the meet and confer. The email concluded with a request that NRA advise on its position regarding withdrawal of the Subpoena. On July 9, 2023, NRA responded without addressing the substance of Mr. Biggs's email and directed him to file his motion to quash.[17]

This historical backdrop lays bare NRA's bad faith intent in seeking to depose Mr. Biggs. Prior to issuing the Subpoena, NRA and its counsel understood the privileged and confidential relationship existing between Mr. Makris and his attorney Mr. Biggs, particularly as it concerned the UWS Litigation. Prior to issuing the Subpoena, NRA and its counsel also understood the ongoing nature of the UWS Litigation, and its intimate relationship to the Texas Litigation.[18] Prior to issuing the Subpoena, NRA and its counsel also understood that they already possessed all of the pleadings, discovery, transcripts, and other nonprivileged documents from the UWS Litigation. Prior to issuing the Subpoena, NRA and its counsel also understood that they could otherwise obtain all of the discoverable information requested in the Subpoena from sources other than Mr. Makris's attorney. And, prior to issuing the Subpoena, NRA and its counsel also understood that

---

[17] A copy of NRA counsel's July 9, 2023, email is attached as **Exhibit R**.

[18] *See, e.g.*, NRA's Rule 26(a)(1) Initial Disclosure in the Texas Litigation, attached as **Exhibit S**. Among other things, NRA disclosed that it sought damages for "[a]ttorneys' fees and costs incurred by the NRA since March 11, 2022 in defending the vexatious UWS Litigation, which was settled by the CSA" and "[a]ny and all judgments or court orders issued against [NRA] in the UWS Litigation, including without limitation, those relating to the jury verdict of $550,000 plus interest." *See also* Ackerman and Mercury's Motion for Summary Judgment, **Exhibit J**, and Mr. Makris's Motion to Dismiss, **Exhibit K**, which unambiguously raise as defenses questions of law arising from the UWS Litigation.

Mr. Biggs has no personal knowledge of the negotiation and execution of the CSA. Yet, despite this complete understanding, NRA and its counsel nevertheless proceeded to subpoena Mr. Biggs. And, when given the opportunity to withdraw the Subpoena, NRA and its counsel refused without justification.

Having exhausted all efforts to reason with NRA and its counsel, Mr. Biggs now moves this Court to quash the Subpoena.

## ARGUMENT

### I.   NRA's attempt to depose Mr. Biggs fails the *Shelton* test.

Before NRA may depose Mr. Biggs or subpoena documents from him, it must first satisfy its burden under the three-part *Shelton* test. *See Ford Motor Co. v. Nat'l Indem. Co.*, Civil Action No. 3:12cv839, 2013 U.S. Dist. LEXIS 102985, at \*6 (E.D. Va. July 22, 2013) ("The test for determining whether it is appropriate to allow the deposition of an opposing party's counsel is set forth in *Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986)."); *Allen v. Brown Advisory, LLC*, Civil Action No. 3:20-mc-00008, 2020 U.S. Dist. LEXIS 170513, at \*6 (W.D. Va. Sep. 17, 2020) (holding that the *Shelton* test applies equally "to document subpoenas served on counsel for an opposing party" and citing cases). Under the *Shelton* test, the party seeking to depose an opposing party's attorney first bears the burden of establishing that: "(1) no other means exist to obtain the information than to impose opposing counsel; (2) the information sought is relevant and non-privileged; and (3) the information is crucial to the preparation of the case." *Ford Motor Co.*, 2013 U.S. Dist. LEXIS 102985 at \*7-\*8 (quoting *Shelton*, 805 F.2d at 1327). NRA cannot meet its burden under any prong of the *Shelton* test.

### A.   Mr. Biggs is counsel for an opposing party.

Mr. Biggs unquestionably qualifies as counsel for an opposing party. Although Mr. Biggs has not entered an appearance in the Texas Litigation, that fact is not dispositive because courts

9

considering the issue "have held that an attorney need not be counsel of record in order to trigger the *Shelton* test." *Allen*, 2020 U.S. Dist. LEXIS 170513, at *7 (citing cases). Rather, courts have determined that the *Shelton* test applies to counsel not-of-record where the attorney "has provided legal advice and assistance on matters related to the pending litigation." *Id.* at *8. Here, NRA cannot dispute that Mr. Biggs currently represents Mr. Makris and UWS, of which Mr. Makris is the sole shareholder, in ongoing litigation with NRA in Virginia. Nor can NRA dispute that the UWS Litigation intimately relates to the Texas Litigation. Indeed, but for the UWS Litigation, there would be no Texas Litigation. Thus, the *Shelton* test properly applies in this case.

**B.      NRA has other means of obtaining the information sought from Mr. Biggs.**

NRA has numerous other means to obtain the information it purportedly seeks from Mr. Biggs. Regarding Mr. Biggs's declaration in the Texas Litigation, NRA already has all of the documents authenticated through and appended to the declaration. NRA also already has in its possession the entire record from the UWS Litigation, as well as all of the discovery and correspondence exchanged between the parties and the deposition and trial court transcripts. Those materials are also directly available to NRA from other parties to the Texas Litigation. And NRA is also aware that Mr. Biggs had no involvement in the negotiation and execution of the CSA. Moreover, NRA has available to it in the Texas Litigation *all* of the parties directly involved in that effort. Mr. Biggs simply possesses no documents or information that NRA cannot obtain from other sources.

**C.      The Subpoena seeks privileged and irrelevant information.**

In subpoenaing Mr. Biggs, NRA plainly seeks disclosure of privileged information. After accounting for all of the materials already in NRA's possession, or otherwise available from more convenient sources, any remaining responsive documents or information in Mr. Biggs's possession

10

unquestionably constitute privileged attorney-client communications or protected attorney work product.

The Subpoena also seeks disclosure of irrelevant information. To the extent it concerns Mr. Biggs's declaration, any information outside the four corners of the documents authenticated by Mr. Biggs has no bearing on the pure questions of law at issue in the Texas Litigation. And it would be incredible to believe that every single document related to the years-long UWS Litigation is relevant to a dispute concerning the legal effect of a settlement agreement in the 2019 Litigation, reached only months before the trial in the UWS Litigation. They would not. And any impressions Mr. Biggs may have about the negotiation and execution of the CSA—in which, again, he was not involved—would also be irrelevant to any of the legal claims or defenses raised in the Texas Litigation.

**D.    The information NRA seeks is not crucial to the preparation of its case.**

Most importantly, NRA has not and cannot explain how any documents or information maintained by Mr. Biggs are crucial to the preparation of NRA's case in the Texas Litigation. They plainly are not. NRA is using the Subpoena only as a pretext to go fishing through Mr. Biggs's files, harass Mr. Makris and his counsel, and impose as much burden and expense as it can in the process.

For the reasons state above, NRA cannot meet its burden under the *Shelton* test and the Subpoena must be quashed.

**II.    The burden of obtaining discovery from Mr. Biggs, a non-party to the Texas Litigation, outweighs any benefit.**

Obtaining discovery from Mr. Biggs will not benefit NRA. But it will impose undue burden and expense on Mr. Biggs and Mr. Makris. Under those circumstances, NRA's Rule 45 Subpoena must be quashed.

11

## A.     Legal Standard

As a threshold matter, "[w]hen discovery is sought from nonparties … its scope must be limited even more" than the general limitations imposed under Rule 26(b)(1). *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019). In policing third-party discovery, courts are cognizant of the fact that "[n]onparties are 'strangers' to the litigation, and since they have 'no dog in [the] fight,' they have 'a different set of expectations' from the parties themselves." *Id.* (quoting *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)). As such, "[b]ystanders should not be drawn into the parties' dispute without some good reason, even if they have information that falls within the scope of party discovery." *Id.* In the context of Rule 45 subpoenas, "[a]s under Rule 26, the ultimate question is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient." *Id.* "But courts must give the recipient's nonparty status 'special weight,' leading to an even more 'demanding and sensitive' inquiry than the one governing discovery generally." *Id.* (quoting *Weinman v. Cable*, 427 F.3d 49, 53 (1st Cir. 2005)).

## B.     Obtaining discovery from Mr. Biggs will not benefit NRA.

When assessing the benefits of third-party discovery, "courts should consider not just the relevance of information sought, but the requesting party's need for it." *Id.* In that sense, the information sought "must offer some value over and above what the requesting party already has … a mere *de minis* benefit will [not] suffice." *Id.* Courts must also take into consideration the information available to the requesting party from other sources. *Id.* "To that end, the requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation." *Id.*

In light of the circumstances here, it is clear that obtaining third-party discovery from Mr. Biggs will yield, at most, only a *de minis* benefit to NRA. The issues raised in the Texas Litigation present pure questions of law that will be resolved based on the terms of the parties' agreement, as

12

defined within the four corners of the CSA, and the record of the proceedings in the UWS Litigation. Whatever thoughts or opinions Mr. Biggs may have on those subjects are wholly irrelevant to the Texas court's analysis and do not constitute cognizable evidence capable of supporting either side of the argument. NRA therefore already has possession of the documents and information necessary to present its case. Obtaining similar, and less useful, information from Mr. Biggs is of no benefit to NRA.

NRA also cannot explain why it needs to obtain the requested documents and information from Mr. Biggs. All of the information necessary for NRA to present its case already resides in NRA's possession or can readily be obtained from another party to the Texas Litigation. As explained previously, NRA already has the documents authenticated and appended to Mr. Biggs's declaration. NRA already has the entire record of the UWS Litigation, as well as all of the documents exchanged between the parties and all of the deposition and court transcripts. And NRA has before it in the Texas Litigation all of the parties to the CSA. There is nothing Mr. Biggs can offer NRA that NRA cannot obtain through less intrusive means.

## C.    Compliance with NRA's subpoena will impose undue burden and expense.

When assessing the burden of third-party discovery, courts should "consider the dollars-and-cents costs associated with a large and demanding document production," as well as any other "cognizable burdens." *Jordan*, 921 F.3d at 189. For example, in addition to "the interests of the recipient of the subpoena," courts should take into consideration "others who[se] [privacy interests] might be affected." *Id.* at 190. ("The text of Rule 45 makes that clear, encompassing burdens on any 'person,' not just the recipient of the subpoena." (quoting Fed. R. Civ. P. 45(d)(3)(A)(iv)). Moreover, because "[a] nonparty should not have to do the work of tailoring a subpoena to what the requesting party needs," courts must also consider the "burden [that] arises when a subpoena is overbroad." *Id.*

13

*First*, complying with the Subpoena would impose an undue burden on Mr. Biggs. Read literally, the Subpoena requires Mr. Biggs to print out and appear for a deposition with the entire record from the UWS Litigation and all other documents merely "relating" to the UWS Litigation. The record from the UWS Litigation alone is composed of a sprawling 7,000 pages of pleadings, orders, transcripts, jury instructions, and any other materials filed with the court. Together with all of the materials exchanged between the parties—such as discovery requests and responses and communications between counsel—the total approaches, if not exceeds, 10,000 pages. In addition to printing and producing 10,000 pages of documents, the Subpoena also requires Mr. Biggs to be prepared for questioning on those materials.

*Second*, complying with the Subpoena would also impose undue burden on Mr. Makris. As Mr. Biggs's client in the UWS Litigation, Mr. Makris has an interest in protecting the sensitive and confidential information conveyed between him and Mr. Biggs. The expansive scope of the Subpoena threatens to intrude upon those interests by subjecting Mr. Biggs to lines of questioning regarding his representation of Mr. Makris.

*Last*, and relatedly, the categories of information identified in the Subpoena are patently overbroad. By requesting "[a]ll documents" merely "relating" to three unparticularized subjects, NRA plainly seeks information beyond what it reasonably requires. The overbreadth of the requests is only compounded by the fact that, as explained previously, NRA does not reasonably require anything from Mr. Biggs. Nevertheless, Mr. Biggs "should not have to do the work of tailoring [the] subpoena to what [NRA] needs; [NRA] should have done that before serving it." *Jordan*, 921 F.3d at 190.

In sum, NRA cannot articulate any need for the information sought from Mr. Biggs, nor any cognizable benefit derived from it. But the burden of compliance imposed upon Mr. Biggs and

Mr. Makris is obvious. NRA is not entitled to pursue such discovery from a third party. And there is no amount of modifying the Subpoena that will alleviate those burdens. As such, the Subpoena must be quashed.

## CONCLUSION

NRA improperly seeks to depose and collect documents from an opposing party's attorney under circumstances that fail the *Shelton* test on every level. In doing so, NRA also seeks to impose undue burden and expense upon Mr. Biggs and his client Mr. Makris. The Court should not allow NRA to succeed in its campaign of harassment. The Subpoena must be quashed. And, because NRA has entirely abandoned its obligation to "take reasonable steps to avoid imposing undue burden or expense on [the] person subject to the subpoena," the Court "must enforce this duty and impose an appropriate sanction." Fed. R. Civ. P. 45(d)(1).

> Respectfully submitted,
> Thomas Wayne Biggs II
> By counsel

_____ /s/ _____
Skyler R. Peacock, Esq. (VSB No. 87894)
Dycio & Biggs
10533 Main Street
Fairfax, Virginia 22030
(703) 383-0100
(703) 383-0101 (FAX)
speacock@dyciolaw.com

# EXHIBIT A

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 3:22-CV-1944-G |
| ACKERMAN McQUEEN, INC., MERCURY GROUP, INC., and ANTHONY MAKRIS | ) |
| *Defendant* | ) |

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:        Thomas Wayne Biggs, by service at Dycio & Biggs, 10533 Main Street, Fairfax, Virginia 22030.

*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Casamo & Associates c/o Lexitas Legal 4041 University Drive Unit 404 Fairfax, VA 22030 | Date and Time: 06/20/2023 09:00 am CST/10:00am EST |
|---|---|

The deposition will be recorded by this method:        Stenographic and video methods.

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Exhibit A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

                *CLERK OF COURT*

                                                OR

_____        _____
        *Signature of Clerk or Deputy Clerk*                                *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
The National Rifle Association of America                        , who issues or requests this subpoena, are:

Ramon Hernandez, 1717 Main Street, Suite 5900, Dallas, Texas 75201(214) 653-4000

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  3:22-CV-1944-G

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____        on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____                  _____

                                                        *Server's signature*

                                         _____

                                                        *Printed name and title*

                                         _____

                                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| | § | **Civil Action No. 3:22-CV-1944-G** |
| **Plaintiff,** | § | |
| | § | **The Honorable A. Joe Fish, presiding.** |
| **v.** | § | |
| | § | |
| **ACKERMAN McQUEEN, INC.,** | § | **FILED UNDER SEAL** |
| **MERCURY GROUP, INC., and** | § | |
| **ANTHONY MAKRIS,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| | § | |

## NOTICE OF SUBPOENA TO THOMAS WAYNE BIGGS, II

TO:     Thomas Wayne Biggs, II ("Wayne Biggs") by service at Dycio & Biggs, 10533 Main Street, Fairfax, Virginia 22030.

**PLEASE TAKE NOTICE** that pursuant to Rule 45 of the Federal Rules of Civil Procedure (**"Federal Rules"**), Plaintiff the National Rifle Association of America (the "**NRA**"), by and through their attorneys, will take the oral and videotaped deposition of Wayne Biggs (**"You"**), for the purposes of discovering matters relevant to the above-captioned litigation. You are commanded to produce at the place provided herein any and all responsive documents or tangible things as requested.

The deposition shall commence on **June 20, 2023, at 9:00 a.m. CST/10:00 a.m. EST** and will be conducted remotely via Zoom, Webex, or other videoconferencing platform. The deposition may be recorded by sound, videotape, and/or stenographic means in accordance with the Federal Rules and shall continue from day-to-day until completed. A true and correct copy of the Subpoena is attached hereto.

Dated: May 19, 2023                    Respectfully submitted,

By:    */s/ Ramon Hernandez*
           Cecelia L. Fanelli
           *Pro Hac Vice*
           clf@brewerattorneys.com
           Ramon Hernandez
           State Bar No. 24126896
           rxh@brewerattorneys.com
           1717 Main St. Suite 5900
           Dallas, Texas 75201
           Telephone: (214) 653-4000
           Facsimile: (214) 653-1015

           **ATTORNEYS FOR PLAINTIFF THE NATIONAL
           RIFLE ASSOCIATION OF AMERICA**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record in the above cause via electronic mail in accordance with the Federal Rules of Civil Procedure and the Local Rules on this 19th day of May, 2023.

/s/ Ramon Hernandez
Ramon Hernandez

## EXHIBIT A

## DEFINITIONS

1)      Unless otherwise defined, the terms used herein should be read and construed in accordance with the English language, the Federal Rules of Civil Procedure, and the ordinary meanings and definitions attached thereto.

2)      If you believe that the use of any term in any Topic is ambiguous or if you do not understand any of these Topics, definitions, or instructions, before asserting an objection related thereto, you should immediately contact the undersigned and seek a clarification.

3)      For the purpose of interpreting or construing the scope of these Topics, the defined terms shall be given their most expansive and inclusive meanings, unless specifically limited by the language of an individual Topic.

4)      The present tense shall include the past and future tenses. The singular shall include the plural, and the plural shall include the singular.

5)      "**Ackerman McQueen**" or "**AMc**" shall mean Defendant Ackerman McQueen, Inc., together with (i) any of the directors, officers, agents, employees, consultants, representatives, attorneys, and other Persons acting on behalf of Ackerman McQueen or Mercury Group, (ii) any predecessors, successors, parent corporations, subsidiaries, divisions, assigns, "d/b/a" names, and affiliates of Ackerman McQueen; and, (iii) any entities that, directly or indirectly, control, are controlled by, or are under common control with Ackerman McQueen, including by possessing, directly or indirectly, the power to direct or cause the direction of Ackerman McQueen's or Mercury Group's management and policies, whether through membership, the ownership of voting securities, by contract, or otherwise.

6) **"Action"** refers to the above-captioned and numbered action.

Page 1

7)      "**All**," "**any**," "**each**," or "**every**" mean "**all, any, each and every**." The terms "**and**" and "**or**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a Topic all documents that otherwise might be outside their scope.

8)      "**Communication**" shall mean any oral or written utterance, notation, statement and electronically stored information of any nature whatsoever, by and to whomsoever made, including, but not limited to, correspondence, conversations, dialogues, discussions, interviews, consultations, agreements, and other understandings between or among two or more persons, and transfer or exchange between two or more persons of any information, whether through an intermediary or by written, electronic, computer, or oral means, including any written summary of any of the foregoing communications.

9)      "**Concerning**" shall mean, directly or indirectly, relating to, referring, describing, discussing, supporting, evidencing, reflecting, constituting, comprising, consisting of, summarizing, explaining, alluding to, analyzing, mentioning, illustrating, memorializing, responding to, connected with, dealing with, commenting on, in respect of, about, regarding, involving or in any way pertaining to.

10)     "**Confidential Settlement Agreement**" or "**CSA**" shall mean the settlement agreement dated March 11, 2022 (the "CSA Date") which resolved, *inter alia*, a litigation previously pending before this Court captioned *NRA v. AMc, et al.* (Civil Action No. 3:19-cv-02074-G) (the "AMc Litigation").

11)     "**Custodian**" shall mean any Person or Entity that maintained, possessed, or otherwise kept or controlled the Document.

12)     "**Defendant(s)**" shall mean each and every Defendant to the above captioned action, including AMc, Mercury, and Makris.

13)    "**Document**" is used in these Topics in the broadest sense of the term and shall mean all records and other tangible media of expression of any nature, including: originals, drafts or finished versions; annotated or nonconforming or other copies, however created, produced or stored (manually, mechanically, electronically or otherwise); electronic mail ("email"), instant messages, text messages, Blackberry or other wireless device messages; voicemail; calendars, date books, appointment books, and diaries; books, papers, files, notes, temporary files, permanent files, desk files, correspondence, memoranda, reports, records, journals, summaries, registers, account statements, analyses, plans, manuals, policies, telegrams, faxes, wires, telephone logs, telephone messages, message slips; minutes, notes, records or transcriptions of conversations, Communications, or meetings; video and audio tape recordings; disks and other electronic media; microfilm, microfiche; electronic data or information stored on thumb drives, cloud storage, servers, and any other electronic platform or device ; press releases; contracts, agreements; notices and confirmations. Any non-identical version of a Document constitutes a separate Document within this definition, including without limitation drafts or copies bearing any notation, edit, comment, marginalia, underscoring, highlighting, marking, or any other alteration of any kind resulting in a difference between two or more otherwise identical Documents. Documents existing in electronic form shall include all items that may have been, including but not limited to the scope of the definition of "document" provided in the Federal Rules of Civil Procedure.

14)    "**Electronically stored information**" or "**ESI**" shall mean any information created, manipulated, communicated, stored, or best utilized in digital form or with computer technology of any type, including any electronically stored data on magnetic or optical storage media (*e.g.*, hard drives or disks, backup tapes, CD-ROMs, DVD-ROMs, JAZ and Zip drives, thumb drives, and floppy disks) as an "active" file or files (*i.e.*, readily readable by one or more computer

Page 3

applications or forensic software); any "deleted" but recoverable electronic files on said media; any electronic file fragments (*i.e.*, files that have been deleted and partially overwritten with new data); and "slack" (*i.e.*, data fragments stored randomly from random access memory on said media during the normal operation of a computer (RAM slacks) or residual data left on said media after new data has overwritten some but not all of previously stored data).

    15)    "**Identify**" or "**identity**" as applied to

        a.    *a natural Person* means and includes the provision in writing of the Person's name, title, any aliases, place of employment, telephone number, email address, mailing address, physical address, and if applicable, employment history;

        b.    *an Entity* means the provision in writing of the Entity's legal name, any d/b/a, former, or other names, any parent, subsidiary, officers, employees, or agents thereof; and any addresses and any telephone numbers thereof;

        c.    *an account with a financial institution* means the provision in writing of the institution's name, its address, the names of the account holders, the account number, the account type, the signatories on the account, and the individuals authorized to use a credit, debit, or ATM card relating to the account;

        d.    *a financial transaction* means the provision in writing of the type of transaction (e.g., donation, grant, withdrawal, deposit, or disbursement), the amount, date, payor, grantor, donor or other party disbursing the funds, the payee, grantee, done or other party receiving the funds, the reason for the transaction, and any applicable terms or restrictions;

e.   *an agreement* means to provide the terms of the agreement and any amendments; and

f.   *a Document* shall mean the provision in writing of information sufficiently particular to enable Plaintiff to request the Document's production through document requests or otherwise, including but not limited to (a) the document control number or Bates number, if applicable, (b) document type (letter, memorandum, etc.); (c) the document subject matter; (d) the document date; and (e) the document's author(s), addressee(s) and recipient(s). In lieu of identifying a document, Plaintiff will accept production of the Document, together with a designation of the Document's custodian, and identification of each You believe to have received a copy of the Document.

16)   "**Including**" shall mean "**including but not limited to**."

17)   "**Makris**" shall mean Defendant Anthony Makris.

18)   "**Media**" shall mean an object or device, real or virtualized, including but not limited to a disc, tape, computer, or other device, on which data is or was stored.

19)   "**Mercury Group**" or "**Mercury**" shall mean Defendant Mercury Group, Inc, together with (i) any of the directors, officers, agents, employees, consultants, representatives, attorneys, and other Persons acting on behalf of Mercury Group, (ii) any predecessors, successors, parent corporations, subsidiaries, divisions, assigns, "d/b/a" names, and affiliates of Mercury Group, and (iv) any entities that, directly or indirectly, control, are controlled by, or are under common control with Mercury Group, including by possessing, directly or indirectly, the power

to direct or cause the direction of Mercury Group's management and policies, whether through membership, the ownership of voting securities, by contract, or otherwise.

20)     "**Metadata**" shall mean and refers to information about electronic documents or data, and includes without limitation (i) information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, usage and/or validity of the electronic file and/or (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system.

21)     "**Montgomery**" shall mean non-party Melanie Montgomery.

22)     "**Native data format**" shall mean and refers to the format of ESI in which it was originally generated and/or normally kept by the producing party in the usual course of its business and in its regularly conducted activities.

23)     "**NRA**" shall mean the Plaintiff, the National Rifle Association of America, and includes its officers, directors, employees, principals, attorneys or other persons acting on their behalf, including all successor or predecessor entities.

24)     "**Person**" shall mean all natural persons, groups of natural persons acting in a collegial capacity (*e.g.*, a committee or counsel), corporations, partnerships, associations, trusts, joint ventures, and any other incorporated or unincorporated business, governmental, public, or legal entity, including, when applicable, the person's subsidiaries, controlled persons, controlling persons, shareholders, officers, directors, employees, agents, or other persons acting or purporting to act on its behalf.

25)     "**Refer(s) or relate(s) to**" shall mean, directly or indirectly, concerning, relating to, reflecting, referring to, having a relationship to, pertaining to, identifying, containing, pertinent to, compromising, setting forth, showing, disclosing, describing, explaining, summarizing, evidencing, or constituting, directly or indirectly, in whole or in part, or to be otherwise factually, legally, or logically connected to the subject matter of the particular Topic.

26)     "**Second Amended Complaint**" shall mean the most recent operative complaint filed by the NRA in the above captioned matter and shall be inclusive of any future operative complaint filed subsequent to these Topics.

27)     "**Show**" shall mean the hunting television series titled Under Wild Skies.

28)     "**Supplemental Expenses**" shall mean those expenses referenced to in the NRA's Second Amended Complaint, in particular, as described in Paragraph 66.

29)     "**Supplemental Invoices**" shall mean those invoices set forth in Paragraph 62 of the NRA's Second Amended Complaint.

30)     "**Relevant Time Period.**" Unless otherwise noted, the time period covered by these Topics is January 1, 2009 to the present.

31)     "**UWS**" or "**Under Wild Skies**" shall mean Under Wild Skies, Inc., together with (i) any of the directors, officers, agents, employees, consultants, representatives, attorneys, and other Persons acting on behalf of UWS, (ii) any predecessors, successors, parent corporations, subsidiaries, divisions, assigns, "d/b/a" names, and affiliates of UWS, and (iv) any entities that, directly or indirectly, control, are controlled by, or are under common control with UWS, including by possessing, directly or indirectly, the power to direct or cause the direction of UWS's management and policies, whether through membership, the ownership of voting securities, by contract, or otherwise.

32)     "**UWS Litigation**" shall mean the litigation pursued by UWS against the NRA in the Circuit Court of the County of Fairfax, Virginia, in a matter captioned *UWS v. NRA*, Case No. 2019-12530.

33)     "**William Winkler**" and "**Brandon Winkler**" shall mean non-parties William Winkler and Brandon Winkler.

34)     "**You**" and "**Your**" refers to Thomas Wayne Biggs, II, including any subsidiary, affiliate, joint venture, or other business arrangement, as well as officers, directors, employees, principals, contractors, agents, attorneys or other persons acting on their behalf, including all successor or predecessor entities.

## DOCUMENTS ON WHICH DEPOSITION TESTIMONY IS SOUGHT

1. All Documents relating to the declarations You submitted to the Court (i) in support of Anthony Makris' Motion to Dismiss and (ii) in support of the Motion for Summary Judgment filed by Ackerman and Mercury.

2. All Documents relating to the claims and defenses raised in the UWS Litigation, the documents produced in discovery conducted in the UWS Litigation, and the deposition and trial testimony presented in the UWS Litigation.

3. All Documents relating to the CSA, including but not limited to the negotiation and execution of the CSA.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon

counsel of record in the above cause via electronic mail in accordance with the Federal Rules of

Civil Procedure and the Local Rules on this 19th day of May, 2023.


*/s/ Cecelia L. Fanelli*
Cecelia L. Fanelli

# EXHIBIT B

*Executed Version*

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Confidential Settlement Agreement (the "*Agreement*") is entered into as of this 11th day of March, 2022 ("*Effective Date*") by and between the National Rifle Association of America and Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, William Winkler, and Melanie Montgomery (collectively, the "*Parties*" or individually, a "*Party*").

### DEFINITIONS

It is agreed to by the Parties that, in addition to terms defined elsewhere in this Agreement, the following terms shall have the following meanings and scope for purposes of this Agreement:

"*NRA*" means the National Rifle Association of America, and the respective rights and obligations shall be defined to include, be binding on, and benefit, any and all of its past, present and future named and unnamed parents, divisions, subsidiaries, affiliates, related companies, associates, owners, shareholders, representatives, directors, agents, partners, principals, officers, executives, employees, representatives, trustees, claims administrators, third-party administrators, sureties, insurers, reinsurers and representatives of any of them, and their attorneys and all persons acting by or on behalf of any of them, including any of their respective heirs, executors, administrators, successors, assigns, and any financing entities;

"*AMc*" means Ackerman McQueen, Inc., and the respective rights and obligations shall be defined to include, be binding on, and benefit, any and all of its past, present and future named and unnamed parents, divisions, subsidiaries, affiliates, related companies, associates, owners, shareholders, representatives, directors, agents, partners, principals, officers, executives, employees, representatives, trustees, claims administrators, third-party administrators, sureties, insurers, reinsurers and representatives of any of them, and their attorneys and all persons acting by or on behalf of any of them, including any of their respective heirs, executors, administrators, successors, assigns, and any financing entities;

"*Mercury Group*" means Mercury Group, Inc., and the respective rights and obligations shall be defined to include, shall be binding on, and benefit to, any and all of its past, present and future named and unnamed parents, divisions, subsidiaries, affiliates, related companies, associates, owners, shareholders, representatives, directors, agents, partners, principals, officers, executives, employees, representatives, trustees, claims administrators, third-party administrators, sureties, insurers, reinsurers and representatives of any of them, and their attorneys and all persons acting by or on behalf of any of them, including any of their respective heirs, executors, administrators, successors, assigns, and any financing entities;

"*Winkler*" means William Winkler individually and the respective rights and obligations shall be defined to include, shall be binding on, and of benefit to any and all of his respective heirs, executors, administrators, successors and assigns;

"*Montgomery*" means Melanie Montgomery individually and the respective rights and obligations shall be defined to include, shall be binding on, and of benefit to any and all of her respective heirs, executors, administrators, successors and assigns;

1

*Executed Version*

"***Martin***" means Henry Martin individually and the respective rights and obligations shall be defined to include, shall be binding on, and of benefit to any and all of his respective heirs, executors, administrators, successors and assigns;

"***Ackerman Parties***" collectively refers to AMc, Mercury Group, Winkler, Martin, and Montgomery;

"***NRA/AMc Litigation***" means the following lawsuits:

1.  *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No. 3:19-cv-02074-G, pending in the Northern District of Texas;

2.  *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No. CL19002067, in the Circuit Court for the City of Alexandria, Virginia;

3.  *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No. CL19001757, in the Circuit Court for the City of Alexandria, Virginia;

4.  *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No. CL19002886, in the Circuit Court for the City of Alexandria, Virginia;

"***Loesch Arbitration***" means the arbitration styled: *Dana Loesch v. Ackerman McQueen, Inc.*, JAMS Ref. No. 1335000082;

"***Loesch Settlement***" means the settlement as described in paragraph number one (1) below in this Agreement;

"***Services Agreement***" means the Services Agreement by and between the NRA, AMc, and Mercury Group, dated April 30, 2017, as amended on May 6, 2018;

"***NRA Bankruptcy***" means the matters (1) *In re Sea Girt LLC*, Docket No. 21-30080-hdh11, in the U. S. Bankruptcy Court for the Northern District of Texas; and (2) *In re National Rifle Association of America*, Docket No. 21-30085-sgj11, in the U. S. Bankruptcy Court for the Northern District of Texas;

"***Cox Arbitration***" means the arbitration styled: *Christopher Cox v. National Rifle Association*, CPR Case Number: G-21-05-S;

## RECITALS

**WHEREAS**, the Parties are currently engaged in the NRA/AMc Litigation;

**WHEREAS**, AMc is the respondent in the Loesch Arbitration;

**WHEREAS**, while denying any liability for claims asserted against them, the Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof, arising out of the services provided by the Ackerman Parties to the NRA,

2

including but not limited to disputes and controversies with respect to the Services Agreement (the "***Services***"), the NRA/AMc Litigation, and the Loesch Arbitration; and

**WHEREAS,** the Parties wish to compromise and settle all disputes and claims arising out of or related to the Services, the NRA/AMc Litigation, the Loesch Arbitration, and the facts and circumstances that form the basis of the respective parties claims in the NRA/AMc Litigation and the Loesch Arbitration.

## AGREEMENT

1.    **Loesch Settlement.** The NRA has agreed to fund a settlement of the claims held by Dana Loesch against AMc arising from the Loesch Arbitration (the "***Loesch Settlement***").

2.    **Settlement Funds.** The NRA agrees to make a payment to DORSEY & WHITNEY LLP as attorneys and on behalf of the Ackerman Parties in the total amount of Twelve Million Two Hundred Fifty Thousand Dollars ($12,250,000.00) (the "***Settlement Funds***"). The NRA agrees to wire the Settlement Funds to the following DORSEY & WHITNEY LLP designated trust account no later than March 16, 2022:

> U.S. Bank National Association
> 800 Nicollet Mall
> Minneapolis, MN 55402
> ABA Routing Number: 091000022
> Account Number: 1602-3010-8765
> Account Name: Dorsey & Whitney LLP Trust Account
> Message: Ackerman McQueen – 503967

3.    **Return of Property.** The Ackerman Parties agree to return the NRA's tangible and intangible property (the "***NRA Property***"), including but not limited to its files, books and records, whether in hard copy form, electronic form, or residing on any electronic platforms utilized by the Ackerman Parties, including originals and all copies in possession of the Ackerman Parties. This agreement applies to all NRA Property in the possession of the Ackerman Parties with respect to the NRA/AMc Litigation, the Loesch Arbitration, the NRA Bankruptcy and the Cox Arbitration. The Parties agree to cooperate and coordinate the return of the NRA Property to the NRA, and the Ackerman Parties further agree to work diligently in order to return the NRA Property once the NRA has identified same.

4.    **Mutual Releases.** In consideration of the Settlement Funds, the Loesch Settlement, the Return of Property, and the mutual promises contained in this Agreement, the NRA and the Ackerman Parties hereby fully, finally, irrevocably, and unconditionally release and forever discharge and covenant not to sue one another of and from any and all claims, allegations, duties, causes of action, lawsuits, proceedings, contracts, demands, obligations, liabilities, rights, damages, costs, fees, or expenses, equitable or declaratory relief of any kind or nature, including but not limited to any claim or cause of action for breach of contract, tort, contribution, indemnity, subrogation, bad faith, unfair claims handling practices under statute or common law, extra-contractual damages, and/or punitive damages, whether presently known or unknown, suspected or unsuspected, past, present or future which the parties had, now have or hereafter can, shall or

3

may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Release including, but not limited to claims that arise out of, relate to, or are in any way connected to the services provided by the Ackerman Parties to the NRA, including but not limited to with respect to the Services, the NRA's activities in connection with the Services, the NRA/AMc Litigation, the Loesch Arbitration, the facts and circumstances that are connected to or form the basis of the respective parties claims in the NRA/AMc Litigation and the Loesch Arbitration, or that arise out of any agreement, act, omission, occurrence, transaction, or matter up to and including the date of this Agreement. **FOR THE AVOIDANCE OF DOUBT, THIS AGREEMENT DOES NOT RELEASE THE NRA'S PENDING OR FUTURE CLAIMS AGAINST ATTORNEY MARK DYCIO.**

5.      **Dismissal of Litigation.** Within five (5) calendar days of receipt of the Settlement Funds, the Parties shall file or cause to be filed the appropriate dismissal documents in the NRA/AMc Litigation, with prejudice, dismissing the NRA/AMc Litigation and/or jointly requesting that the Court dismiss the NRA/AMc Litigation. The Parties will cooperate to ensure that the Loesch Arbitration is also dismissed with prejudice.

6.      **Confidentiality.** The Parties acknowledge and agree that this Agreement, its terms, and the negotiations leading hereto shall be deemed confidential and may not be disclosed beyond legal counsel and accountants, auditors, insurers or reinsurers, claims administrators, lenders, affiliates, parent companies, and directors, owners, officers, and/or employees of the Parties on a need-to-know basis, except as necessary for:  (a) tax or audit purposes; (b) reinsurance; (c) to enforce the terms and conditions of this Agreement; (d) any financing entities; and (e) as otherwise required by law or regulation. Any Party served with a subpoena, discovery request, or other similar legal instrument that could lead to disclosure of the terms of this Agreement shall provide reasonable notice of same to the other Parties, which have the right to move to quash said subpoena or discovery request. In furtherance of this confidentiality agreement, the Parties shall not file this document in any proceeding, even any proceeding to enforce the terms herein, without first seeking leave of Court to do so under seal or with full consent of the other Parties hereto. The Parties agree that for any claims brought pursuant to this paragraph, damages are presumed. Subject to the above, the Parties agree that the only written statement, oral statement or media statements to be issued by the Parties shall be that: **"The NRA and Ackerman McQueen have resolved their disputes. Therefore, all litigation matters between them are concluded."** No other statements shall be made by the Parties concerning the NRA/AMc litigation and/or the Loesch Arbitration.

7.      **Binding Effect.** This Agreement shall be binding upon, and inure to the benefit of and be enforceable by, the Parties and their respective heirs, agents, successors, legal representatives, and assigns.

8.      **Representations and Warranties.** The Parties hereby represent and warrant that the following statements are true, complete and correct as of the date hereof: (i) The execution, delivery and performance of this Agreement has been authorized by the Parties; (ii) the Parties have not assigned or transferred to any person, entity or party the claims which they may have against the Ackerman Parties, the NRA, or released in this Agreement and the Parties are the sole parties in interest with respect to the claims about which this Agreement and Release is being made; (iii) there have been no statements, representations, promises, undertakings or inducements made to the Parties or any other person, that has induced the Parties to enter into and/or execute

4

this Agreement; (iv) the Parties are entering and have entered into this Agreement voluntarily and entirely of their own free will accord and volition without any pressure or undue influence whatsoever by any individual including, but not limited to, their attorneys and/or the Ackerman Parties, the Ackerman Parties' Counsel, the NRA, and/or the NRA's counsel; and (v) the Parties have authority to execute this Agreement, and have read this Agreement, understand all of the terms and provisions set forth herein, and have knowingly, with a complete understanding of the terms and provisions herein, affixed their signatures to this Agreement.

9.      **No Admission of Liability.** This Agreement is intended to be, and is solely, a commercial accommodation between the Parties with respect to the services provided by the Ackerman Parties to the NRA, including but not limited to with respect to the Services, the NRA/AMc Litigation, and the Loesch Arbitration. It is specifically understood and agreed that this Agreement shall not be construed as an admission of any liability, duty, or obligation relating to the services provided by the Ackerman Parties to the NRA, including but not limited to with respect to the Services, the NRA's activities in connection with the Services, the NRA/AMc Litigation, the Loesch Arbitration, and the Loesch Settlement.

10.      **Authority.** The Parties declare and represent that they entered into this Agreement after consultation with their attorneys and intend to be legally bound hereby, and the person who signs this Agreement on behalf of a Party is duly authorized to bind that respective Party.

11.      **Execution of this Agreement.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, all of which shall be considered and constitute one and the same instrument. Signatures by facsimile or electronic imaging shall be deemed to constitute original signatures.

12.      **Covenant Not to Sue.** The Parties hereby irrevocably covenant to refrain from asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding, claims, legal action or lawsuit of any kind against any person released hereby, based upon any matter released hereby. Without in any way limiting any of the rights and remedies otherwise available to any person released hereby, each releasing person, jointly and severally, shall indemnify and hold harmless each person released hereby from and against all loss, liability, claim, damage (including incidental and consequential damages) or expense (including costs of investigation and defense and reasonable attorney's fees), claims, arising directly from or in connection with the assertion by or on behalf of such releasing party of any claim or other matter purported to be released hereby asserted by any of the Parties against the other. This indemnification provision is and shall be construed as a prevailing party clause which shall entitle the released party in any litigation commenced against it by a releasing party to an award of any and all costs of litigation including but not limited to reasonable attorneys' fees.

12.      **AMc's Liability with Respect to Taxes.** Any taxes, or interest or penalties on taxes, on any portion of the Settlement Funds shall be the sole and complete responsibility of the Ackerman Parties, and the Ackerman Parties shall have no claim, right, or cause of action against the NRA or its Counsel on account of such taxes, interest, or penalties.

13.      **Disposition of Protected Material.** The Parties acknowledge their obligations to comply with the Protective Orders issued in the NRA/AMc Litigations, including but not limited

5

to (a) the Protective Order dated October 8, 2019 issued in *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No. CL19002067, in the Circuit Court for the City of Alexandria, Virginia and (b) the Protective Order dated June 22, 2020 issued in issued in *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No. 3:19-cv-02074-G, pending in the Northern District of Texas.

No later than two (2) calendar days after the payment of the Settlement Funds, the Ackerman Parties and DORSEY & WHITNEY LLP shall each certify in writing that they are in compliance with the provisions in the Protective Order issued in the NRA Bankruptcy (*see* NRA Bankruptcy Docket No. 386, ¶ 14).

No later than two (2) calendar days after the payment of the Settlement Funds, the Ackerman Parties and DORSEY & WHITNEY LLP shall each certify in writing that they have returned to the NRA all information in their possession concerning the Cox Arbitration and destroyed all copies in their possession.

14. **Miscellaneous**.

a. This Agreement contains the entire understanding and agreement of the Parties hereto with respect to the settlement of this Action and any and all claims, actions, causes of action or disputes between them, and all prior negotiations, discussions, understandings and agreements among the Parties with respect to this action and the subject matter hereof. No change, waiver, amendment, supplement or modification of this Agreement shall be valid unless the same shall be in writing and signed by all of the Parties hereto.

b. This Agreement may be executed in one or more counterparts, all of which taken together shall be deemed one original. A facsimile or electronically mailed copy of this Agreement may be used in lieu of the original.

c. It is expressly agreed and understood that the language of this Agreement shall not be presumptively construed against any of the Parties hereto.

d. If a court holds any provision of this Agreement or its application to any person, entity or circumstance invalid, illegal or unenforceable, the remainder of this Agreement, or the application of such provision to persons, entities or circumstances other than those to which it was held to be invalid, illegal or unenforceable, shall not be affected, and shall be valid, legal and enforceable to the fullest extent permitted by law, but only if and to the extent such enforcement would not materially and adversely frustrate the Parties' essential objectives as expressed in this Agreement. Furthermore, in lieu of any such invalid or unenforceable term or provision, the Parties intend that the court add to this Agreement a provision as similar in terms to such invalid, illegal or unenforceable provision as may be valid and enforceable, so as to affect the original intent of the Parties to the greatest extent possible.

e. This Agreement shall be construed in accordance with and governed by laws of the State of Texas applicable to agreements made and performed wholly in that State and venue. In connection with any dispute which may arise under this Agreement, the Parties hereto hereby irrevocably submit to, consent to, and waive any objection to, the exclusive jurisdiction of the

*Executed Version*

courts of the United States District Court for the Northern District of Texas, and waive any objection to the laying of venue in such court.

      f.    In the event that any Party hereto shall bring an action seeking damages for a breach of, or enforcement of, this Agreement, or any provision hereof, against any other Party hereto, any Party to such action ultimately prevailing as to the substantive issues raised in such action shall be entitled, in addition to any other remedies to which it may be entitled, to recover from all of the Parties to such action not so prevailing as to the substantive issues raised in such action, all fees and expenses of counsel retained by the prevailing Party in connection with such action.

      g.    The fact that the first or any subsequent draft of this Agreement was prepared by counsel for one of the Parties hereto shall create no presumptions, and specifically shall not cause any ambiguities that may exist in this Agreement to be construed against such Party.

      h.    The undersigned represent and warrant that they will execute and deliver any and all other instruments or documents that any of the undersigned may request that are necessary or proper in order to give effect to the terms and provisions of this Agreement and that the provisions of such instruments or documents shall in all respects be consistent with the terms of this Agreement. The undersigned agree to cooperate in good faith in connection with implementing the terms of this Agreement. If consent of any of the undersigned is required hereunder, it is agreed that such consent shall not be unreasonably withheld, conditioned or delayed.

      i.    Failure to enforce any provision of this Agreement shall not constitute a waiver of any term hereof. The waiver of any provision of this Agreement may only be affected by a writing signed by the Party against whom the waiver is sought to be enforced. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly so provided.

      16.    **Notices**. Any notice permitted or required to be given hereunder shall be sent by e-mail and certified mail to the Parties and their Counsel as provided below, or as may be changed from time to time by written notice as provided herein.

If to the NRA:
      Cecelia L. Fanelli, Esq.
      Brewer, Attorneys & Counselors
      750 Lexington Avenue, 14th Floor
      New York, NY 10022
      Tel: (212) 489-1400
      clf@brewerattorneys.com

      with a copy to
      Philip J. Furia, Esq.
      pjf@brewerattorneys.com

If to the Ackerman Parties:
      Brian E. Mason
      DORSEY & WHITNEY LLP

7

*Executed Version*

300 Crescent Ct, Suite 400
Dallas, TX 75201
Tel: (214) 981-9929
mason.brian@dorsey.com

**[SIGNATURES ON THE FOLLOWING PAGES]**

8

*Executed Version*

**THE PARTIES HAVE READ THE FOREGOING CONFIDENTIAL SETTLEMENT
AGREEMENT CAREFULLY AND FULLY UNDERSTAND IT.**

**National Rifle Association of America**

By: _____

Printed Name: John Frazer, Esq.

Position/Title: Secretary; General Counsel

Date: March 14, 2022

**Counsel for NRA**

By: _____

Printed Name: Cecelia L. Fanelli, Esq.

Position/Title: Partner
              Brewer Attorneys & Counselors

Date: March 14, 2022

**Ackerman McQueen, Inc.**

By: _____

Printed Name: William Winkler, CFO

Date: March 11, 2022

APPX0013

*Executed Version*

**Mercury Group, Inc.**

By: _____

Printed Name: William Winkler

Position/Title: Chief Financial Officer

Date: March 11, 2022

**William Winkler**

By: _____

Printed Name: William Winkler

Date: March 11, 2022

**Melanie Montgomery**

By: _____

Printed Name: Melanie Montgomery

Date: March 11, 2022

**Henry Martin**

By: _____

Printed Name: Henry Martin

Date: March 11, 2022

**Counsel for the Ackerman Parties**

By: _____

Printed Name: Brian Mason, Esq.

Date: March 11, 2022

10

**Mercury Group, Inc.**

By:_____

Printed Name: <u>William Winkler</u>

Position/Title: <u>Chief Financial Officer</u>

Date: <u>March 11, 2022</u>

**William Winkler**

By:_____

Printed Name: <u>William Winkler</u>

Date: <u>March 11, 2022</u>

**Melanie Montgomery**

By: *Melanie Montgomery*

Printed Name: <u>Melanie Montgomery</u>

Date: <u>March 11, 2022</u>

**Henry Martin**

By:_____

Printed Name: <u>Henry Martin</u>

Date: <u>March 11, 2022</u>

**Counsel for the Ackerman Parties**

By:_____

Printed Name: <u>Brian Mason, Esq.</u>

Date: <u>March 11, 2022</u>

APPX0015

*Executed Version*

**Mercury Group, Inc.**

By:_____

Printed Name: William Winkler

Position/Title: Chief Financial Officer

Date: March 11, 2022

**William Winkler**

By:_____

Printed Name: William Winkler

Date: March 11, 2022

**Melanie Montgomery**

By:_____

Printed Name: Melanie Montgomery

Date: March 11, 2022

**Henry Martin**

By:_____

Printed Name: Henry Martin

Date: March 11, 2022

**Counsel for the Ackerman Parties**

By:_____

Printed Name: Brian Mason, Esq.

Date: March 11, 2022

10

APPX0016

# EXHIBIT C

FILED

NOV 0 8 2019

JOHN T. FREY
Clerk of the Circuit Court
of Fairfax County, VA

**VIRGINIA:**

NOV 08 2019

**IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX**

| | |
|---|---|
| UNDER WILD SKIES, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 19-12530 |
| | ) |
| NATIONAL RIFLE ASSOCIATION | ) |
| OF AMERICA | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## AMENDED COMPLAINT

COMES NOW YOUR PLAINTIFF, Under Wild Skies, Inc. ("Plaintiff" or "UWS") by counsel, and for its Amended Complaint against the National Rifle Association of America ("Defendant" or "NRA") hereby states as follows:

## PARTIES

1.      Under Wild Skies, Inc. ("UWS") is a Virginia corporation with its principal place of business located at 52 Wolfe Street, Alexandria, Virginia.

2.      National Rifle Association of America ("NRA") is a foreign corporation authorized to transact business in the Commonwealth of Virginia with its principal office located at 11250 Waples Mill Road, Fairfax, Virginia.

## JURISDICTION AND VENUE

3.      Venue is permissible in this county pursuant to Virginia Code § 8.01-262.

## FACTS

1

4.      UWS is a television program that is hosted by Anthony Makris, a world renowned game hunter. The program has been televised continuously for the past twenty-six (26) years.

5.      The program is contractually bound to air, and will continue to air through calendar year 2025 making it one of the longest running television shows in history. UWS has contractual obligations with Winnercomm, Inc. regarding the production of the television program. At all times relevant hereto, the NRA was aware of UWS' contractual obligations with Winnercomm. At all times relevant hereto, the NRA was aware that a breach by the NRA of any agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm.

6.      Winnercomm Inc. is a television and web production, development and marketing company owned by the Outdoor Channel Holdings Inc.

7.      The program has aired on multiple television channels including ESPN, NBC Sports, NRA TV and, most recently, the Outdoor Channel.

8.      Anthony Makris is an executive with public relations firm, Ackerman McQueen, who was recently sued by the NRA in the Circuit Court for the City of Alexandria, Virginia.

9.      Anthony Makris is also the principal of the Mercury Group, a subsidiary of Ackerman McQueen, which was also recently sued by the NRA in the Circuit Court for the City of Alexandria, Virginia.

10. Prior to the lawsuits filed by the NRA against both Mercury Group and Ackerman McQueen, the NRA made each and every payment due under the Agreements to UWS in full and in a timely manner.

11.     Subsequent to the lawsuits being filed by the NRA against both Mercury Group and Ackerman McQueen, the NRA made but one payment to UWS.

2

48

12.     As a result of the aforesaid lawsuits, Ackerman McQueen severed its thirty-eight (38) year continuous relationship as the NRA's chief marketing, branding, and crisis management company. Ackerman McQueen filed a counter suit against the NRA for the sum of one hundred million dollars ($100,000,000.00)

13.     On or about January 1, 2016, UWS and NRA entered into a written Advertising Agreement ("Advertising Agreement") whereby the NRA contracted to pay a certain sum of money to UWS and in return, the NRA receives two minutes of advertising time per episode run. Exhibit A.

14.     Contemporaneous to the execution of the Advertising Agreement, on or about January 1, 2016, UWS and NRA entered into a written Sponsorship Agreement ("Sponsorship Agreement") whereby the NRA contracted to pay a certain sum of money to UWS and in return, the NRA receives two (2) billboards, one (1) in show feature, and one (1) in show bumper per episode. Exhibit B.

15.     This advertising ran in both original episodes and reruns of the program.

16.     Similarly, the NRA received two (2) billboards, one (1) in show feature, and one (1) in show bumper per original episodes and reruns of the program.

17.     The Advertising Agreement was executed by Anthony Makris on behalf of UWS and Wayne LaPierre, the Executive Vice President and Chief Executive Officer of the NRA.

18.     The Sponsorship Agreement was executed by Anthony Makris on behalf of UWS and Wayne LaPierre, the Executive Vice President and Chief Executive Officer of the NRA.

19.     The Sponsorship Agreement provides a sponsorship fee schedule whereby UWS receives from the NRA a specified sum of money on or before the following dates each calendar year through the contract term: March 1, May 1, July 1, and September 1.

3

49

20.     The Sponsorship Agreement contemplates episodes running through 2025 and contractually obligates the NRA for payments through that period. At all times relevant hereto, the NRA was aware that a breach by the NRA of the Sponsorship Agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm.

21.     The Advertising Agreement provides a sponsorship fee schedule whereby UWS receives from the NRA a specified sum of money on or before the following dates each calendar year through the contract term: March 1, May 1, July 1, and September 1. At all times relevant hereto, NRA was aware that a breach by the NRA of the Advertising Agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm.

22.     The Advertising Agreement contemplates episodes running through 2025 and contractually obligates the NRA for payments through that period.

23.     UWS has served to promote NRA principles and leadership, and has assisted, if not facilitated, Wayne LaPierre's introduction and inclusion in the world of hunting and hunters.

24.     Prominent NRA figures such as Wayne LaPierrre, Chris Cox, Kayne Robinson, Sandy Froman, Ron Schmeits, Pete Brownell, and Susan LaPierre have all appeared on the show in multiple hunts, episodes and seasons promoting the NRA to the viewing public.

25.     This collective group of prominent NRA figures has participated in televised hunts in the United States, Botswana, Tanzania, South Africa, Zimbabwe, Mozambique, Argentina, and Uruguay, amongst others.

26.     The impact of UWS was so evident to the NRA and its officers, that on or about January 24, 2018, the parties to the both the Advertising and Sponsorship Agreements ratified the respective contracts with additional acknowledgement and affirmation by the NRA.

4

27.     On or about January 24, 2018 the Advertising Agreement was ratified by, attested to, and executed by Pete Brownell, who was the President of the NRA at the time of his execution and attestation, and Carolyn Meadows, who was the 2nd Vice President of the NRA at the time of her execution and attestation. Exhibit A.

28.     On or about January 24, 2018 the Sponsorship Agreement was ratified by, attested to, and executed by Pete Brownell, who was the President of the NRA at the time of his execution and attestation and Carolyn Meadows, who was the 2nd Vice President of the NRA at the time of her execution and attestation. Exhibit B.

29.     Ms. Meadows is the current President of the NRA.

30.     At the time of the January 24, 2018, ratifications of the Sponsorship Agreement and Advertising Agreement, NRA remained aware of UWS' contractual obligations with Winnercomm. The NRA remained aware and the parties specifically contemplated that a breach by the NRA of any agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm.

31.     The appearances on UWS by Wayne LaPierre, Chris Cox, Kayne Robinson, Sandy Froman, Ron Schmeits and Pete Brownell, amongst others was of great value to the NRA as these individuals had little national presence in the hunting community prior to said appearances despite the fact that hunters make up a large segment of the NRA membership.

32.     Additionally Wayne LaPierre, Susan LaPierre, and Chris Cox, amongst others, have used their respective UWS experiences to seek membership(s) into elite hunting organizations. To that end, there can be no question that large donations from those elite hunting groups flowed to the benefit of the NRA.

5

33.     Indeed almost all of the NRA high donors are hunters and watch UWS, which gives

the NRA brand awareness, credibility, and legitimacy in the hunting and sportsman community.

34.     It is of some relevance that UWS paid for the safaris and hunts of these NRA

officers, spouses, and board members, namely Wayne LaPierrre, Chris Cox, Kayne Robinson,

Sandy Froman, Ron Schmeits, Pete Brownell, and Susan LaPierre.

35.     Pursuant to the NRA bylaws, specifically Article V, Section 5, a Board Member

cannot receive any salary or "private benefit" without approval of the Board or a Committee of the

Board.

36.     Specifically, section 5(a) of the Bylaws states:

> (a) No Director or member of the Executive Council shall receive any
> salary or other private benefit unless specifically authorized by resolution
> of the Board of Directors or an authorized committee thereof, but all such
> persons shall be entitled to reimbursement for expenses incurred on behalf
> of the Association, to such extent as may be authorized or approved by the
> Board of Directors.

37.     Given that UWS incurred the expense of these hunts and safaris and that the NRA

permitted their inclusion it stands to reason that the NRA benefitted greatly from UWS.

38.     It further stands to reason that these trips were neither a private benefit nor were

they specifically authorized by resolution of the Board of Directors, or an authorized committee

thereof, as they benefitted the organization itself and were sanctioned by their very inclusion.

39.     The Agreements between UWS and the NRA simply require production of thirteen

episodes each calendar year as identified in the Agreements.

40.     The Agreements further specify that each episode of the program be thirty minutes

in length and that thirteen of the twenty-six weeks be original programs.

41.     All twenty-six weeks receive one additional showing for a total of sixty-eight

showings during the term of the Agreements and renewals.

6

52

42.     Given that Mr. Makris is only in safari year 2019, as defined by the Agreements, there is no question he has met and maintained his current contractual obligations.

43.     It bears note that over the course of the twenty-six year contractual relationship between the parties, the filming of many UWS episodes were delayed and scheduled trips canceled or postponed as a result of Mr. LaPierre's insistence that Mr. Makris remain available to address pressing NRA issues. The longevity of the twenty-six year contractual relationship between the parties is bested only by the forty year relationship between LaPierre and Makris.

44.     Between 2016 and July 1, 2019, every payment owed to UWS by the NRA under each of the Agreements was paid on-time. The NRA has, through its course of dealing and payments, ratified both Agreements.

45.     In fact, over the course of the twenty-six years in which the parties contracted, the NRA honored all previous Advertising and Sponsorship Agreements and paid them in a timely and consistent manner. The NRA has, through its course of dealing and payments over twenty-six years ratified all Agreements.

46.     As of September 11, 2019, UWS has not received its payment of $250,000 for September 1, 2019 due it by the NRA under the Sponsorship Agreement. At all times relevant hereto, the NRA was aware that a breach by the NRA of the Sponsorship Agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm.

47.     As of September 11, 2019, UWS has not received its payment of $300,000 for September 1, 2019 due it by the NRA under the Advertising Agreement. At all times relevant hereto, the NRA was aware that a breach by the NRA of the Advertising Agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm.

7

48.     Prior to its breach of the agreements, on or about July 31, 2019 the NRA forwarded Mr. Makris (on behalf of UWS) a letter demanding specific and excessive information about the show, its platform metrics, viewership information, and other information not covered by the contracts between the parties and said information has never been requested in twenty-six years. Exhibit C. The information requested is not only not contained within the broadest parameters of the contract but had no bearing on the present status of the present contract.

49.     Despite the show having aired for twenty-six years, and despite the NRA having no contractual right to request the information, the NRA presented UWS with a task it neither required over the previous twenty-six years nor that it could expect UWS to comply with in good faith.

50.     It is clear to the most basic eye that the NRA is seeking to claim that absent compliance by UWS, UWS would be in breach of the Agreement.

51.     It is clear to the most basic eye that the NRA is seeking to claim that absent compliance by UWS, UWS would be in breach of the Agreement as a result of Mr. Makris' relationship with Ackerman McQueen.

52.     Specifically, and deserving of scrutiny, is the NRA's request that Mr. Makris provide a copy of his contract with Ackerman McQueen (or any of its subsidiaries or alter-egos) for the appearance of UWS on NRATV.

53.     The NRA was well aware that no such contract existed as Wayne LaPierre and NRA leadership were aware that the airing of UWS on NRATV was provided free of charge by Mr. Makris to the NRA in gratitude for twenty-six years of partnership.

54.     The NRA is retaliating and acting in bad faith by failing to honor its contractual obligations to UWS by withholding the contract payments due to UWS, and by purposely preventing the shows production as retaliation for those lawsuits filed by Ackerman McQueen

8

54

against the NRA. At all times relevant hereto, the NRA was aware that a breach by the NRA of the Advertising Agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm.

55.    UWS is not a subsidiary of Ackerman McQueen and is not under its control or direction.

56.    The NRA's action are in pure malice against Anthony Makris.

57.    The NRA's actions are fueled by malice, wantonness, and oppression. The NRA's actions constitute an independent, willful tort in which exemplary damages may be recovered.

58.    The NRA has after twenty-six years no legal basis to deny payment under both agreements.

**COUNT I**
(Breach of Advertising Contract)

59.    The allegations in paragraphs one through fifty-eight are incorporated herein by reference as though fully set forth.

60.    UWS entered into a mutually beneficial Agreement with the NRA whereby the NRA paid UWS in exchange for a commercial advertising presence on UWS episodes.

61.    UWS has fully performed all obligations under the Advertising Agreement; namely, providing the NRA with commercial air time on each of its episodes. Additionally, the NRA is listed as a primary sponsor on UWS show credits.

62.    NRA has, without justification, and in breach of its contractual obligations, ceased payments to UWS. At all times relevant hereto, the NRA was aware that a breach by the NRA of the Advertising Agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm.

9

63.     The breach by the NRA has damaged UWS in the amount of Three Hundred Thousand Dollars ($300,000.00) plus damages incurred or to be incurred from any breach of the agreements with Winnercomm.

## COUNT II
(Breach of Sponsorship Contract)

64.     The allegations in paragraphs one through fifty-eight are incorporated herein by reference as though fully set forth.

65.     UWS entered into a mutually beneficial Agreement with the NRA whereby the NRA paid UWS in exchange for a sponsorship presence on UWS episodes.

66.     UWS has fully performed all obligations under the Sponsorship Agreement; namely, providing the NRA with commercial air time on each of its episodes. Additionally, the NRA is listed as a primary sponsor on UWS show credits.

67.     NRA has, without justification, and in breach of its contractual obligations, ceased payments to UWS, thus breaching the contract. At all times relevant hereto, the NRA was aware that a breach by the NRA of the Sponsorship Agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm.

68.     The breach by the NRA has damaged UWS in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) plus damages incurred or to be incurred from any breach of the agreements with Winnercomm.

## COUNT III
(Advertising Agreement - Anticipatory Breach)

69.     The allegations in paragraphs one through fifty-eight are incorporated herein by reference as though fully set forth.

10

56

70.     UWS entered into a mutually beneficial Agreement with the NRA whereby the NRA paid UWS in exchange for commercial ad time.

71.     UWS has fully performed all obligations under the Agreement; namely, providing the NRA with commercial air time on each of its episodes.   UWS stands ready and willing to perform its obligations in the future.

72     NRA has, without justification, ceased payments to UWS, thus breaching the Advertising Agreement. At all times relevant hereto, the NRA was aware that a breach by the NRA of the Advertising Agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm. As such, it was contemplated that damages for a breach of the Advertising Agreement would include damages flowing from any breach by UWS of its agreements with Winnercomm.

73.     The NRA is currently in dire financial straits and is struggling to stay financially afloat. Exhibits D and E.

74.     Given the NRA's current financial situation and its blatant failure to make the September 2019 payment, UWS has a good-faith, reasonable belief that the NRA will continue to fail to make regular payments.

75.     Indeed, the NRA's actions and words evince a clear indication that it will continue to refuse performance in the future. The NRA has not made its September 1, 2019, payment under the Advertising Agreement after a 26 year history of timely and consistent payments to UWS arising from the television show. The NRA issued the July 31, 2019 letter (Exhibit C) seeking unprecedented and burdensome information with the clear implication that the failure to provide such information would be considered a breach of the Advertising Agreement or an excuse for nonperformance by the NRA. The July 31, 2019, letter is clear subterfuge designed to conceal the

11

NRA's intention not to fulfill its future obligations under the Advertising Agreement. Indeed, the NRA did not make the next payment. Further, the NRA has failed and refused to respond directly to correspondence which asserted that the July 31, 2019, letter was being interpreted as an anticipatory breach, and, despite such interpretation, the NRA has failed and refused to provide any assurances of performance. The NRA has, thus, abandoned the Advertising Agreement and clearly has no intention of performing.

76. The anticipated breach by the NRA will damage UWS in the Advertising Agreement in the amount of Nine Million Two Hundred and Twenty-Five Thousand Dollars ($9,225,000) plus damages incurred or to be incurred from any breach of the agreements with Winnercomm.

**COUNT IV**
(Sponsorship Agreement - Anticipatory Breach)

77. The allegations in paragraphs one through fifty-eight are incorporated herein by reference as though fully set forth.

78. UWS entered into a mutually beneficial Agreement with the NRA whereby the NRA paid UWS in exchange for sponsorship time.

79. UWS has fully performed all obligations under the Agreement; namely, providing the NRA with commercial air time on each of its episodes. UWS stands ready and willing to perform its obligations in the future.

80. NRA has, without justification, ceased payments to UWS, thus breaching the Sponsorship Agreement. At all times relevant hereto, NRA was aware that a breach by the NRA of the Sponsorship Agreement with UWS would result in UWS' subsequent default of obligations to Winnercomm. As such, it was contemplated that damages for a breach of the Sponsorship

12

Agreement would include damages flowing from any breach by UWS of its agreements with Winnercomm.

81.     The NRA is currently in dire financial straits and is struggling to stay financially afloat. Exhibits D and E.

82.     Given the NRA's current financial situation and its blatant failure to make the September 2019 payment, UWS has a good-faith, reasonable belief that the NRA will continue to fail to make regular payments.

83.     Indeed, the NRA's actions and words evince a clear indication that it will continue to refuse performance in the future. The NRA has not made its September 1, 2019, payment under the Sponsorship Agreement after a 26 year history of timely and consistent payments to UWS arising from the television show. The NRA issued the July 31, 2019 letter (Exhibit C) seeking unprecedented and burdensome information with the clear implication that the failure to provide such information would be considered a breach of the Sponsorship Agreement or an excuse for nonperformance by the NRA. The July 31, 2019, letter is clear subterfuge designed to conceal the NRA's intention not to fulfill its future obligations under the Sponsorship Agreement. Indeed, the NRA did not make the next payment. Further, the NRA has failed and refused to respond directly to correspondence which asserted that the July 31, 2019 letter was being interpreted as an anticipatory breach, and, despite such interpretation, the NRA has failed and refused to provide any assurances of performance. The NRA has, thus, abandoned the Sponsorship Agreement and clearly has no intention of performing.

84.     The anticipated breach by the NRA will damage UWS in the Sponsorship Agreement amount of Seven Million Eight Hundred and Seventy-Five Thousand Dollars

13

($7,875,000) plus damages incurred or to be incurred from any breach of the agreements with

Winnercomm.

      WHEREFORE, Plaintiff, Under Wild Skies, requests judgment against Defendant

National Rifle Association of America in the amount of Seventeen Million One Hundred

Thousand Dollars ($17,100,000.00) plus pre-judgment and post-judgment interest and costs.

                                          Respectfully submitted,
                                          Under Wild Skies, Inc.
                                          By counsel

DYCIO & BIGGS
Mark R. Dycio, Esq. VSB 32741
T. Wayne Biggs, Esq. VSB 41281
Danielle A. Quinn, Esq. VSB 89502
10533 Main Street
Fairfax, Virginia 22032
T: (703) 383-0100
F: (703) 383-0101
Counsel for Plaintiffs

14

60

# EXHIBIT D

**VIRGINIA:**

FILED
COURT SERVICES
2019 DEC 12 ▷ 3:46

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

**IN THE CIRCUIT COURT OF THE COUNTY OF FAIRFAX**

**UNDER WILD SKIES, INC.,**

    **Plaintiff,**

v.

**Case No. 2019 - 12530**

**NATIONAL RIFLE ASSOCIATION
OF AMERICA.**

    **Defendant.**

### DEFENDANT'S DEMURRER, ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT

Defendant the National Rifle Association of America (the "NRA"), by counsel, hereby submits the following Demurrer, Answer, Affirmative Defenses, and Counterclaims to the Amended Complaint filed by Plaintiff Under Wild Skies, Inc. ("UWS").

### DEMURRER

1. Counts I and II of the Amended Complaint fail to state a claim for Breach of Contract because the NRA is not a party to any contract between UWS and Winnercomm, Inc. and is not liable for any breach by UWS of a contract to which the NRA is not a party.

2. Count III of the Amended Complaint fails to state a claim for Anticipatory Repudiation of the Advertising Agreement, because: (i) to the extent that Count III alleges a claim for promissory estoppel, such a claim does not exist in Virginia, *see W.J. Schafer Assocs. v. Cordant, Inc.*, 254 Va. 514, 521, 493 S.E.2d 514 (1997); (ii) anticipatory repudiation is not applicable to contracts for installment payments in exchange for continuing services, *see Fairfax Fall Church Community Services Bd. v. Herren*, 230 Va. 390, 395, 337 S.E.2d 741

63

(1985); *Henderson v. Martin & Meyer Investments, Inc.*, 20 Cir. L12811, 1992 WL 884691, at *1 (Loudoun Co. Cir. Ct. 1992); (iii) the NRA is not a party to any contract between UWS and Winnercomm, Inc. and is not liable for any breach by UWS of a contract to which the NRA is not a party.

3. Count IV of the Amended Complaint fails to state a claim for Anticipatory Repudiation of the Sponsorship Agreement, because: (i) to the extent that Count III alleges a claim for promissory estoppel, such a claim does not exist in Virginia, *see W.J. Schafer Assocs.*, 254 Va. at 521; (ii) anticipatory repudiation is not applicable to contracts for installment payments in exchange for continuing services, *see Fairfax Fall Church Community Services Bd.*, 230 Va. at 395; *Henderson*, 1992 WL 884691, at *1; (iii) the NRA is not a party to any contract between UWS and Winnercomm, Inc. and is not liable for any breach by UWS of a contract to which the NRA is not a party.

## ANSWER

In response to the specific, numbered paragraphs of UWS's Amended Complaint, the NRA responds as follows:

### Parties

1. The NRA admits the allegations in Paragraph 1.

2. The NRA admits the allegations in Paragraph 2.

### Jurisdiction and Venue

3. Paragraph 3 contains conclusions of law to which no response is required.

### Facts

4. The NRA admits that UWS is a television program that is hosted by Anthony Makris ("Makris"). The NRA lacks sufficient information to admit or deny the remaining

2

allegations in Paragraph 4. To the extent a response is required, the NRA denies any and all remaining allegations in Paragraph 4.

5. The NRA denies the allegations in Paragraph 5.

6. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 6. To the extent a response is required, the NRA denies the allegations in Paragraph 6.

7. The NRA admits the allegations in Paragraph 7.

8. The NRA denies the allegations in Paragraph 8.

9. The NRA lacks sufficient knowledge to admit or deny that Makris is the principal of the Mercury Group. The NRA denies the remaining allegations in Paragraph 9.

10. The NRA admits the allegations in Paragraph 10.

11. The NRA denies the allegations in Paragraph 11.

12. The NRA admits that Ackerman McQueen has filed counterclaims in the lawsuits against the NRA in a sum exceeding one hundred million dollars. The NRA denies the remaining allegations in Paragraph 12.

13. Paragraph 13 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, some of the allegations contained in this paragraph assert legal arguments and conclusions to which no response is required. To the extent a response is required the NRA denies the allegations of Paragraph 13.

14. Paragraph 14 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, some of the allegations contained in this paragraph assert legal arguments and conclusions to which no response is required. To the extent a response is required the NRA denies the allegations of Paragraph 14.

3

65

15.     The NRA lacks sufficient information to admit or deny the allegations in Paragraph 15. To the extent a response is required, the NRA denies the allegations in Paragraph 15.

16.     The NRA lacks sufficient information to admit or deny the allegations in Paragraph 16. To the extent a response is required, the NRA denies the allegations in Paragraph 16.

17.     Paragraph 17 refers to a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required the NRA admits the allegations of Paragraph 17.

18.     Paragraph 18 refers to a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required the NRA admits the allegations of Paragraph 18.

19.     Paragraph 19 refers to a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required the NRA admits the allegations of Paragraph 19.

20.     The NRA denies the allegations in Paragraph 20.

21.     Paragraph 21 contains legal conclusions to which no response is required. To the extent a response is required the NRA denies the allegations of Paragraph 21.

22.     The NRA denies the allegations in Paragraph 22.

23.     The NRA denies the allegations in Paragraph 23.

24.     The NRA lacks sufficient information to admit or deny whether all of the individuals listed in Paragraph 24 appear on UWS. However, the NRA admits that at least some of the individuals listed in Paragraph 24 have appeared on UWS in an effort to promote the NRA to the viewing public. Any and all remaining allegations in Paragraph 24 not explicitly admitted herein are denied.

4

25.     The NRA lacks sufficient information to admit or deny the allegations in Paragraph 25. To the extent a response is required, the NRA denies the allegations in Paragraph 25.

26.     The NRA denies the allegations in Paragraph 26.

27.     Paragraph 27 refers to a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required the NRA denies the allegations of Paragraph 27.

28.     Paragraph 28 refers to a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required the NRA denies the allegations of Paragraph 28.

29.     The NRA admits the allegations in Paragraph 29.

30.     Paragraph 30 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, Paragraph 30 contains legal arguments and conclusions to which no response is required. To the extent a response is required, the NRA denies the allegations in Paragraph 30.

31.     The NRA denies the allegations in Paragraph 31.

32.     The NRA denies the allegations in Paragraph 32.

33.     The NRA denies the allegations in Paragraph 33.

34.     The NRA denies the allegations in Paragraph 34.

35.     Paragraph 35 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, Paragraph 35 contains legal arguments and conclusions to which no response is required. To the extent a response is required, the NRA denies the allegations in Paragraph 35.

5

67

36.     Paragraph 36 purports to quote from a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required, the NRA denies the allegations in Paragraph 36.

37.     The NRA denies the allegations in Paragraph 37.

38.     The NRA denies the allegations in Paragraph 38.

39.     The NRA denies the allegations in Paragraph 39.

40.     Paragraph 40 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, Paragraph 40 contains legal arguments and conclusions to which no response is required. To the extent a response is required, the NRA denies the allegations in Paragraph 40.

41.     Paragraph 41 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, Paragraph 41 contains legal arguments and conclusions to which no response is required. To the extent a response is required, the NRA denies the allegations in Paragraph 41.

42.     The NRA denies the allegations in Paragraph 42.

43.     The NRA denies the allegations in Paragraph 43.

44.     The NRA admits that between 2016 and July 1, 2019, every payment owed to UWS by the NRA under each of the Agreements was paid on-time and consistently. The NRA denies the remaining allegations in Paragraph 44.

45.     The NRA admits that the NRA complied with the Advertising and Sponsorship Agreements at all relevant times. The NRA denies the remaining allegations in Paragraph 45.

46.     The NRA denies the allegations in Paragraph 46.

47.     The NRA denies the allegations in Paragraph 47.

6

48.    Paragraph 48 contains legal conclusions to which no response is required. To the extent a response is required, the NRA denies the allegations in Paragraph 48.

49.    Paragraph 49 contains legal conclusions to which no response is required. To the extent that a response is required, the NRA denies the allegations in Paragraph 49.

50.    The NRA denies the allegations in Paragraph 50.

51.    The NRA denies the allegations in Paragraph 51.

52.    The NRA denies the allegations in Paragraph 52.

53.    The NRA denies the allegations in Paragraph 53.

54.    The NRA denies the allegations in Paragraph 54.

55.    Paragraph 55 contains legal conclusions to which no response is required. To the extent that a response is required, the NRA denies the allegations in Paragraph 55.

56.    The NRA denies the allegations in Paragraph 56.

57.    The NRA denies the allegations in Paragraph 57.

58.    The NRA denies the allegations in Paragraph 58.

## COUNT I

### (Breach of Advertising Contract)

59.    The NRA reincorporates by reference its responses to the allegations in Paragraphs 1 through 58.

60.    The NRA denies the allegations in Paragraph 60.

61.    The NRA denies the allegations in Paragraph 61.

62.    The NRA denies the allegations in Paragraph 62.

63.    The NRA denies the allegations in Paragraph 63.

## COUNT II

7

69

(Breach of Sponsorship Contract)

64.     The NRA reincorporates by reference its responses to the allegations in Paragraphs

1 through 63.

65.     The NRA denies the allegations in Paragraph 65.

66.     The NRA denies the allegations in Paragraph 66.

67.     The NRA denies the allegations in Paragraph 67.

68.     The NRA denies the allegations in Paragraph 68.

## COUNT III

(Advertising Agreement – Anticipatory Breach)

69.     The NRA reincorporates by reference its responses to the allegations in Paragraphs

1 through 68.

70.     The NRA denies the allegations in Paragraph 70.

71.     The NRA denies the allegations in Paragraph 71.

72.     The NRA denies the allegations in Paragraph 72.

73.     The NRA denies the allegations in Paragraph 73.

74.     The NRA denies the allegations in Paragraph 74.

75.     The NRA denies the allegations in Paragraph 75.

76.     The NRA denies the allegations in Paragraph 76.

## COUNT IV

(Sponsorship Agreement – Anticipatory Breach)

77.     The NRA reincorporates by reference its responses to the allegations in Paragraphs

1 through 76.

78.     The NRA denies the allegations in Paragraph 78.

8

79.     The NRA denies the allegations in Paragraph 79.

80.     The NRA denies the allegations in Paragraph 80.

81.     The NRA denies the allegations in Paragraph 81.

82.     The NRA denies the allegations in Paragraph 82.

83.     The NRA denies the allegations in Paragraph 83.

84.     The NRA denies the allegations in Paragraph 84.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

1.     UWS' claims are barred in whole or in part by UWS' duty to mitigate.

### Second Affirmative Defense

2.     UWS' claims are barred in whole or in part by UWS' prior material breaches of

the Advertising and Sponsorship Agreements.

### Third Affirmative Defense

3.     UWS' claims are barred in whole or in part by UWS' failure of consideration

under the Advertising and Sponsorship Agreements.

### Fourth Affirmative Defense

4.     UWS' claims are barred in whole or in part by UWS' fraudulent submission of

expenses.

### Fifth Affirmative Defense

5.     UWS' claims are barred in whole or in part because UWS obtained the

Advertising and Sponsorship Agreements under duress.

### Sixth Affirmative Defense

9

6.    To the extent that UWS suffered any injury, such injury was not caused by the

NRA.

### Seventh Affirmative Defense

7.    UWS claims are barred, in whole or in part, by the doctrine of unclean hands.

### Eighth Affirmative Defense

8.    As a result of UWS conduct, works, and/or actions, UWS Amended Complaint is

barred, in whole or in part, by the doctrine of waiver.

### Ninth Affirmative Defense

9.    UWS failed to satisfy conditions precedent.

### Tenth Affirmative Defense

10.    The NRA is entitled to setoff and/or recoupment.

### Eleventh Affirmative Defense

11.    UWS' Amended Complaint fails to state a claim upon which relief can be granted.

### COUNTERCLAIMS

Counterclaim Plaintiff the NRA alleges as follows in support of its Counterclaims against

UWS on personal knowledge as to its own actions and on information and belief as to all other

matters as follows:

1.    The NRA and UWS entered into the Advertising and Sponsorship Agreements

("Agreements") on January 24, 2018.

2.    Fundamental to the Agreements are the obligations by UWS to deliver thirteen

original episodes to run in the third and fourth quarters of the year.

10

3.      A fair and good faith reading of the Agreements requires UWS to deliver the

thirteen original episodes to run in the third and fourth quarters in a timely manner.

4.      UWS has materially failed to perform its obligations under the Agreements.

5.      For example, UWS failed to deliver the required thirteen original episodes to run

in the third and fourth quarters of 2018. Instead, UWS delivered only eleven original episodes to

run.

6.      In the third and fourth quarters of 2019, UWS delivered only eleven original

episodes to run so far.

### Count I

### (Breach of Advertising Contract)

7.      The NRA incorporates by reference the allegations set forth in paragraphs 1

through 6.

8.      The NRA and UWS entered into an enforceable contract.

9.      The NRA at all times fulfilled its obligations under the Advertising Agreement.

10.     UWS breached material terms of the Advertising Agreement.

11.     As a result of UWS' material breach, the NRA has been damaged, and any future

performance obligations have been discharged.

### Count II

### (Breach of Sponsorship Contract)

12.     The NRA incorporates by reference the allegations set forth in paragraph 1

through 11.

13.     The NRA and UWS entered into an enforceable contract.

11

73

14.   The NRA at all times fulfilled its obligations under the Sponsorship Agreement.

15.   UWS breached material terms of the Sponsorship Agreement.

16.   As a result of UWS' material breach, the NRA has been damaged, and any future

performance obligations have been discharged.

UWS has demurred to all Counts.

WHEREFORE, the NRA respectfully requests that this Court:

   a. Dismiss UWS' Amended Complaint in its entirety, with prejudice;

   b. Deny each of UWS' demands for relief;

   c. Declare that UWS' prior material breach discharges the NRA from any future

   performance under the Agreements;

   d. Award the NRA damages in an amount of not less than $10,000,000.00 ($10 million

   dollars);

   e. Grant the NRA any relief the Court deems just and proper.

Dated:  December 12, 2019               Respectfully submitted,

                                        NATIONAL RIFLE ASSOCIATION
                                        OF AMERICA
                                        By counsel

                                        James W. Hundley (VSB No. 30723)
                                        Robert H. Cox (VSB No. 33118)
                                        Amy L. Bradley (VSB No. 80155)

12

74

BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, Virginia 22182
(703) 883-0880 [telephone]
(703) 883-0899 [facsimile]
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com

*Counsel for the National Rifle Association of
America*

13

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2019, a copy of the foregoing was served by email and first class mail on the following:

Mark R. Dycio
Danielle Quinn
Dycio & Biggs
10533 Main Street
Fairfax, VA 22030

_____
Robert H. Cox (VSB No. 33118)

14

# EXHIBIT E

**V I R G I N I A:**

### IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX

| | |
|---|---|
| UNDER WILD SKIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Civil Case No. 19-12530 |
| | ) |
| NATIONAL RIFLE ASSSOCIATION OF | ) |
| AMERICA. | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

### ORDER GRANTING *PRO HAC VICE* ADMISSION FOR
### WILLIAM A. BREWER IV, ESQUIRE

This matter comes upon motion of Defendant the National Rifle Association of America

(the "NRA") for the *pro hac vice* admission of William A. Brewer IV as counsel for the Defendant

in the above-captioned matter;

Having considered the Application for Admission *Pro Hac Vice* of William A. Brewer IV,

Esquire, the related Motion for *Pro Hac Vice* Admission, and this Order, this court finds that Mr.

Brewer has satisfied the requirements set forth in rule 1A:4 of the rules of the Supreme Court of

Virginia, and orders that the application BE GRANTED. Mr. Brewer is hereby admitted to

practice *pro hac vice* in the above-captioned matter as counsel for the NRA.

Page 1

124

IT IS SO ORDERED.

1/10/2020
Date

Circuit Court Judge

**David Bernhard**

WE ASK FOR THIS:

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, Virginia 22182
jhundley@brigliahundley.com
rcox@brigliahundley.com

*Counsel for Defendant*

SEEN AND *Agreed*:

Mark R. Dycio (VA Bar No. 32741)
Danielle A. Quinn (VA Bar No. 89502)
DYCIO & BIGGS
10533 Main Street
Fairfax, Virginia 22032
mdycio@dyciolaw.com
dquinn@dyciolaw.com

*Counsel for the Plaintiff*

# EXHIBIT F

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE COUNTY OF FAIRFAX

UNDER WILD SKIES, INC.,

    Plaintiff,

v.

    Civil Case No. 19-12530

NATIONAL RIFLE ASSOCIATION
OF AMERICA.

    Defendants.

### ORDER GRANTING *PRO HAC VICE*
### ADMISSION FOR RAMON HERNANDEZ, ESQUIRE

    This matter comes upon motion of Defendant the National Rifle Association of America (the "NRA") for the *pro hac vice* admission of Ramon Hernandez as counsel for the Defendant in the above-captioned matter.

    Having considered the Application for Admission *Pro Hac Vice* of Ramon Hernandez, Esquire, and the related Motion for *Pro Hac Vice* Admission, the Court finds that Mr. Hernandez has satisfied the requirements set forth in Rule 1A:4 of the Rules of the Supreme Court of Virginia and ORDERS that the application be GRANTED. Mr. Hernandez is hereby admitted to practice *pro hac vice* in this matter as counsel for the NRA.

    IT IS SO ORDERED.

7/14/22
_____
Date

_____
Circuit Court Judge

**ORDER GRANTING *PRO HAC VICE***
**ADMISSION FOR RAMON HERNANDEZ, ESQUIRE**

PAGE 1

1400

WE ASK FOR THIS:

James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, Virginia 22182
(703) 883-0880 [telephone]
(703) 883-0899 [facsimile]
jhundley@brigliahundley.com
rcox@brigliahundley.com

*Counsel for Defendant*

SEEN AND _____ :

T. Wayne Biggs (VA Bar No. 41281)
Mark R. Dycio (VA Bar No. 32741)
DYCIO & BIGGS
1053 Main Street
Fairfax, Virginia 22032
twbiggs@dyciolaw.com
mdycio@dyciolaw.com

**ORDER GRANTING *PRO HAC VICE*
ADMISSION FOR RAMON HERNANDEZ, ESQUIRE**                    PAGE 2

# EXHIBIT G

VIRGINIA

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

Under Wild Skies )
Plaintiff(s),           )
                        )
v.                      )
                        )        A No. 1253O
National Rifle Assoc.   )
Defendant(s).           )

This cause came on to be heard on the __19__ day of __August__ 20_22_ on

the Plaintiff's/Defendant's motion for __Motion to Strike Plea In Bar__

Upon the matters presented to the Court at the hearing, it is

ADJUDGED, ORDERED, and DECREED as follows:

Plaintiff's Motion to Strike Is
Granted for the reasons stated
In open court including the finding
that II is Not A Signatory to
the CSA

Entered this __19th__ day of __August__, 20_22_

_____
JUDGE DAVID BERNHARD

SEEN: And agreed

Seen + objected to for the reasons stated
on the transcript.

Counsel for Plaintiff(s)        Counsel for Defendant(s)

EXHIBIT
9

33

# EXHIBIT H

**VIRGINIA:**

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| **UNDER WILD SKIES, INC.** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. CL-2019-12530 |
| | * | |
| **NATIONAL RIFLE ASSOCIATION** | * | |
| **OF AMERICA** | * | |
| | * | |
| Defendant. | * | |

**FINAL ORDER**

THIS MATTER CAME before the Court on September 12, 2022, for trial on the merits of Plaintiff's claims against Defendant for Count I (Breach of Contract- Advertising Agreement); Count II (Breach of Contract—Sponsorship Agreement); Count III (Anticipatory Breach-Advertising Agreement); Count IV (Anticipatory Breach—Sponsorship Agreement). Additionally, Defendant asserted counterclaims for Count I (Breach of Advertising Agreement) and Count II (Breach of Sponsorship Agreement). A jury was empaneled, evidence and argument were presented and the following rulings and verdict were made:

1.      AT THE CLOSE OF PLAINTIFF'S evidence, Defendant moved to strike the Anticipatory Breach Counts--Counts III and IV. Upon consideration of argument by counsel and opposition by Plaintiffs, the Motion to Strike was DENIED as to both Counts III and IV;

2.      AT THE CLOSE OF ALL EVIDENCE, Defendant renewed its Motion to Strike as to Counts III and IV. Upon consideration of argument by counsel and opposition by Plaintiffs, the renewed Motion to Strike of Plaintiff was DENIED.



EXHIBIT

B

Page 1 of 8

3.    AT THE CLOSE OF ALL EVIDENCE, Plaintiff moved to strike Counts I and II of the Defendant's Counterclaim. Upon consideration of argument by counsel and opposition by Defendant, the Motion to Strike Counts I and II of the Counterclaim was DENIED.

4.    AT THE CLOSE OF ALL EVIDENCE, Plaintiff further moved to strike Defendants Affirmative Defenses of Failure of Consideration (Affirmative Defense 3); Fraudulent Submission of Expenses (Affirmative Defense 4); and Setoff and/or Recoupment (Affirmative Defense 10). Upon consideration of argument by counsel and opposition by Defendant, the Motion to Strike Affirmative Defenses 3, 4, and 10 was GRANTED.

5.    As to Plaintiff's claims, the jury was duly instructed as to the elements and burdens of proof for Counts I, II, III, and IV. The jury found in favor of Plaintiff as to Count I and awarded damages to Plaintiff in the amount of $300,000.00. The jury found in favor of Plaintiff as to Count II and awarded damages to Plaintiff in the amount of $250,000.00. The jury thereby awarded $550,000.00 to Plaintiff on Counts I and II of Plaintiff's claims.

6.    As to Counts III and IV of the Plaintiff's claims for Anticipatory Breach the jury found in favor of Defendant.

7.    As to Defendant's counterclaims for Breach of Contract, the jury found in favor of Plaintiff as to Counts I and II of the Defendants counterclaims

8.    The Jury was instructed to set a date for pre-judgment interest and set that date at September 1, 2019.

ACCORDINGLY, IT IS HEREBY ORDERED that judgment for Breach of Contract in the amount of $550,000 is awarded to Under Wild Skies, Inc. as to Counts I and II of Platiniff's claims with prejudgment interest from September 1, 2019, and post-judgment interest as required by law; that judgment in favor of the National Rifle Association of America is awarded as to

Counts III and IV of Plaintiff's claims; that judgment is awarded to Under Wild Skies, Inc. as to Counts I and II of Defendant's Counterclaims. Each party to bear its own costs.

IT IS FURTHER ORDERED that the parties shall file any post trial motions in writing by 4:00PM on October 21, 2022 with the Clerk's Office. Any opposition to said motion shall be filed in writing by 4:00PM on October 28, 2022. A courtesy copy of any pleading filed shall also be delivered to Chambers. The Court reserves the right to rule on any post-trial motions on the papers. To the extent the Court deems that a hearing is required, the Court will notify the parties and take appropriate action at that time.

SO ORDERED.

THIS ORDER IS FINAL.

DATE: _October 13, 2022_

JUDGE: **Christie A. Leary**

SEEN AND
**Endorsement Waived
Per Rule 1:13**

T. Wayne Biggs, Esq.
VSB No. 41281
DYCIO & BIGGS
10533 Main Street
Fairfax, VA 22030
T: (703) 383-0100
F: (703) 383-0101
*Counsel for Plaintiff*

SEEN AND

**Endorsement Waived
Per Rule 1:13**
James Hundley, Esq.
Robert Cox, Esq.
BrigliaHundley, PC
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
*Counsel for Defendant*

A COPY TESTE:
JOHN T. FREY, CLERK
BY:
Deputy Clerk
Date:
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia
Patricia E. Leukhardt

Page 3 of 3

# EXHIBIT I







SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff, | § § | Civil Action No. 3:22-CV-1944-G |
| v. | § § § | The Honorable A. Joe Fish, presiding. |
| ACKERMAN McQUEEN, INC. and MERCURY GROUP, INC. | § § | FILED UNDER SEAL |
| Defendants. | § § § § § § § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff National Rifle Association of America (the "NRA") files this Second Amended Complaint against Ackerman McQueen, Inc. ("AMc"), Mercury Group, Inc. ("Mercury Group"), and Anthony Makris ("Makris") (collectively, "Defendants"), on personal knowledge as to its own actions and on information and belief as to all other matters.

Plaintiff submits for filing under seal this Second Amended Complaint given that the entire case is presently under seal until there is an order to unseal it. *See* Dkt. No. 9; *see also*, LR 79.4.

### I. PRELIMINARY STATEMENT

1.     This is an action to enforce the terms of the Confidential Settlement Agreement ("CSA"), dated March 11, 2022 (the "CSA Date") and to address multiple breaches of the CSA. In addition, the NRA asserts claims against Makris for fraud and breach of fiduciary duty.

2.     The NRA also seeks a declaration that certain claims made by Makris are unlawful and/or barred by judicial estoppel. The facts demonstrate that Makris has taken clearly inconsistent

1

positions before the courts to gain an unfair advantage in disregard of the NRA's rights as memorialized and agreed to in the CSA and elsewhere.

3.   The CSA resolved, *inter alia*, a litigation previously pending before this Court captioned *NRA v. AMc, et al.* (Civil Action No. 3:19-cv-02074-G) (the "AMc Litigation").

4.   The CSA was entered into by the NRA, AMc, Mercury Group, and their respective affiliates and/or related companies, executives, and employees, among other individuals and entities.

5.   The CSA contained a broad, mutual general release of all claims (the "Release").

6.   Despite the CSA, Defendants' affiliate and related company, Under Wild Skies ("UWS") pursued litigation against the NRA in the Circuit Court of the County of Fairfax, Virginia, in a matter captioned *UWS v. NRA*, Case No. 2019-12530 (the "UWS Litigation"). The UWS litigation involved at least one controlling person of AMc, Mercury Group, and UWS, namely, Makris, who at all relevant times was an executive of each of AMc, Mercury Group, and UWS.

7.   During the negotiation of the CSA, it is undisputed that AMc and Mercury Group proposed to carve out UWS's pending or future claims against the NRA. The NRA rejected that proposal, and the carveout was not included in the CSA. Despite UWS not being excepted from the CSA and its broad general release terms, AMc and Mercury Group signed the CSA on March 11, 2022.

8.   Thereafter, UWS refused to dismiss its claims in the UWS Litigation. On, June 21, 2022, the NRA objected to UWS's continued pursuit of the UWS Litigation given the terms of the CSA. However, AMc and Mercury Group erroneously contended that the CSA did not impose an obligation on them or Makris to cause that Litigation to be dismissed. Defendants' actions in this

2

regard were an attempt to rewrite the CSA. In other words, Defendants sought to re-write the CSA to include the UWS carveout they requested but did not get.

9.      From September 12-20, 2022, a trial was held in the UWS Litigation. On September 20, 2022, a jury entered a verdict of $550,000 in favor of UWS. UWS had sought $17,100,000 plus interest and costs in damages.

10.     In addition to its breach of the CSA, Defendants have used UWS, a corporate fiction, as a means of evading their legal obligations, to justify wrongdoing, to circumvent operative law, and as described more fully herein.

11.     Further, it is now known that Makris surreptitiously breached duties that he owed to the NRA as its fiduciary and defrauded the NRA.

12.     In disregard of those fiduciary obligations and in betrayal of the trust and confidence placed in him by the NRA, Makris utilized the company he owns and controls – UWS – in a fraudulent invoicing scheme for his personal financial benefit, to the detriment of the NRA. This, of course, is in addition to this fraudulent pursuit of the UWS Litigation for his own direct personal financial gain.

13.     The NRA brings this action: (1) to hold Defendants liable for costs and other burdens incurred by the NRA, without limitation, in connection with the defense of the UWS Litigation, both at trial and with regard to any appeal; and, (2) to hold Makris liable for the return of funds that he wrongfully obtained from the NRA pursuant to the fraudulent invoicing scheme that he conducted to the detriment of the NRA and for his own direct personal financial gain.

14.     Defendants' actions with respect to the pursuit of the UWS Litigation are (a) in derogation of Texas law which strongly favors the enforcement of settlement agreements; and, (b) contrary to the public interest which favors disallowing vexatious litigation.

3

## II. PARTIES AND RELEVANT NON-PARTIES

15.    Plaintiff the NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution. A 501(c)(4) tax-exempt organization, the NRA has approximately 4.3 million members and hundreds of thousands of donors, in addition to the many millions who support its legendary advocacy.

16.    Defendant AMc is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Oklahoma City. AMc is an advertising and public relations agency that for decades counted the NRA as its largest client. AMc, at one point in time, maintained a principal office located at 1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202, but that office is now closed.

17.    Defendant Mercury Group was a for-profit-business corporation organized under the laws of the State of Oklahoma and was a wholly owned subsidiary of Defendant AMc. Mercury Group specialized in public communication strategy, including on behalf of advocacy groups such as the NRA. Mercury Group had its principal place of business in the Commonwealth of Virginia ("Virginia"), but that office is currently inactive in Virginia.

18.    Defendant Makris is an AMc senior executive, was the President of Mercury Group, and is the President and owner of UWS. Makris resides in Beaufort, South Carolina.

19.    Relevant non-party UWS is a Virginia corporation with its principal place of business at 1053 Main Street, Fairfax, Virginia. The president and owner of UWS is Makris, who was the President of Defendant Mercury Group and is also a senior executive at Defendant AMc. UWS produced the hunting television series Under Wild Skies (the "Show"), which for several

4

years was sponsored by the NRA.

20.     Makris was the host of the Show. In the UWS litigation against the NRA, UWS counsel also represented AMc in the AMc Litigation. UWS is an affiliate and/or related company of Defendants.

### III. JURISDICTION AND VENUE

21.     The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the NRA and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.

22.     Subject matter jurisdiction for this case rests with this Honorable Court as the case involves issues and/or violations of federal law.

23.     An actual controversy exists within this court's jurisdiction pursuant to 28 U.S.C. § 2201.

24.     The CSA also states that its terms must be construed in accordance with and governed by the laws of the State of Texas. The CSA further states that the agreement was to be performed wholly within the State of Texas.

25.     Pursuant to the CSA, the contracting parties agreed to submit to the exclusive jurisdiction of this Court in connection with any dispute that may arise under the CSA, and expressly waived any objection to the laying of venue in this Court.

26.     The Court has supplemental jurisdiction over the state law claims including, without limitation, fraud, arising under the statutory and common law pursuant to 28 U.S.C. § 1367 because the NRA's state law claims are interrelated with the NRA's federal claims and arise from a common nucleus of operative facts. The adjudication of the NRA's state law claims with the NRA's federal claims furthers the interests of judicial economy.

5

## IV. **FACTUAL BACKGROUND**

27.     The terms of the CSA are enforceable, and from the time it was agreed to, barred the UWS Litigation as well as any other pending or future claims that UWS might have against the NRA.

28.     Pursuant to the CSA, the contracting parties agreed, without limitation, to a global resolution and a broad, mutual release of all claims whether presently known or unknown, suspected or unsuspected, past, present, or future from the beginning of the world to the date of the Release, that included all named and unnamed affiliates and/or related companies, executives, and employees, among other individuals and entities.

29.     Pursuant to the CSA, the parties also agreed that Defendants would return all NRA Property.

30.     Defendants have violated the terms of the CSA and continue to engage in unlawful and improper activity to the injury of the NRA as set forth below.

A.     **AMc Litigation.**

31.     Until it was terminated in 2019, AMc had a long-standing relationship with the NRA. Originally an advertising agency, AMc was, by 2017, responsible for creating and managing the branding, advertising, public relation, and the NRA's digital platform, NRATV. The intended outcome from this array of services was to expand the NRA's reach, appeal to a wider audience, and monetize digital advertising for the NRA's benefit.

32.     Mercury Group was the crisis communications subsidiary of AMc and worked closely with the NRA.

33.     The Show was conceived, planned, and executed in large part from Mercury Group's offices in Virginia using Mercury Group personnel.

6

34.    In addition to his ownership and control of UWS, Makris was President of Mercury Group and a senior executive at AMc. More importantly, Makris had a decades long relationship of trust and confidence with the NRA. In fact, that Makris and LaPierre developed a close personal friendship was an essential element to the willingness of the NRA to trust Defendants to manage the Association's outreach to the public in a cost-effective and honest manner.

35.    Although it was shocking to many at the time, the relationship between AMc, Mercury Group, and the NRA deteriorated in 2018, after the NRA requested information from AMc and Mercury Group about its invoicing for its expenses and services to the NRA as part of a broader effort by the NRA to ensure that its vendors were in compliance with their contracts. Similarly and concurrently, the relationship between the NRA and Makris deteriorated as the NRA sought information from him regarding the business purpose for millions of dollars of expenses for which he obtained reimbursement from the NRA.

36.    When the NRA and AMc reached an impasse, the NRA sued AMc in a Virginia state court in April 2019 seeking access to books and records. As new information and details emerged, the NRA sued AMc and Mercury Group in Texas federal court for, among other things, claims related to Defendants' breaches of their contractual and common law duties. For example, the NRA alleged that AMc provided it with misleading performance information that exaggerated and/or overstated the performance and/or value of NRATV to the NRA.

37.    Makris was a key witness in the AMc Litigation, testifying on numerous important issues, including the significant role that he played in the development of NRATV and its content.

38.    Further, in the AMc Litigation, he testified that the Show was a daily broadcast on NRATV.

39.    In resolution of the AMc Litigation, and pursuant to the CSA, the NRA, AMc, and

7

Mercury Group ultimately filed a stipulation of dismissal with prejudice resulting in the termination of the AMc Litigation on March 21, 2022. *See* Exhibit 1, attached hereto and incorporated by reference as if fully set forth herein, Stipulation of Dismissal with Prejudice, dated March 21, 2022. Similarly, in *NRA v. AMc, et al.* (Case Nos. CL19001757, CL19002067, and CL19002886) (Consolidated), a matter in the Circuit Court of the City of Alexandria, Virginia, Defendants' and the NRA's motion to dismiss with prejudice was granted on April 6, 2022. *See* Exhibit 2, attached hereto and incorporated by reference as if fully set forth herein, Order dated April 6, 2022.

40.     The CSA encompassed and applied to the dismissal of any and all pending claims by Defendants' affiliates and/or related companies, including UWS, executives and employees, among other individuals and entities.

**B.     UWS Agreements.**

41.     UWS is an entity solely owned and operated by its President, Makris. The Virginia State Corporation Commission website lists his spouse, Warner Loughlin, as the company's Vice President. His executive assistant from the offices of Defendants, Stephanie West ("West"), was until recently, UWS's Secretary. UWS has no other employees.

42.     In the 1990s, the NRA sought to expand its reach to prospective donors and supporters in the hunting community. Recognizing the NRA's long-time efforts to appeal to hunting audiences, some of its then trusted advisors, Makris, and other AMc executives such as Angus McQueen, conceived of the Show. Makris would serve as the Show's host— which would be an NRA-sponsored platform to build audiences from which the NRA would attract new members, raise funds, and elevate the NRA brand through increased exposure.

43.     The Show is the sole business purpose for UWS's existence and the NRA was the largest, and often only, advertiser and sponsor of the Show.

8

44.    Over their decades-long relationship, the NRA and UWS formalized their arrangement in various written Sponsorship and Advertising Agreements (the "Agreements"), under which UWS agreed to provide advertising and sponsorship deliverables ("Deliverables") to the NRA in exchange for installment payments.

45.    Each iteration of the UWS Agreements contains the same or similar elements and services to be provided by UWS to the NRA.

46.    On January 24, 2018, the NRA and UWS entered into the most recent iteration of the Agreements (the "UWS Agreements"). The UWS Agreements required UWS to provide Deliverables to the NRA each year through 2025 in connection with the Show in exchange for installment payments. *See* Exhibit 3, attached hereto and incorporated by reference as if fully set forth herein, the UWS Agreements.

47.    As was the case with AMc, given the trust and confidence placed in Makris, the NRA permitted UWS to maintain the backup for expenses allegedly incurred in connection with the Show. Nowhere in the UWS Agreements is there any indication that Makris was being paid for any personal services to the NRA, NRA members, or anyone else.

48.    In the Summer of 2019, as part of its effort to ensure vendors were in compliance with their contracts and providing value to the NRA, the NRA requested information from UWS regarding its performance, including, but not limited to, viewership, performance metrics, and any marketing and business plans. In response to the NRA's requests for information and after the NRA was not untypically a few days past an installment payment date, UWS repudiated the UWS Agreements in hopes of relieving itself of its obligations to complete performance under the UWS Agreements.

C.    **UWS Litigation: Makris' Invoicing Scheme.**

9

49.     On September 11, 2019, UWS filed the UWS Litigation, claiming that the NRA's late (by 10 days) payment breached and anticipatorily repudiated the UWS Agreements, seeking tens of millions of dollars from the NRA. The NRA countersued based, *inter alia,* on prior material breaches of the Agreements by UWS.

50.     During the NRA's investigation in connection with the UWS Litigation, it became apparent that not only had UWS failed to fully perform its contractual obligations—facts which UWS and Makris concealed from the NRA—but that public interest in the Show had diminished significantly.

51.     Even though Makris, a disloyal and self-dealing fiduciary, knew that the Show's performance was abysmal, he failed to disclose and concealed such negative performance data.

52.     Worse yet, the NRA discovered that Makris had years earlier embarked on a strategy to extract significant additional sums of money for his direct personal benefit from the NRA under the guise of "supplemental invoices" which he falsely represented to be related to the Show and submitted through UWS, an entity which he owned and controlled.

53.     Makris' representations to the NRA were made with the dishonest purpose and intent to deceive the NRA and he did deceive the NRA. Makris intentionally deceived the NRA by making it appear that the payments were linked to UWS when, in fact, they were for his direct personal financial benefit.

54.     It was not until the NRA's investigation in response to UWS's Complaint in the UWS Litigation that the NRA learned that Makris, in his individual capacity and through the use of UWS, a sham and corporate fiction, submitted fraudulent invoices for payment to the NRA for his direct personal benefit. *See* Exhibit 4, attached hereto and incorporated by reference as if fully set forth herein, Excerpts from UWS Third Supplemental Responses and Objections to NRA's

10

First Interrogatories, dated August 9, 2022.

55.     With respect to the "Supplemental Invoices," UWS was organized and operated as a mere tool or business conduit for Makris to implement his wrongdoing as described herein.

56.     As described herein, Makris used UWS, a corporate fiction, as a sham device (i) to perpetrate a fraud on the NRA; (ii) to evade legal obligations to the NRA; (iii) to circumvent applicable law; and, (iv) in order to achieve an inequitable result, namely, for his direct personal benefit, at the expense of the NRA.

57.     Such conduct by Makris constitutes an abuse of the corporate privilege.

58.     Such unity exists between Makris and UWS that UWS ceased to be separate from Makris and any recognition of separateness would lead to an unjust and inequitable result.

59.     At all relevant times, Makris acted with dishonesty of purpose and intent to deceive the NRA.

60.     Between November 3, 2010 and December 7, 2018, Makris submitted to the NRA at least 54 invoices, requesting payment of up to $585,000 per year, via the mail and/or the wires. Makris submitted the invoices on UWS letterhead, each with the description "Supplemental Invoice" (collectively, the "Supplemental Invoices"). On their face, and to any reasonable person, the Supplemental Invoices request payment in connection with the Show. By way of example, *See* Exhibit 5, attached hereto and incorporated by reference as if fully set forth herein, which are Supplemental Invoices for the year 2016. However, as revealed during the UWS Litigation, no such connection existed. Instead, Makris claimed that the Supplemental Invoices were payment to him personally for his alleged work with NRA donors and potential donors.

61.     During the UWS Litigation, numerous NRA employees testified that they understood the Supplemental Invoices to request reimbursement for supplemental expenses

11

incurred by UWS in its promotion of the NRA brand through UWS's advertising and sponsorship activities. Indeed, one employee testified that her understanding was based on direct conversations with Makris regarding the Supplemental Invoices. *See* Exhibit 6, attached hereto and incorporated by reference as if fully set forth herein. Transcript of Testimony from the UWS Litigation ("Trial Trans.") (L. Supernaugh), 497:2-19.

62.     In reliance on these representations, the NRA paid these invoices from November 17, 2009 to January 15, 2019.

63.     The invoices, each for $97,500, except for the first invoice paid November 17, 2009, which was for $65,500, were submitted by Makris in an ongoing, continuous fashion and were submitted to the NRA along with other invoices. The invoices were dated and paid as follows:

| Invoice Date | Invoice Paid |
| --- | --- |
| November 3, 2009 | November 17, 2009 |
| January 29, 2010 | February 25, 2010 |
| April 21, 2010 | May 18, 2010 |
| July 15, 2010 | July 20, 2010 |
| October 14, 2010 | December 14, 2010 |
| January 12, 2011 | March 8, 2011 |
| June 1, 2011 | July 28, 2011 |
| June 1, 2011 | October 5, 2011 |
| June 1, 2011 | November 15, 2011 |
| August 1, 2011 | October 13, 2011 |
| August 1, 2011 | December 15, 2011 |
| November 27, 2011 | January 31, 2012 |
| November 27, 2011 | April 3, 2012 |
| November 27, 2011 | May 31, 2012 |
| November 27, 2011 | August 2, 2012 |
| November 27, 2011 | October 2, 2012 |
| November 27, 2011 | December 4, 2012 |
| November 1, 2012 | January 31, 2013 |
| March 1, 2013 | March 28, 2013 |
| May 1, 2013 | May 30, 2013 |
| July 1, 2013 | August 13, 2013 |
| September 1, 2013 | October 1, 2013 |

12

| November 1, 2013 | November 26, 2013 |
| December 12, 2013 | January 16, 2014 |
| December 12, 2013 | March 27, 2014 |
| December 12, 2013 | May 29, 2014 |
| December 12, 2013 | July 31, 2014 |
| December 12, 2013 | September 30, 2014 |
| December 12, 2013 | November 25, 2014 |
| December 18, 2014 | January 20, 2015 |
| December 18, 2014 | March 31, 2015 |
| December 18, 2014 | May 28, 2015 |
| December 18, 2014 | May 28, 2015 |
| December 18, 2014 | October 1, 2015 |
| December 18, 2014 | December 1, 2015 |
| December 18, 2015 | January 14, 2016 |
| December 18, 2015 | March 31, 2016 |
| December 18, 2015 | May 31, 2016 |
| December 18, 2015 | July 28, 2016 |
| December 18, 2015 | September 29, 2016 |
| December 18, 2015 | December 1, 2016 |
| December 18, 2016 | January 31, 2017 |
| December 18, 2016 | March 30, 2017 |
| December 28, 2016 | June 8, 2017 |
| December 28, 2016 | August 1, 2017 |
| December 28, 2016 | October 10, 2017 |
| December 28, 2016 | December 12, 2017 |
| December 7, 2017 | February 1, 2018 |
| December 7, 2017 | March 29, 2018 |
| December 7, 2017 | May 31, 2018 |
| December 7, 2017 | July 31, 2018 |
| December 7, 2017 | December 27, 2018 |
| December 7, 2018 | January 15, 2019 |

64.     In responses to discovery served in the UWS Litigation, UWS claimed that the

Supplemental Invoices were for sums advanced on behalf of the NRA. That answer was verified

by Makris. *See* Exhibit 4, p. 12-13, 17; *see also* Exhibit 7, attached hereto and incorporated by

reference as if fully set forth herein, UWS Second Supplemental Responses to NRA's First

Request for Admissions, p. 4. However, later realizing that those sums could not be supported with

13

evidence of expenditures, UWS reversed its position and admitted that the Supplemental Invoices were not submitted in connection with the Show at all.

65.    Instead, UWS alleged – without any support – that the Supplemental Invoices were "paid to Makris as compensation" (Exhibit 4, p. 12-13), pursuant to an oral agreement with Wayne LaPierre for "assist[ing] the NRA with its fund raising [sic] efforts by entertaining donors, potential donors, and otherwise cultivating such donors." Exhibit 4, p. 12. This about face by Makris has no evidentiary support and was specifically denied by Wayne LaPierre.

66. Nonetheless, on August 9, 2022, under penalty of perjury, Makris affirmed the following responses in Plaintiff's Third Supplemental Responses and Objections to Defendant's First Interrogatories in the UWS Litigation:

> 15.    Specify in detail the bases for and the use of moneys paid to UWS by the NRA resulting from UWS's 2017 invoices to the NRA for 'supplemental' expenses.
>
> **RESPONSE**: Plaintiff objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome taking into account the needs of the case.
>
> **SUPPLEMENTAL RESPONSE**: Without waiving the foregoing objections, the supplemental expenses were part of a course of dealing that the NRA, through Wayne LaPierre, had established with Tony Makris. During the course of any given year, Mr. Makris would assist the NRA with its fund raising efforts by entertaining donors, potential donors, and otherwise cultivating such donors. The Supplemental Expenses were paid to Makris as compensation for these efforts. Invoices for these efforts were sent to the NRA as 'supplemental expenses' under the express direction of Wayne LaPierre and Woody Phillips.
>
> 16.    Specify in detail the bases for and the use of moneys paid to UWS by the NRA resulting from UWS's 2018 invoices to the NRA for 'supplemental' expenses.

14

> **RESPONSE**: Plaintiff objects to this Interrogatory on the grounds
> that it is overly broad and unduly burdensome taking into account
> the needs of the case.
>
> **SUPPLEMENTAL   RESPONSE:**   Without   waiving   the
> foregoing objection, see response to interrogatory #15.

Exhibit 4.

   67.       However, no such agreement for payment and/or compensation in exchange for

fundraising services has <u>ever</u> existed between the NRA and Makris. *See* <u>Exhibit 6</u>, Trial Trans. (L.

Supernaugh), 497:2-19; <u>Exhibit 8</u>, attached hereto and incorporated by reference as if fully set

forth herein, Trial Trans. (W. LaPierre), 597:14-600:8; <u>Exhibit 9</u>, attached hereto and incorporated

by reference as if fully set forth herein, Trial Trans. (W. LaPierre), 906:3-21; <u>Exhibit 10</u>, attached

hereto and incorporated by reference as if fully set forth herein, Trial Trans. (W. Phillips), 674:15-

18; <u>Exhibit 11</u>, attached hereto and incorporated by reference as if fully set forth herein, Trial

Trans. (T. Schropp), 949:17-949:19 & 950:10-13.

   68.       The NRA's claims against Makris regarding the Supplemental Invoices were not

litigated in the UWS trial. Those claims relating to this multi-million dollar fraud remain

unremedied.

   69.       The trial in the UWS Litigation concluded on September 20, 2022. The NRA

prevailed against UWS on its anticipatory repudiation claims. However, the jury returned a verdict

against the NRA on the breach of contract claims, resulting in a $550,000 plus interest award to

UWS. The NRA is appealing the judgment.

**D.     UWS is an Affiliate and/or Related Company of Defendants and, Therefore, UWS is
        Bound by the Release in the CSA.**

   70.       UWS is an affiliate and/or related company of AMc and Mercury Group.

   71.       AMc, Mercury Group, and UWS provided similar services to the NRA, utilized

personnel among the three entities interchangeably, and shared common controlling persons and

entities, including Makris. In fact, UWS is a "passthrough entity" to Makris.

72.     Makris, UWS's President and owner, also served as the President of Mercury Group and is a senior executive at AMc. He has been a high-ranking executive of each of the companies since UWS's inception in the 1990s. As noted, Makris was the sole host of the Show, which aired on NRATV. Makris donated his rights to the Show to the NRA.

73.     The entities—AMc, Mercury Group, and UWS—employed an overlapping business infrastructure and personnel. The administrative apparatus of AMc and Mercury Group was used by Makris to conduct UWS business. Makris used his AMc email address to interact with the NRA and third parties when doing business for UWS.

74.     In addition, Makris' executive assistant, West, who, at all relevant times, was an AMc employee, was also the registered Secretary of UWS. West regularly performed work for Makris in connection with the Show, including through interactions with the NRA and third parties. West also used her AMc employee email address to conduct UWS business. Further she testified in the UWS Litigation that there were no UWS company email accounts until 2019.

75.     Nader Tavanger, another AMc executive, also provided services to the NRA in connection with UWS.

76.     The Show, created by Defendants' executives, delivered NRA marketing spots via programming to its viewers.

77.     Similarly, AMc produced and delivered branded NRA content through NRATV.

78.     In the UWS Litigation and AMc Litigation, UWS retained the same counsel as AMc's local counsel in its litigation with the NRA. Indeed, the same counsel represents UWS against the NRA.

79.     There was also shared corporate control with respect to AMc's, Mercury Group's,

and UWS's provision of services to the NRA as well as their billing practices with respect to the NRA. In presentations made by AMc to NRA executives concerning NRATV (the "Presentations"), AMc identified UWS as a member of the NRATV "Digital Network," which AMc managed. AMc's statements to the NRA in those Presentations formed the basis for certain of the NRA's claims in the AMc Litigation.

80.     Further, AMc's billing practices established that Defendants and UWS are affiliated and related entities. *See* Exhibit 12, attached hereto and incorporated by reference as if fully set forth herein, AMc Invoices to the NRA.

81.     UWS's invoices to the NRA sought payment to the same address as Mercury Group's offices. *See id.*

82.     Moreover, invoices were billed to AMc from Facebook concerning UWS programming on NRATV. *See* Exhibit 13, attached hereto and incorporated by reference as if fully set forth herein, Invoices from Facebook to AMc.

83.     Invoices from AMc to the NRA also reflect fees incurred by AMc for work developing UWS related content. *See* Exhibit 12.

84.     AMc, Mercury Group, and UWS shared other financial interests in connection with the Show.

85.     Makris testified that he "participated in NRATV from the beginning" and that "Under Wild Skies ran on a daily broadcast on NRATV. I was on there constantly." Exhibit 14, attached hereto and incorporated by reference as if fully set forth herein, Transcript of Deposition of Makris, dated August 5, 2021, 32:7-14 & 33:12-17.

86.     The UWS Litigation also shares other common facts and circumstances with the AMc Litigation. In each case, the Litigations ensued after the NRA sought greater transparency

17

and information concerning vendor billing practices and performance metrics.

87.     The above facts establish that UWS is bound by the terms of the CSA including the Release therein.

**E.     AMc's and Mercury Group's Breaches.**

88.     After the execution of the CSA, AMc and Mercury Group breached its obligations, including, but not limited to: (1) failing to cause UWS to dismiss the UWS Litigation; (2) contending that the CSA did not release all pending or future claims of UWS, including the UWS Litigation; (3) claiming that AMc and Mercury Group have no control over or connection with UWS, despite AMc and Mercury Group having attempted to negotiate a carveout from the CSA on behalf of UWS; (4) claiming that UWS is not an affiliate or related party to AMc or Mercury Group; and, (5) claiming that they no longer were in possession, custody or control of certain NRA Property or that NRA Property had been returned to the NRA.

**1.     Pursuit of A Released Claim, the UWS Litigation.**

89.     Despite objection from the NRA, the UWS Litigation, which was resolved by the CSA, proceeded to trial and a judgment in violation of the CSA, to the expense of the NRA.

90.     During negotiations of the CSA, AMc and Mercury Group attempted to obtain a carveout from the CSA for any pending or future claims of UWS against the NRA.

91.     Such carveout was rejected by the NRA, and AMc agreed to its removal.

**2.     Contention that the CSA is Unrelated to Makris.**

92.     After execution of the CSA, AMc and Mercury Group asserted that Makris had no involvement in the drafting or negotiation of the CSA and had not been provided with a copy of the CSA. AMc and Mercury Group also claimed that Makris was not bound by the terms of the CSA, and that they had no "authority, power or right" to direct UWS or Makris to dismiss the

18

UWS Litigation.

F.    **Makris' Breaches.**

93.    As noted above, Makris individually and through the mere tool, business conduit, and corporate fiction of UWS, implemented a fraudulent invoicing scheme for his direct financial benefit and in derogation of his fiduciary duties to the NRA.

94.    In addition, Makris, individually and through the mere tool, business conduit, and corporate fiction of UWS, fraudulently pursued the UWS Litigation against the NRA in disregard of and in breach of the CSA, in particular its Release provision, and in derogation of his fiduciary duties to the NRA.

95.    As explained herein, UWS was a beneficiary and/or party to the Release which UWS's affiliates and related companies, AMc and Mercury Group, negotiated and agreed to. Accordingly, UWS and Makris, as the principal owner of UWS, are and were required to comply with the Release in the CSA.

96.    Despite AMc's and Mercury Group's (unsuccessful) attempt to carve out the UWS Litigation from the Release, and the fact the Makris is the President and owner of UWS, Makris unconvincingly testified that the only knowledge that he had about the CSA and Release was what he "read in the paper" or "the press."

97.    In the UWS Litigation, Makris further testified that he "wasn't a part of the negotiations" of the CSA and did not "benefit from it"—in contravention of the broad, inclusive language of the CSA and Release regarding resolution of any and all claims among the broadly and inclusively defined parties to the CSA.

98.    Makris' implausible testimony in this regard demonstrates that he acted individually as well as using UWS, a corporate fiction, to (i) perpetrate a fraud on the NRA; (ii) to

19

evade his existing legal obligations to the NRA; (iii) to circumvent the law; and, (iv) to justify his wrongdoing, employing UWS as an unfair device to achieve the inequitable result of a direct personal financial gain to him through the pursuit of released claims in the UWS Litigation.

99.    Such conduct by Makris constitutes an abuse of the corporate privilege.

100.    Such unity exists between Makris and UWS that UWS ceased to be separate from Makris and any recognition of separateness would lead to injustice by allowing Makris to continue to pursue and/or orchestrate the pursuit of the released claims that form the basis of the UWS Litigation.

101.    At all relevant times, Makris acted with dishonesty of purpose and intent to deceive the NRA.

102.    As a result of Makris' misconduct, Makris must be held individually liable for breach of the CSA and its Release.

## G.    Defendants' Use of the CSA as a Liability Shield While at the Same Time Pursuing Claims Against the NRA in Violation of the CSA.

103.    Defendants have willfully and deliberately refused to comply with the CSA and its Release by pursuing the UWS Litigation.

104.    The consideration given by the NRA pursuant to the CSA was in exchange for, and contingent upon, Defendants' cooperation in complying with the terms of the CSA and the Release. That cooperation and compliance never materialized, as described herein.

105.    Defendants' aforementioned breaches caused the UWS Litigation to continue, which damaged the NRA by forcing it to incur increased attorneys' fees, costs, and expenses, in addition to other damages.

106.    While Defendants violate the CSA, Defendants benefit from the Release of all claims in the CSA.

20

107.    For example, Makris seeks to use the CSA as a shield from his own liability to the NRA, as described herein, while at the same time disregarding the CSA when it benefits his personal interests to pursue the UWS Litigation through the corporate fiction of the sham UWS.

## H.    Makris is Judicially Estopped.

108.    Makris is judicially estopped from maintaining a position here that is inconsistent with or contradicts his sworn statements in other litigations concerning the CSA, which sworn statements are described herein.

109.    Makris is also judicially estopped from maintaining a position here that is inconsistent with or contradicts his prior sworn statements concerning the nature and purpose of the Supplemental Invoices, which sworn statements are described herein.

110.    Any inconsistent and contrary statements by Makris here reflect on the integrity of the judicial system; and, thus Makris is estopped from changing or altering his prior sworn statements concerning, *inter alia*, (i) the applicability of the CSA; and, (ii) the nature and purpose of the Supplemental Invoices.

111.    Such inconsistent and contradictory statements prejudice the NRA, impose an unfair detriment on the NRA, and provide Makris with an unfair advantage. Accordingly, the NRA is entitled to the declaratory relief sought herein.

## V.CAUSES OF ACTION

### COUNT ONE: BREACH OF CONTRACT (against all Defendants)

112.    The NRA incorporates the allegations in the preceding and subsequent paragraphs as if fully set forth herein.

113.    The CSA is a legally enforceable contract and contains a Release of any and all claims between UWS and the NRA, either pending or future.

21

114.    The NRA performed all of its obligations under the CSA.

115.    The UWS Litigation constitutes a material breach of the CSA by Defendants, which is a complete bar to the UWS Litigation.

116.    In committing such breach, Defendants have directly and proximately deprived the NRA of the benefits to which it was entitled under the CSA, causing injury to the NRA for which it seeks monetary damages in an amount to be determined at trial.

117.    As a result of the UWS Litigation, the NRA has suffered and will continue to suffer damages including, but not limited to, the expenditure of attorneys' fees, costs, and expenses related to the UWS Litigation.

### COUNT TWO: BREACH OF FIDUCIARY DUTY (against Makris)

118.    The NRA incorporates the allegations in the preceding and subsequent paragraphs as if fully set forth herein.

119.    The NRA and Makris had a long-standing, multi-decade agency relationship.

120.    Makris was steeped in knowledge of the NRA and the NRA reposed its trust and confidence in Makris to handle its sensitive public relations and advertising work.

121.    In connection with that relationship of trust and confidence, the NRA entrusted Makris with funds in the approximate amount of $585,000 annually pursuant to the Supplemental Invoices that he issued on the UWS letterhead, and that he knowingly, intentionally, deliberately, and willfully misrepresented to NRA employees were incurred by UWS in its promotion of the NRA brand pursuant to the UWS Agreements.

122.    Makris, individually and through the mere tool, business conduit, and corporate fiction of UWS, extracted these funds from the NRA for his direct personal benefit under the false pretense that the funds were "expenses" incurred with respect to the Services required under the

22

UWS Agreements, ultimately admitting that the funds were not used for that purpose at all.

123.   The Supplemental Invoices were unrelated to and not part of the UWS Agreements as admitted by Makris.

124.   At all relevant times, Makris concealed from the NRA the fact that the Supplemental Invoices were unrelated to UWS, the Show, or the UWS Agreements, such information only emerging during the UWS Litigation.

125.   In addition to his invoicing scheme, Makris, individually and through the mere tool, business conduit, and corporate fiction of UWS, sought to extract funds from the NRA for his direct personal benefit through the continued pursuit of the UWS Litigation despite the fact that such litigation was encompassed within and barred by the CSA.

126.   Such unity exists between Makris and UWS that UWS ceased to be separate from Makris and any recognition of separateness would lead to an unjust and inequitable result.

127.   By virtue of the NRA's trust and confidence in Makris, its entrustment of its monies each month to him to be managed and spent for the benefit of the NRA, a fiduciary relationship was created and existed between Makris and the NRA at all relevant times.

128.   At all relevant times, Makris owed the NRA the highest fiduciary obligation and utmost duties of good faith, fair dealing, loyalty, honesty, and full disclosure by virtue of the fiduciary relationship between the parties. Makris was obligated, and continues to be obligated, as a fiduciary not to engage in self-dealing or otherwise promote his interests at the expense and to the detriment of the NRA. Pursuant to his fiduciary obligations and duties, Makris was required to exercise a high degree of care to conserve any funds he received from the NRA and to refrain from litigating claims released by the CSA for his direct personal benefit.

129.   Makris has breached his fiduciary duties and obligations to the NRA by failing to

23

exercise reasonable care, skill, and diligence, including by way of illustration, the acts and omissions described in this Second Amended Complaint, which acts and omissions Makris carried out individually and through the corporate fiction UWS for his direct personal benefit.

130.    Makris' breach of his fiduciary duties and obligations is particularly outrageous because he acted with supposed expertise in public relations, advertising, and hunting on behalf of the NRA who relied upon him to discharge his fiduciary duties with the utmost loyalty and consistent with the highest standards of care.

131.    The NRA has suffered, and will continue to suffer, damages as a direct, proximate, and consequential result of Makris' breaches of his fiduciary duties and obligations, in a monetary amount to be determined at trial by jury, including, but not limited to, attorneys' fees, costs, and expenses incurred by the NRA in connection with the UWS Litigation.

132.    In addition, because Makris' breaches of his fiduciary duties and obligations were committed knowingly, intentionally, recklessly, and with a conscious disregard of the rights of the NRA, the NRA is entitled to recover punitive damages in addition to the monetary damages sought herein in an amount to be determined at trial by jury.

### COUNT THREE: FRAUD (Against Makris)

133.    The NRA incorporates the allegations in the preceding and subsequent paragraphs as if fully set forth herein.

134.    Makris, individually and through the corporate fiction of UWS, submitted Supplemental Invoices on UWS letterhead to the NRA for payment in which Makris knowingly, intentionally, recklessly, and falsely made misrepresentations to the NRA, by commission and omission, seeking payment for "supplemental" costs, expenses, goods and/or services which he misrepresented to be related to UWS, the UWS Agreements, and the Show.

24

135.    Such unity exists between Makris and UWS that UWS ceased to be separate from Makris and any recognition of separateness would lead to an unjust and inequitable result.

136.    Makris caused UWS, the corporate fiction, to be used for the purpose of perpetrating his fraudulent Supplemental Invoice scheme and did perpetrate an actual fraud on the NRA for his own direct personal benefit in order to divert the NRA's funds to himself, and acted at all times with dishonesty of purpose and intent to deceive the NRA.

137.    At all relevant times, Makris knowingly, intentionally, recklessly, and falsely concealed these material facts from the NRA relating to the Supplemental Invoices, with a conscious disregard of the rights of the NRA.

138.    Instead, Makris misrepresented that the costs and expenses for alleged goods and/or services were legitimate supplemental costs and expenses for actual goods and/or services in order to induce the NRA to provide him with payment.

139.    The NRA reasonably relied upon Makris' misrepresentations and believed them to be true at the time they were made.

140.    The NRA's reliance thereto was justified because Makris was a long-time, trusted fiduciary of the NRA, close personal friend of LaPierre, and a senior executive at AMc, the President of Mercury Group, and the President and principal owner of UWS, who played a central role in the development of NRATV, which aired the Show.

141.    Makris' misrepresentations, concealment, and omission of material facts were false when made, or were made with reckless disregard of the truth, and the NRA did not discover the true facts until after it had acted in reliance on Makris' misrepresentations and omissions and made the payments.

142.    After the NRA made the payments, it learned that there were no actual

25

supplemental "costs" or expenses. Rather, Makris caused the "Supplemental" invoices to be sent to the NRA as if related to the UWS Agreements when they were not related to the Show.

143.    In fact, it was only during the UWS Litigation that the NRA learned that those payments were for Makris personally. In an attempt to contrive some justification for this now obvious swindle, Makris now contends that he was entitled to payment of the Supplemental Invoices as payment for his alleged fundraising activities outside the scope of the UWS Agreements.

144.    In addition to his fraudulent invoicing scheme, Makris individually and through the mere tool, business conduit, and corporate fiction of UWS, sought to extract funds from the NRA for his direct personal benefit through the continued pursuit of the UWS Litigation despite the fact that such litigation was encompassed within and barred by the CSA.

145.    The UWS Litigation proceeded after the NRA entered into the CSA without any carve out for the UWS Litigation. That Makris, UWS and the other Defendants always intended to do so despite the CSA is now obvious. At all times, Makris acted with dishonesty of purpose and with intent to deceive the NRA.

146.    Such unity exists between Makris and UWS that UWS ceased to be separate from Makris and any recognition of separateness would lead to an unjust and inequitable result by, *inter alia*, allowing Makris to avoid his obligations under the CSA while reaping its benefits.

147.    The aforementioned misconduct of Makris was performed with malice, wantonness, or oppression in disregard of the NRA's rights, to the detriment and harm of the NRA.

148.    The NRA was damaged by Makris' malfeasance and incurred monetary damages as a direct and proximate result of Makris' actual fraud, fraudulent inducement, constructive fraud, fraudulent concealment, and the NRA's detrimental reliance thereon.

26

149.    As a result thereof, the NRA has also suffered, and will continue to suffer, harm in the form of attorneys' fees, costs, and expenses incurred in connection with the UWS Litigation.

150.    As a result thereof, the NRA requests punitive damages in an amount to be determined at trial, because Makris' fraudulent conduct was committed knowingly, intentionally, recklessly, and in conscious disregard of the rights of the NRA.

### COUNT FOUR: DECLARATORY JUDGMENT THAT MAKRIS IS ESTOPPED FROM ASSERTING THAT CLAIMS AGAINST HIM ARE RELEASED BY THE CSA (Against Makris)

151.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

152.    Plaintiff requests a declaratory judgment pursuant to 28 U.S.C. § 2201, that Makris is precluded from claiming that claims against him are released under the CSA because Makris is judicially estopped from making that contention.

153.    As part of the UWS Litigation, Makris, a non-party to the UWS Litigation, made sworn statements concerning his supposed lack of knowledge about the negotiation and execution of the CSA, including its mutual, general Release provision.

154.    In this litigation, the NRA is entitled to a declaration that Makris is estopped from taking the inconsistent position that the Release in the CSA is effective to bar the NRA's claims against Makris, since Makris previously took the position that he knew nothing about the CSA, except what he read in the "newspapers" and was not bound by it.

155.    To permit Makris, after his disavowal of the CSA and the settlement of the AMc Litigation, to take a clearly inconsistent position here, namely that he is covered and/or protected from liability by the CSA, will provide him with an unfair advantage, impose an unfair detriment on the NRA, and threaten the integrity of the judicial process.

27

156.   The NRA has a special interest as a contracting party of the CSA.

157.   All parties named in this action have an interest in the CSA and therefore, this declaration should apply to all parties.

158.   Therefore, an actual controversy of a justiciable nature exists between the NRA and Makris regarding the release under the CSA. A declaratory judgment setting forth that Makris is estopped from asserting that claims against him are released under the CSA is necessary and would terminate the controversy.

### COUNT FIVE: DECLARATORY JUDGMENT THAT MAKRIS IS ESTOPPED FROM ASSERTING THAT THE SUPPLEMENTAL INVOICES AND ANY PAYMENTS THEREUNDER RELATED TO THE UWS AGREEMENTS AND WERE LEGALLY PROCURED (Against Makris)

159.   The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

160.   Plaintiff requests a declaratory judgment pursuant to 28 U.S.C. § 2201, that Makris is precluded from asserting that the payments of the Supplemental Invoices to Makris from the NRA were connected to the UWS Agreements and/or were legally procured because Makris is judicially estopped from making that contention.

161.   Makris has made sworn statements as part of the UWS Litigation concerning the reasons that he requested and received payment for the Supplemental Invoices, namely that he received the payments for his "fundraising" efforts, which were not related to the UWS Agreements.

162.   Makris stated in the UWS Litigation that he received the Supplemental Invoice payments as expense reimbursement related to activities with donors and potential donors to the NRA. The activities described by Makris were not a part of or covered by the UWS Agreements.

28

163.    None of the reasons that Makris gave for his receipt of payment pursuant to the Supplemental Invoices are supported by any written documentation.

164.    In the UWS Litigation, in sworn testimony, Makris misrepresented that the monies he received from the NRA were for legitimate amounts due.

165.    Rather, Makris took monies from the NRA on the false representation that he was owed reimbursement for the purported expenses stated in the Supplemental Invoices. Makris' representation was made with the dishonest purpose and intent to deceive the NRA and he did deceive the NRA.

166.    The payments to Makris from the NRA pursuant to the Supplemental Invoices were as a result of breaches of fiduciary duties and fraud committed by Makris for his direct personal benefit.

167.    Having taken the position in the UWS Litigation that the Supplemental Invoices were issued as reimbursement to Makris individually for alleged "Supplemental Expenses" that he individually incurred in entertaining donors and potential donors to the NRA, Makris cannot assume a contrary position in this litigation and allege that the Supplemental Invoices were somehow related to the UWS Agreements and the Show.

168.    To allow Makris to take such an inconsistent position here would prejudice the NRA, provide him with an unfair advantage, impose an unfair detriment on the NRA, and threaten the integrity of the judicial process. Accordingly, he must be estopped from taking any position other than that which he assumed in the UWS Litigation.

169.    The NRA has a special interest as the payor of the Supplemental Invoices.

170.    All parties named in this action have an interest in the Supplemental Invoices and therefore, a declaration should apply to all parties.

29

171.   Therefore, an actual controversy of a justiciable nature exists between the NRA and Makris regarding the payments of the Supplemental Invoices. A declaratory judgment setting forth that Makris is precluded from asserting that the payments of the Supplemental Invoices to Makris from the NRA were connected to the UWS Agreements and/or were legally procured is necessary and would terminate the controversy.

### COUNT SIX: ACCOUNTING (Against Makris)

172.   Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

173.   The NRA is entitled to an order, *inter alia*, requiring an accurate accounting of any of Makris' accounts in which any NRA funds relating to the Supplemental Invoices were deposited, transferred, disbursed or withdrawn from, removed or altered in any manner. The NRA is also entitled to an order requiring Makris to disgorge any profits or amounts removed from such accounts.

174.   Plaintiff further requests that the Court appoint a qualified expert to conduct and certify, or audit, the accuracy of the accounting.

### DEMAND FOR JURY TRIAL

175.   The NRA hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this action.

### PRAYER

For all of the foregoing reasons, the NRA requests that the Court enter judgment in its favor and award the NRA the following relief against Defendants:

    a.   As to the First Cause of Action as Against All Defendants:

        i.   Damages in an amount in excess of $75,000 to be determined at trial

30

including:

     i.   Attorneys' fees and costs incurred by the NRA since March 11, 2022 in defending the UWS Litigation; and

     ii.  Amounts set forth in any and all judgments or court orders issued against Plaintiff in the UWS Litigation including, without limitation, $550,000 plus interest in damages awarded in the UWS Litigation;

     iii. An award of attorneys' fees, costs, and expenses incurred in this action to enforce the CSA;

b.  As to the Second Cause of Action as Against Makris:

     i.   Damages in an amount to be determined at trial;

     ii.  Punitive damages in an amount to be determined at trial;

c.  As to The Third Cause of Action as Against Makris:

     i.   Damages in an amount to be determined at trial;

     ii.  Punitive damages in an amount to be determined at trial;

d.  As to the Fourth Cause of Action as Against Makris:

     i.   Declaratory judgment that Makris is estopped from claiming that claims against him are released under the CSA;

e.  As to the Fifth Cause of Action as Against Makris:

     i.   Declaratory judgment that Makris is estopped from asserting that the payments on the Supplemental Invoices to Makris from the NRA were connected to the UWS Agreements and/or were procured by legal means;

31

    f. As to the Sixth Cause of Action as Against Makris. an accounting:

        i.    Damages in an amount to be determined at trial:

    g. An award of attorneys' fees. costs. and expenses;

    h. Prejudgment interest and post-judgment interest from the date of entry until the

       date of satisfaction at the highest rates allowed by law; and

    i.  Such other relief. at law or in equity, as the Court deems just and proper.

Dated: January 9, 2023                      Respectfully submitted.

                                   **BREWER. ATTORNEYS & COUNSELORS**

                            By: _____

                              Cecelia L. Fanelli
                              *Pro Hac Vice*
                              clf@brewerattorneys.com
                              Ramon Hernandez
                              State Bar No. 24126896
                              rxh@brewerattorneys.com
                              1717 Main Street, Suite 5900
                              Dallas, Texas 75201
                              Telephone: (214) 653-4000
                              Facsimile: (214) 653-1015

                              **ATTORNEYS FOR PLAINTIFF THE NATIONAL RIFLE ASSOCIATION OF AMERICA**

# EXHIBIT J

COPY    SEALED    
CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS MAR 15  PM 2:34
DALLAS DIVISION

DEPUTY CLERK_____ MO

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § |
| | § Civil Action No. 3:22-CV-1944-G |
| Plaintiff, | § |
| | § The Honorable A. Joe Fish, |
| v. | § presiding. |
| | § |
| ACKERMAN McQUEEN, INC. and MERCURY GROUP, INC. | § § FILED UNDER SEAL |
| | § |
| Defendants. | § |

### DEFENDANTS ACKERMAN MCQUEEN, INC.'S AND MERCURY GROUP, INC.'S MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE A. JOE FISH:**

Ackerman McQueen, Inc. ("*AMc*"), and Mercury Group, Inc. ("*MG*"), Defendants (together "*Movants*"), file this their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, and Local Rules 7.1 and 7.2, respectfully showing as follows:

### I.

### SUMMARY

1.    AMc and MG are entitled, as a matter of law, to summary disposition of the sole claim asserted against them, Count One (Breach of Contract) in Plaintiff's

Second Amended Complaint ("*Amended Complaint*").[1] This single claim was fully litigated in a September 2022 jury trial in Virginia and is barred by the doctrines of collateral estoppel and *res judicata*.

2. The claimed breach is based on the assertion that Movants, signatories to the Confidential Settlement Agreement ("*CSA*") reached in earlier litigation[2] (the "*Texas Litigation*"), have failed to prevent their purported "affiliate" or "related party" (categories included in the Release provision of the CSA), Under Wild Skies, Inc. ("*UWS*"), from pursuing its own claims and from prevailing against the NRA before a jury in Circuit Court in Fairfax County, Virginia (the "*UWS Litigation*").[3] AMc and MG have consistently denied that UWS is either an "affiliate" or "related party" or that either entity has any ownership interest in or exercises any control over UWS, despite certain immaterial common elements such as AMc officer Tony Makris ("*Makris*"), who separately owns and controls UWS.

3. This very issue was raised by the NRA and fully litigated in the UWS Litigation in an effort to delay, and then avoid, the adverse jury verdict in the UWS Litigation. In two separate rulings, the Virginia Court resoundingly denied the NRA's dilatory efforts, finding that claims asserted by UWS in the UWS Litigation

---

[1] Plaintiff's Second Amended Complaint, adding claims against newly-added Defendant Anthony Makris ("Makris") was originally filed on January 9, 2023, without leave of Court and without seeking opposing counsel's agreement. Plaintiff has now corrected that deficiency and has filed its Amended Complaint pursuant to Stipulation. *See* ECF 37.

[2] The referenced litigation was Civil Action No. 3:19-cv-02074-G, *National Rifle Association v. Ackerman McQueen, Inc., et al*, in the Northern District of Texas, Dallas Division.

[3] The referenced litigation was Case No. CL-2019-12530, *Under Wild Skies, Inc. v. National Rifle Ass'n*, in the Circuit Court for Fairfax County, Virginia.

were not covered by the CSA release, an outcome that could only have come from a determination consistent with Movants' position regarding their relationship to UWS. Those orders rejected Plaintiff's claim that UWS was an "affiliate" of or a "related party" to Movants. Neither UWS nor its owner Makris were parties to the Texas Litigation and had no part in negotiating the CSA. Neither were they signatories to the CSA.

4.     A third ruling in Virginia reinforced the prior orders, when on the eve of trial the Court denied the NRA's request to add "Release" as an affirmative defense.

5.     Similarly, newly-added Counts Three (Fraud arising from submission of fraudulent invoices); Four (Declaratory Judgment – Estoppel to deny release of UWS claim); and Five (Estoppel from asserting legality of UWS invoices), all directed at Makris, are claims which were also litigated in the UWS Litigation and resoundingly determined against the NRA.

6.     Because of these prior court rulings, which are now final, the NRA is collaterally estopped from asserting its breach of contract claim herein against Movants. Further, to the extent the fraud and Release claims asserted against the newly-added Defendant Makris were litigated and disposed of against the NRA in the UWS Action, those claims as well as the claim against Movants are barred by the doctrine of *res judicata*. Makris has advanced his own defense in his pending Motion to Dismiss.

## II.

## EVIDENCE IN SUPPORT

6.     Filed contemporaneously herewith, in accordance with Northern

District of Texas Local Civil Rules 56.5 and 56.6, are Movants' Brief in Support of

Motion for Summary Judgment and an Appendix (herein, "***App.***") incorporating

evidence germane to this Motion, to-wit: Declaration of T. Wayne Biggs ("Biggs

Decl.," App. 3-7) authenticating the following:

> a. Defendants' Demurrer, Answer, Affirmative Defenses and
>    Counterclaims to Plaintiff's Amended Complaint (App. 8-21);
>
> b. NRA's Plea in Bar and Memorandum of Law in Support of Its Plea
>    in Bar for Settlement and Release of Claims (App. 22-32);
>
> c. Virginia Court Order dated August 19, 2022 (App. 33);
>
> d. Virginia Court Order dated August 26, 2022 (App. 34-37);
>
> e. Redacted copy of Confidential Settlement Agreement (App. 38-
>    49); and
>
> f. Final Order of the Virginia Court dated October 18, 2022 (App.
>    50-52).

7.     Also provided in support of this Motion is the Declaration of Jay

J. Madrid ("Madrid Decl.," App. 53-54) authenticating the following:

> a. True and correct copy of the Certificate of Incorporation of
>    Under Wild Skies, Inc., attached to which are the Articles of
>    Incorporation of UWS (App. 55-57); and
>
> b. True and correct copy of a sample Annual Report of UWS,
>    dated July 28, 2022, as filed with the State Corporation
>    Commission of the commonwealth of Virginia (App. 58).

## III.

### CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Movants pray that upon hearing, this Honorable Court GRANT their Motion for Summary Judgment consistent with the proposed Order submitted herewith, dismiss Plaintiff's claim against Movants, and grant Movants such other relief to which they may show themselves entitled.

Respectfully submitted,

**DORSEY & WHITNEY LLP**

By: _____*Jay J. Madrid*_____
    Jay J. Madrid      SB#12802000
    madrid.jay@dorsey.com
    Brian Vanderwoude   SB#24047558
    vanderwoude.brian@dorsey.com
    Monica Niewiarowski  SB#24105877
    niewiarowski.monica@dorsey.com
    200 Crescent Court, Suite 1600
    Dallas, Texas 75201
    214-981-9900 (Tel.)
    214-981-9901 (Fax)

    **ATTORNEYS FOR DEFENDANTS**
    **ACKERMAN McQUEEN, INC. AND**
    **MERCURY GROUP, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 15, 2023, a true and correct

copy of the foregoing instrument was hand delivered to the Court Clerk for filing in

the sealed case. All counsel of record were served by U.S. mail and email on this date.

/s/ *Jay J. Madrid*
Jay J. Madrid

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § |
| | § |
| | § Civil Action No. 3:22-CV-1944-G |
| Plaintiff, | § |
| | § The Honorable A. Joe Fish, presiding. |
| v. | § |
| | § |
| ACKERMAN McQUEEN, INC. and | § **FILED UNDER SEAL** |
| MERCURY GROUP, INC. | § |
| | § |
| Defendants. | § |

## DEFENDANT ANTHONY MAKRIS'
## MOTION TO DISMISS UNDER FRCP 12(b)(6)

TO THE HONORABLE A. JOE FISH, SENIOR JUDGE:

Comes now, ANTHONY "TONY" MAKRIS ("*Makris*"), recently added as a Defendant herein, and files this his Motion to Dismiss Plaintiff's Second Amended Complaint (the "*Complaint*") for failure to state a claim under FED. R. CIV. P. 12(b)(6), and in support thereof respectfully shows as follows:

## I.
## SUMMARY OF MOTION

1.1    The claims asserted against Makris were previously tried before a jury in September 2022 in the Circuit Court of Fairfax County, Virginia (the "*UWS Litigation*"). Trial resulted in a verdict favorable to Makris and is the subject of final orders. The instant suit against Makris is an improvident attempt by Plaintiff, National Rifle Association of America ("*NRA*"), to circumvent the legal process to undo binding decisions and a verdict in favor of Makris.

1.2     Since these claims have been fully litigated to conclusion, they are moot and are barred by collateral estoppel. Therefore, the claims against Makris are by definition implausible on the face of the pleadings.

1.3     In addition, the fraud claim asserted against Makris (Cause of Action No. CL-2019-12530) is barred by the Virginia two-year statute of limitations. As was evident from the scope of the UWS Litigation, Virginia law applies to the fraud claim. Under Virginia, such a claim is subject to the two-year statute of limitations. A two-year limitations period likewise applies to a claim for breach of fiduciary duty.

## II.
## GROUNDS FOR MOTION

2.1     The UWS Litigation, styled *Under Wild Skies, Inc. v. National Rifle Association of America*, Case No. CL-2019-12530 in the Circuit Court of Fairfax County, Virginia, was tried to a jury during September 2022. The jury returned its verdict, final orders have been entered and both sides have lodged appeals.

2.2     The claims here brought against Makris are moot, as the controversy between these parties has been decided. Furthermore, Plaintiff is collaterally estopped from re-litigating those same claims. Plaintiff has alleged in those same claims, entitlement to recover, as damages, costs expended in the UWS Litigation, among others.

## III.
## EVIDENCE IN SUPPORT OF MOTION

Because Plaintiff has claimed an entitlement to recover damages associated with the UWS Litigation, the following evidence is submitted herewith, in an appendix filed contemporaneously with this Motion and cited as "*App.*", to demonstrate both the implausibility and mootness of claims against Makris:

---

**DEFENDANT ANTHONY MAKRIS' MOTION TO DISMISS UNDER FRCP 12(B)(6)**      **PAGE 2**
8434693_1

Declaration of T. Wayne Biggs, ("**Biggs Decl.**") (App., pp. 3- 6) attached to which are:

1.     NRA's Demurrer, Answer, Affirmative Defenses and Counterclaims to Plaintiff's Amended Complaint (which includes Defense No. 4, "Fraudulent Submission of Expenses") (App., pp. 8 – 21);

2.     Copy of Order of August 19, 2022 granting UWS' Motion to Strike NRA's "Release" Defense (App., p. 23);

3.     Copy of Order dated August 26, 2022, denying NRA's request to add "Release" (under the CSA involved in this case) as a defense and finding the earlier court order to be "dispositive of the legal question of whether the CSA released UWS **[i.e., the UWS Clams]**" (App., pp. 25 - 28); and

4.     Redacted copy of Confidential Settlement Agreement (App., pp. 31 - 42).

## IV.
## CONCLUSION AND PRAYER

FOR THESE REASONS, Makris prays that, upon consideration, this Honorable Court GRANT his Motion to Dismiss, and award him such other relief to which he may show himself entitled.

Respectfully submitted,

/s/ *James S. Robertson, III*

James S. Robertson, III
State Bar No. 17061075
GLAST, PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254-1449
972-419-7136
469-206-5048 – Telecopier
jrobertson@gpm-law.com

ATTORNEY FOR DEFENDANT
ANTHONY MAKRIS

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 1, 2023, a true and correct copy of the foregoing instrument was electronically filed under seal with Court Clerk through the Court's electronic case filing system and a copy served on all other counsel/parties of record in accordance with FED. R. CIV. P. 5.

/s/ *James S. Robertson, III*

James S. Robertson, III

# EXHIBIT L

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § |
| | § |
| | § Civil Action No. 3:22-CV-1944-G |
| Plaintiff, | § |
| | § The Honorable A. Joe Fish, presiding. |
| v. | § |
| | § |
| ACKERMAN McQUEEN, INC. and | § FILED UNDER SEAL |
| MERCURY GROUP, INC. | § |
| | § |
| Defendants. | § |

### DECLARATION OF T. WAYNE BIGGS

Pursuant to 28 USC § 1746, I, T. Wayne Biggs hereby declare as follows:

1.     My name is T. Wayne Biggs. I am a principal in the Fairfax, Virginia

law firm of Dycio & Biggs. I am over the age of eighteen, have never been convicted

of a felony. I am competent to make this Declaration, and I have personal knowledge

of the matters set forth herein.

2.     I make this Declaration in support of the Motion to Dismiss filed on

behalf of Anthony (Tony) Makris ("Makris"), in that certain lawsuit in the United

States District Court of the Northern District of Texas, Dallas Division, styled

*National Rifle Association of America, Plaintiff v. Ackerman McQueen, Inc. and*

*Mercury Group, Inc.*

3.     I am a practicing attorney with our principal office in Fairfax, Virginia.

I am admitted to practice before all courts in the State of Virginia, the United States

District Court for the Eastern District of Virginia, the United State Bankruptcy Court

for the Eastern District of Virginia, and the Fourth United States Circuit Court of Appeals.

4.     I was lead counsel for Plaintiff in that certain lawsuit styled *Under Wild Skies, Inc., Plaintiff v. National Rifle Association of America, Defendant,* Case No. CL19-12530, in the Circuit Court for the County of Fairfax, Virginia (the "UWS Litigation"). Mr. Makris, while not a named party, was active in the case on behalf of UWS and was the principal witness on behalf of my client at trial of the case.

5.     The UWS Litigation was tried to a jury beginning September 12, 2022 and concluded on September 20, 2022 when the jury returned a verdict favorable to my client.

6.     The NRA filed a counterclaim and asserted affirmative defenses in the case that were centered around its allegations that Makris, on behalf of UWS, had submitted fraudulent invoices to the NRA for work done for that entity.  Attached hereto as *Exhibit "1"* is a true and correct copy of **Defendant's Demurrer, Answer, Affirmative Defenses, and Counterclaims to Plaintiff's Amended Complaint,** filed by the NRA containing their claims and affirmative defenses that were presented to the jury during the UWS Litigation. Prior to the case being submitted the jury, the Court struck affirmative defenses 3 ("Failure of Consideration"), 4 ("Fraudulent Submission of Expenses"), and 10 ("Setoff/Recoupment") pursuant to Under Wild Skies' motion to strike for insufficient proof made after the close of evidence.    The NRA had previously, voluntarily withdrawn affirmative defense 5 ("Duress").

2

7.      Prior to the start of the jury trial, the NRA sought to continue the case and to add, as an affirmative defense, that the claims asserted by UWS had been released by that certain Confidential Settlement Agreement and Mutual Release ("CSA") that had been reached by the parties in litigation in Texas, in that certain lawsuit styled *National Rifle Association of America v. Ackerman McQueen, Inc., et al*, Civil Action No. 3:19-cv-02074-G (the "Texas Litigation"). Neither Makris nor UWS was a party to that litigation nor was either a signatory to the CSA. The NRA, additionally, filed a pleading known as a "Plea in Bar" which sought to assert the supposed "release" defense related to the CSA.

8.      In the UWS Litigation, the Court directly considered the supposed "release defense" first in the context of the Plea In Bar hearing and then in relation to the request to continue the case and add the affirmative defense of release. UWS contested the Plea In Bar and moved to strike the Plea in Bar based on, *inter alia*, (a) the fact that neither UWS nor Makris were signatories; (b) UWS is neither an affiliate of nor related to AMc or MG; and (c) Makris did not participate in and had never seen the full text of the CSA. The Court granted the Motion to Strike the Plea in Bar based on its finding that UWS was not a signatory to the CSA. Please see *Exhibit "2"* which is the Court's Order dated August 19, 2022, granting the Motion to Strike.

9.      On August 26, 2022, the Court heard the NRA's motions to continue and for leave to add the release defense. In addition to the substantive arguments made against adding the release as a defense (i.e. that neither Makris nor UWS were bound by the CSA in any way and that the Court had already made a substantive ruling on

4864-6898-2349\1

3

the CSA's application to the UWS Litigation), UWS argued that the continuance motion and motion for leave to amend came too late. That is, the NRA was obviously aware of the CSA in March of 2022, but filed no pleadings related to the CSA until July 27, 2022 when it filed the Plea in Bar. Notably, the pleadings came at a time when it was too late for UWS to issue discovery in the case under the Court's Scheduling Order. Please see *Exhibit "3"* which is the Court's Order dated August 26, 2022, denying the motion for continuance and for leave to add the release defense.

10.     Indeed, the only familiarity I or Makris had with the CSA document leading up to trial was the Plea In Bar filing by the NRA attached to which (as Exhibit D) was a heavily redacted copy of the CSA. Please see *Exhibit "4"*, a true and correct copy of the NRA filing disclosing that portion of the CSA.

11.     The claims asserted by the NRA against UWS included fraud, based on alleged fraudulent invoices (the "Supplemental Invoices"), and were asserted as part of its 4th affirmative defense which, as noted, was struck by the Court. As such, these claims were actually litigated in the context of the UWS Litigation.

I declare, under penalty of perjury, and in accordance with 28 USC 1746, the foregoing is true and correct to my personal knowledge, approved and correct.

SIGNED this ___30th___ day of _____, 2023.

T. Wayne Biggs

# EXHIBIT 1

**VIRGINIA:**

**IN THE CIRCUIT COURT OF THE COUNTY OF FAIRFAX**

FILED
COURT SERVICES

2019 DEC 12 ⊃ 3: 4b

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

| | |
|---|---|
| **UNDER WILD SKIES, INC.,** | |
| **Plaintiff,** | |
| v. | **Case No. 2019 - 12530** |
| **NATIONAL RIFLE ASSOCIATION OF AMERICA.** | |
| **Defendant.** | |

## DEFENDANT'S DEMURRER, ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT

Defendant the National Rifle Association of America (the "NRA"), by counsel, hereby submits the following Demurrer, Answer, Affirmative Defenses, and Counterclaims to the Amended Complaint filed by Plaintiff Under Wild Skies, Inc. ("UWS").

### DEMURRER

1. Counts I and II of the Amended Complaint fail to state a claim for Breach of Contract because the NRA is not a party to any contract between UWS and Winnercomm, Inc. and is not liable for any breach by UWS of a contract to which the NRA is not a party.

2. Count III of the Amended Complaint fails to state a claim for Anticipatory Repudiation of the Advertising Agreement, because: (i) to the extent that Count III alleges a claim for promissory estoppel, such a claim does not exist in Virginia, *see W.J. Schafer Assocs. v. Cordant, Inc.*, 254 Va. 514, 521, 493 S.E.2d 514 (1997); (ii) anticipatory repudiation is not applicable to contracts for installment payments in exchange for continuing services, *see Fairfax Fall Church Community Services Bd. v. Herren*, 230 Va. 390, 395, 337 S.E.2d 741



DEPOSITION
EXHIBIT
Appendix - Page 8

(1985); *Henderson v. Martin & Meyer Investments, Inc.*, 20 Cir. L12811, 1992 WL 884691, at \*1 (Loudoun Co. Cir. Ct. 1992); (iii) the NRA is not a party to any contract between UWS and Winnercomm, Inc. and is not liable for any breach by UWS of a contract to which the NRA is not a party.

3. Count IV of the Amended Complaint fails to state a claim for Anticipatory Repudiation of the Sponsorship Agreement, because: (i) to the extent that Count III alleges a claim for promissory estoppel, such a claim does not exist in Virginia, *see W.J. Schafer Assocs.*, 254 Va. at 521; (ii) anticipatory repudiation is not applicable to contracts for installment payments in exchange for continuing services, *see Fairfax Fall Church Community Services Bd.*, 230 Va. at 395; *Henderson*, 1992 WL 884691, at \*1; (iii) the NRA is not a party to any contract between UWS and Winnercomm, Inc. and is not liable for any breach by UWS of a contract to which the NRA is not a party.

## ANSWER

In response to the specific, numbered paragraphs of UWS's Amended Complaint, the NRA responds as follows:

### Parties

1. The NRA admits the allegations in Paragraph 1.

2. The NRA admits the allegations in Paragraph 2.

### Jurisdiction and Venue

3. Paragraph 3 contains conclusions of law to which no response is required.

### Facts

4. The NRA admits that UWS is a television program that is hosted by Anthony Makris ("Makris"). The NRA lacks sufficient information to admit or deny the remaining

2

allegations in Paragraph 4. To the extent a response is required, the NRA denies any and all remaining allegations in Paragraph 4.

5.    The NRA denies the allegations in Paragraph 5.

6.    The NRA lacks sufficient information to admit or deny the allegations in Paragraph 6. To the extent a response is required, the NRA denies the allegations in Paragraph 6.

7.    The NRA admits the allegations in Paragraph 7.

8.    The NRA denies the allegations in Paragraph 8.

9.    The NRA lacks sufficient knowledge to admit or deny that Makris is the principal of the Mercury Group. The NRA denies the remaining allegations in Paragraph 9.

10.    The NRA admits the allegations in Paragraph 10.

11.    The NRA denies the allegations in Paragraph 11.

12.    The NRA admits that Ackerman McQueen has filed counterclaims in the lawsuits against the NRA in a sum exceeding one hundred million dollars. The NRA denies the remaining allegations in Paragraph 12.

13.    Paragraph 13 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, some of the allegations contained in this paragraph assert legal arguments and conclusions to which no response is required. To the extent a response is required the NRA denies the allegations of Paragraph 13.

14.    Paragraph 14 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, some of the allegations contained in this paragraph assert legal arguments and conclusions to which no response is required. To the extent a response is required the NRA denies the allegations of Paragraph 14.

3

15.     The NRA lacks sufficient information to admit or deny the allegations in Paragraph 15. To the extent a response is required, the NRA denies the allegations in Paragraph 15.

16.     The NRA lacks sufficient information to admit or deny the allegations in Paragraph 16. To the extent a response is required, the NRA denies the allegations in Paragraph 16.

17.     Paragraph 17 refers to a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required the NRA admits the allegations of Paragraph 17.

18.     Paragraph 18 refers to a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required the NRA admits the allegations of Paragraph 18.

19.     Paragraph 19 refers to a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required the NRA admits the allegations of Paragraph 19.

20.     The NRA denies the allegations in Paragraph 20.

21.     Paragraph 21 contains legal conclusions to which no response is required. To the extent a response is required the NRA denies the allegations of Paragraph 21.

22.     The NRA denies the allegations in Paragraph 22.

23.     The NRA denies the allegations in Paragraph 23.

24.     The NRA lacks sufficient information to admit or deny whether all of the individuals listed in Paragraph 24 appear on UWS. However, the NRA admits that at least some of the individuals listed in Paragraph 24 have appeared on UWS in an effort to promote the NRA to the viewing public. Any and all remaining allegations in Paragraph 24 not explicitly admitted herein are denied.

4

25.    The NRA lacks sufficient information to admit or deny the allegations in Paragraph 25. To the extent a response is required, the NRA denies the allegations in Paragraph 25.

26.    The NRA denies the allegations in Paragraph 26.

27.    Paragraph 27 refers to a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required the NRA denies the allegations of Paragraph 27.

28.    Paragraph 28 refers to a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required the NRA denies the allegations of Paragraph 28.

29.    The NRA admits the allegations in Paragraph 29.

30.    Paragraph 30 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, Paragraph 30 contains legal arguments and conclusions to which no response is required. To the extent a response is required, the NRA denies the allegations in Paragraph 30.

31.    The NRA denies the allegations in Paragraph 31.

32.    The NRA denies the allegations in Paragraph 32.

33.    The NRA denies the allegations in Paragraph 33.

34.    The NRA denies the allegations in Paragraph 34.

35.    Paragraph 35 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, Paragraph 35 contains legal arguments and conclusions to which no response is required. To the extent a response is required, the NRA denies the allegations in Paragraph 35.

5

36.  Paragraph 36 purports to quote from a document to which no response is required as the document is the best evidence of its contents. To the extent a response is required, the NRA denies the allegations in Paragraph 36.

37.  The NRA denies the allegations in Paragraph 37.

38.  The NRA denies the allegations in Paragraph 38.

39.  The NRA denies the allegations in Paragraph 39.

40.  Paragraph 40 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, Paragraph 40 contains legal arguments and conclusions to which no response is required. To the extent a response is required, the NRA denies the allegations in Paragraph 40.

41.  Paragraph 41 refers to a document to which no response is required as the document is the best evidence of its contents. In addition, Paragraph 41 contains legal arguments and conclusions to which no response is required. To the extent a response is required, the NRA denies the allegations in Paragraph 41.

42.  The NRA denies the allegations in Paragraph 42.

43.  The NRA denies the allegations in Paragraph 43.

44.  The NRA admits that between 2016 and July 1, 2019, every payment owed to UWS by the NRA under each of the Agreements was paid on-time and consistently. The NRA denies the remaining allegations in Paragraph 44.

45.  The NRA admits that the NRA complied with the Advertising and Sponsorship Agreements at all relevant times. The NRA denies the remaining allegations in Paragraph 45.

46.  The NRA denies the allegations in Paragraph 46.

47.  The NRA denies the allegations in Paragraph 47.

6

48.     Paragraph 48 contains legal conclusions to which no response is required. To the extent a response is required, the NRA denies the allegations in Paragraph 48.

49.     Paragraph 49 contains legal conclusions to which no response is required. To the extent that a response is required, the NRA denies the allegations in Paragraph 49.

50.     The NRA denies the allegations in Paragraph 50.

51.     The NRA denies the allegations in Paragraph 51.

52.     The NRA denies the allegations in Paragraph 52.

53.     The NRA denies the allegations in Paragraph 53.

54.     The NRA denies the allegations in Paragraph 54.

55.     Paragraph 55 contains legal conclusions to which no response is required. To the extent that a response is required, the NRA denies the allegations in Paragraph 55.

56.     The NRA denies the allegations in Paragraph 56.

57.     The NRA denies the allegations in Paragraph 57.

58.     The NRA denies the allegations in Paragraph 58.

## COUNT I

### (Breach of Advertising Contract)

59.     The NRA reincorporates by reference its responses to the allegations in Paragraphs 1 through 58.

60.     The NRA denies the allegations in Paragraph 60.

61.     The NRA denies the allegations in Paragraph 61.

62.     The NRA denies the allegations in Paragraph 62.

63.     The NRA denies the allegations in Paragraph 63.

## COUNT II

7

(Breach of Sponsorship Contract)

64.     The NRA reincorporates by reference its responses to the allegations in Paragraphs

1 through 63.

65.     The NRA denies the allegations in Paragraph 65.

66.     The NRA denies the allegations in Paragraph 66.

67.     The NRA denies the allegations in Paragraph 67.

68.     The NRA denies the allegations in Paragraph 68.

## COUNT III

(Advertising Agreement – Anticipatory Breach)

69.     The NRA reincorporates by reference its responses to the allegations in Paragraphs

1 through 68.

70.     The NRA denies the allegations in Paragraph 70.

71.     The NRA denies the allegations in Paragraph 71.

72.     The NRA denies the allegations in Paragraph 72.

73.     The NRA denies the allegations in Paragraph 73.

74.     The NRA denies the allegations in Paragraph 74.

75.     The NRA denies the allegations in Paragraph 75.

76.     The NRA denies the allegations in Paragraph 76.

## COUNT IV

(Sponsorship Agreement – Anticipatory Breach)

77.     The NRA reincorporates by reference its responses to the allegations in Paragraphs

1 through 76.

78.     The NRA denies the allegations in Paragraph 78.

8

79.     The NRA denies the allegations in Paragraph 79.

80.     The NRA denies the allegations in Paragraph 80.

81.     The NRA denies the allegations in Paragraph 81.

82.     The NRA denies the allegations in Paragraph 82.

83.     The NRA denies the allegations in Paragraph 83.

84.     The NRA denies the allegations in Paragraph 84.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

1.     UWS' claims are barred in whole or in part by UWS' duty to mitigate.

### Second Affirmative Defense

2.     UWS' claims are barred in whole or in part by UWS' prior material breaches of the Advertising and Sponsorship Agreements.

### Third Affirmative Defense

3.     UWS' claims are barred in whole or in part by UWS' failure of consideration under the Advertising and Sponsorship Agreements.

### Fourth Affirmative Defense

4.     UWS' claims are barred in whole or in part by UWS' fraudulent submission of expenses.

### Fifth Affirmative Defense

5.     UWS' claims are barred in whole or in part because UWS obtained the Advertising and Sponsorship Agreements under duress.

### Sixth Affirmative Defense

9

6.   To the extent that UWS suffered any injury, such injury was not caused by the

NRA.

### Seventh Affirmative Defense

7.   UWS claims are barred, in whole or in part, by the doctrine of unclean hands.

### Eighth Affirmative Defense

8.   As a result of UWS conduct, works, and/or actions, UWS Amended Complaint is

barred, in whole or in part, by the doctrine of waiver.

### Ninth Affirmative Defense

9.   UWS failed to satisfy conditions precedent.

### Tenth Affirmative Defense

10.   The NRA is entitled to setoff and/or recoupment.

### Eleventh Affirmative Defense

11.   UWS' Amended Complaint fails to state a claim upon which relief can be granted.

### COUNTERCLAIMS

Counterclaim Plaintiff the NRA alleges as follows in support of its Counterclaims against

UWS on personal knowledge as to its own actions and on information and belief as to all other

matters as follows:

1.   The NRA and UWS entered into the Advertising and Sponsorship Agreements

("Agreements") on January 24, 2018.

2.   Fundamental to the Agreements are the obligations by UWS to deliver thirteen

original episodes to run in the third and fourth quarters of the year.

10

3.     A fair and good faith reading of the Agreements requires UWS to deliver the

thirteen original episodes to run in the third and fourth quarters in a timely manner.

4.     UWS has materially failed to perform its obligations under the Agreements.

5.     For example, UWS failed to deliver the required thirteen original episodes to run

in the third and fourth quarters of 2018.  Instead, UWS delivered only eleven original episodes to

run.

6.     In the third and fourth quarters of 2019, UWS delivered only eleven original

episodes to run so far.

## Count I

## (Breach of Advertising Contract)

7.     The NRA incorporates by reference the allegations set forth in paragraphs 1

through 6.

8.     The NRA and UWS entered into an enforceable contract.

9.     The NRA at all times fulfilled its obligations under the Advertising Agreement.

10.    UWS breached material terms of the Advertising Agreement.

11.    As a result of UWS' material breach, the NRA has been damaged, and any future

performance obligations have been discharged.

## Count II

## (Breach of Sponsorship Contract)

12.    The NRA incorporates by reference the allegations set forth in paragraph 1

through 11.

13.    The NRA and UWS entered into an enforceable contract.

11

14.   The NRA at all times fulfilled its obligations under the Sponsorship Agreement.

15.   UWS breached material terms of the Sponsorship Agreement.

16.   As a result of UWS' material breach, the NRA has been damaged, and any future performance obligations have been discharged.

UWS has demurred to all Counts.

WHEREFORE, the NRA respectfully requests that this Court:

   a. Dismiss UWS' Amended Complaint in its entirety, with prejudice;

   b. Deny each of UWS' demands for relief;

   c. Declare that UWS' prior material breach discharges the NRA from any future performance under the Agreements;

   d. Award the NRA damages in an amount of not less than $10,000,000.00 ($10 million dollars);

   e. Grant the NRA any relief the Court deems just and proper.

Dated:  December 12, 2019                    Respectfully submitted,

                                             NATIONAL RIFLE ASSOCIATION
                                             OF AMERICA
                                             By counsel

                                             James W. Hundley (VSB No. 30723)
                                             Robert H. Cox (VSB No. 33118)
                                             Amy L. Bradley (VSB No. 80155)

12

BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, Virginia 22182
(703) 883-0880 [telephone]
(703) 883-0899 [facsimile]
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com

*Counsel for the National Rifle Association of
America*

13

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2019, a copy of the foregoing was served by email and first class mail on the following:

Mark R. Dycio
Danielle Quinn
Dycio & Biggs
10533 Main Street
Fairfax, VA 22030

Robert H. Cox (VSB No. 33118)

14

# EXHIBIT 2

VIRGINIA

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

Under Wild Skies }
Plaintiff(s),        )
                     )
v.                   )        ₲ No. _12530_
                     )
National Rifle Assoc. )
Defendant(s).        )

This cause came on to be heard on the __19__ day of _August_, 20_22_ on
the Plaintiff's/Defendant's motion for _Motion to Strike Plea In Bar_

Upon the matters presented to the Court at the hearing, it is

ADJUDGED, ORDERED, and DECREED as follows:

_Plaintiff's Motion to Strike Is_
_Granted for the reasons stated_
_In open court including the finding_
_that II. is Not A Signatory to_
_the CSA_

Entered this __19th__ day of _August_, 20_22_.

cc: TTPTY
9/8/22

                                    _[signature]_
                                    JUDGE DAVID BERNHARD

SEEN: _And agree_                   Seen & objected to for the reasons stated
                                    on the premise/plstr
_[signature]_                       _[signature]_
Counsel for Plaintiff(s)            Counsel for Defendant(s)

A COPY TESTE:
JOHN T. FREY, CLERK
BY: _[signature]_ Deputy Clerk
Date: _[handwritten]_
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia

**Appendix - Page 23**

# EXHIBIT 3

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | |
|---|---|
| UNDER WILD SKIES, INC., ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | CL–2019–12530 |
| ) | |
| NATIONAL RIFLE ASSOCIATION ) | |
| OF AMERICA, ) | |
| *Defendants*. ) | |

### ORDER

THIS MATTER came before the Court August 26, 2022, on

- Defendant National Rifle Association of America's ("NRA's") Motion for Continuance or in the Alternative Motion to Set a Briefing Schedule and Date Certain for a Summary Judgment Hearing ("Motion to Continue");
- Defendant NRA's Motion for Leave to Amend its Answer ("Motion for Leave to Amend");
- The parties mutual request for leave to file multiple motions *in limine* on a single motion day, and the NRA's request to schedule a Motion for Summary Judgment (Motion Scheduling).

### MOTION TO CONTINUE

IT APPEARING the NRA seeks a last-minute continuance of this September 12, 2022, trial that the parties scheduled over a year ago on May 20, 2021;

APPEARING Plaintiff Under Wild Skies, Inc. ("UWS") filed its Complaint September 11, 2019, seeking payment on unpaid advertising invoices, *inter alia*;

APPEARING the NRA sought a prior continuance July 29, 2022, which was denied by Calendar Control Order the same day;

1

**Appendix - Page 25**

APPEARING the NRA now again seeks to continue the trial in this matter—this time because a non-party has not responded to an out-of-state subpoena. The NRA filed a motion to compel in the District Court of Tulsa County, Oklahoma, but that court has not ruled; and

APPEARING the Oklahoma court has been slow to act, but that the NRA did nothing to push the Oklahoma court for a hearing or ruling for 10 months—between June 16, 2021, and April 29, 2022. Therefore, it is

ADJUDGED the Court finds as fact the NRA was dilatory in seeking discovery by waiting ten months to press its motion to compel in the Oklahoma court; and

ADJUDGED the Court finds as fact that UWS is prejudiced by this continuance request of a trial scheduled over a year ago over a lawsuit filed approximately three years ago—even recognizing delays due to the present pandemic and the NRA's bankruptcy filing. Therefore, it is

**ORDERED the NRA's Continuance Motion is DENIED.**

## MOTION FOR LEAVE TO AMEND

IT FURTHER APPEARING the NRA seeks leave to amend its Answer to add an affirmative defense of release and to withdraw its defense of duress;

APPEARING the basis for the NRA's release defense is a Confidential Settlement Agreement ("CSA") that it argues resulted in a settlement with UWS; and

APPEARING the trial in this matter is approximately six weeks away; it is

ADJUDGED this Court ruled on August 19, 2022, that the CSA did not involve UWS as a matter of law and granted UWS' motion to strike the NRA's plea in bar (Bernhard, J.);

ADJUDGED the August 19, 2022, Order is dispositive of the legal question of whether the CSA released UWS;

ADJUDGED leave to amend should be liberally granted in furtherance of the ends of justice. VA. SUP. CT. R. 1:8. However, trial courts retain discretion to

2

deny a motion for leave to amend when it is apparent that such an amendment would accomplish nothing more than provide opportunity for re-argument of a question already decided. *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 403 (1985);

ADJUDGED leave to amend in the present case would be futile considering Judge Bernhard's August 19, 2022, Order;

ADJUDGED the Court finds as fact that the NRA was dilatory in filing its motion. It knew of the CSA approximately six months ago. However, it waited until approximately three weeks before trial to have a hearing on its motion for leave to amend its Answer. The Court also finds as fact that UWS would be prejudiced by the need to respond to any amendment and the implicit re-argument of the substance of the August 19, 2022, Order an amendment would invite; and

ADJUDGED the parties agree the NRA should be permitted to withdraw its affirmative defense of duress; therefore, it is

**ORDERED the NRA's Motion for Leave to Amend is GRANTED IN PART AND DENIED IN PART. It is GRANTED to the degree that it may withdraw its affirmative defense of duress, and that defense is WITHDRAWN. It is DENIED to the degree that it may not amend its Answer to add the affirmative defense of release.**

## MOTION SCHEDULING

IT FURTHER APPEARING the parties seek to schedule multiple motions *in limine* on a single motions docket, and the NRA seeks to schedule a motion for summary judgement;

APPEARING there are only two motion days remaining before trial; it is

ADJUDGED the Court hears motions of all litigants on demand every Friday. To make this manageable, the Court requires the parties to place only one motion on the docket each Friday;

ADJUDGED there is insufficient time to hear the three motions this close to trial with the available motion dates. The Court has discretion to manage its own docket and is unpersuaded than an emergency exists to make an exception to the Court's normal motion day practice. The Court determines that adjudication of the

3

summary judgment motion better serves judicial economy than the motions *in limine* in the remaining days before trial. The former could potentially consolidate trial issues. The latter typically seeks to exclude inadmissible evidence from trial, *see Turner v. Commonwealth*, 68 Va. App. 72 (2017), a task the Court can take as evidence is offered. The Court finds deferring the motions *in limine* prejudices neither party as each retains the ability to object to inadmissible evidence as it is being offered. Therefore, it is

**ORDERED the motions *in limine* SHALL NOT BE DOCKETED, and UWS' motion currently scheduled for September 9, 2022, is REMOVED from the docket. (The trial judge retains discretion to hear the motions *in limine* pre-trial on September 12, 2022);**

**ORDERED the NRA's Motion for Summary Judgment is DOCKETED for September 9, 2022, at 10:00 a.m., the NRA has leave to file its motion by August 26, 2022, and UWS may oppose the motion under the Court's normal motions procedures.**

THIS CAUSE CONTINUES.

Judge David A. Oblon

AUG 3 0 2022

_____
Entered

PURSUANT TO RULE 1:13 OF THE RULES OF THE SUPREME COURT OF VIRGINIA, ENDORSEMENT OF THIS ORDER IS WAIVED BY DISCRETION OF THE COURT. ANY DESIRED ENDORSEMENT OBJECTIONS MAY BE FILED WITHIN TEN DAYS.

4

# EXHIBIT 4

# EXHIBIT D

*Executed Version*

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Confidential Settlement Agreement (the "*Agreement*") is entered into as of this 11th day of March, 2022 ("*Effective Date*") by and between the National Rifle Association of America and Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, William Winkler, and Melanie Montgomery (collectively, the "*Parties*" or individually, a "*Party*").

### DEFINITIONS

It is agreed to by the Parties that, in addition to terms defined elsewhere in this Agreement, the following terms shall have the following meanings and scope for purposes of this Agreement:

"*NRA*" means the National Rifle Association of America, and the respective rights and obligations shall be defined to include, be binding on, and benefit, any and all of its past, present and future named and unnamed parents, divisions, subsidiaries, affiliates, related companies, associates, owners, shareholders, representatives, directors, agents, partners, principals, officers, executives, employees, representatives, trustees, claims administrators, third-party administrators, sureties, insurers, reinsurers and representatives of any of them, and their attorneys and all persons acting by or on behalf of any of them, including any of their respective heirs, executors, administrators, successors, assigns, and any financing entities;

"*AMc*" means Ackerman McQueen, Inc., and the respective rights and obligations shall be defined to include, be binding on, and benefit, any and all of its past, present and future named and unnamed parents, divisions, subsidiaries, affiliates, related companies, associates, owners, shareholders, representatives, directors, agents, partners, principals, officers, executives, employees, representatives, trustees, claims administrators, third-party administrators, sureties, insurers, reinsurers and representatives of any of them, and their attorneys and all persons acting by or on behalf of any of them, including any of their respective heirs, executors, administrators, successors, assigns, and any financing entities;

"*Mercury Group*" means Mercury Group, Inc., and the respective rights and obligations shall be defined to include, shall be binding on, and benefit to, any and all of its past, present and future named and unnamed parents, divisions, subsidiaries, affiliates, related companies, associates, owners, shareholders, representatives, directors, agents, partners, principals, officers, executives, employees, representatives, trustees, claims administrators, third-party administrators, sureties, insurers, reinsurers and representatives of any of them, and their attorneys and all persons acting by or on behalf of any of them, including any of their respective heirs, executors, administrators, successors, assigns, and any financing entities;

"*Winkler*" means William Winkler individually and the respective rights and obligations shall be defined to include, shall be binding on, and of benefit to any and all of his respective heirs, executors, administrators, successors and assigns;

"*Montgomery*" means Melanie Montgomery individually and the respective rights and obligations shall be defined to include, shall be binding on, and of benefit to any and all of her respective heirs, executors, administrators, successors and assigns;

1

**Appendix - Page 31**

*Executed Version*

"*Martin*" means Henry Martin individually and the respective rights and obligations shall be defined to include, shall be binding on, and of benefit to any and all of his respective heirs, executors, administrators, successors and assigns;

"*Ackerman Parties*" collectively refers to AMc, Mercury Group, Winkler, Martin, and Montgomery;

"*NRA/AMc Litigation*" means the following lawsuits:

1. *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No. 3:19-cv-02074-G, pending in the Northern District of Texas;

2. *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No. CL19002067, in the Circuit Court for the City of Alexandria, Virginia;

3. *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No. CL19001757, in the Circuit Court for the City of Alexandria, Virginia;

4. *National Rifle Association of America v. Ackerman McQueen, et al.*, Case No. CL19002886, in the Circuit Court for the City of Alexandria, Virginia;

"*Loesch Arbitration*" means the arbitration styled: *Dana Loesch v. Ackerman McQueen, Inc.*, JAMS Ref. No. 1335000082;

"*Loesch Settlement*" means the settlement as described in paragraph number one (1) below in this Agreement;

"*Services Agreement*" means the Services Agreement by and between the NRA, AMc, and Mercury Group, dated April 30, 2017, as amended on May 6, 2018;

"*NRA Bankruptcy*" means the matters (1) *In re Sea Girt LLC*, Docket No. 21-30080-hdh11, in the U. S. Bankruptcy Court for the Northern District of Texas; and (2) *In re National Rifle Association of America*, Docket No. 21-30085-sgj11, in the U. S. Bankruptcy Court for the Northern District of Texas;

"*Cox Arbitration*" means the arbitration styled: *Christopher Cox v. National Rifle Association*, CPR Case Number: G-21-05-S;



2

*Executed Version*



4.    **Mutual Releases.** In consideration of the Settlement Funds, the Loesch Settlement, the Return of Property, and the mutual promises contained in this Agreement, the NRA and the Ackerman Parties hereby fully, finally, irrevocably, and unconditionally release and forever discharge and covenant not to sue one another of and from any and all claims, allegations, duties, causes of action, lawsuits, proceedings, contracts, demands, obligations, liabilities, rights, damages, costs, fees, or expenses, equitable or declaratory relief of any kind or nature, including but not limited to any claim or cause of action for breach of contract, tort, contribution, indemnity, subrogation, bad faith, unfair claims handling practices under statute or common law, extra-contractual damages, and/or punitive damages, whether presently known or unknown, suspected or unsuspected, past, present or future which the parties had, now have or hereafter can, shall or

3

*Executed Version*

may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Release including, but not limited to claims that arise out of, relate to, or are in any way connected to the services provided by the Ackerman Parties to the NRA, including but not limited to with respect to the Services, the NRA's activities in connection with the Services, the NRA/AMc Litigation, the Loesch Arbitration, the facts and circumstances that are connected to or form the basis of the respective parties claims in the NRA/AMc Litigation and the Loesch Arbitration, or that arise out of any agreement, act, omission, occurrence, transaction, or matter up to and including the date of this Agreement. **FOR THE AVOIDANCE OF DOUBT, THIS AGREEMENT DOES NOT RELEASE THE NRA'S PENDING OR FUTURE CLAIMS AGAINST ATTORNEY MARK DYCIO.**



4

*Executed Version*



5

*Executed Version*



6

*Executed Version*



7

*Executed Version*



[SIGNATURES ON THE FOLLOWING PAGES]

8

*Executed Version*

## THE PARTIES HAVE READ THE FOREGOING CONFIDENTIAL SETTLEMENT AGREEMENT CAREFULLY AND FULLY UNDERSTAND IT.

National Rifle Association of America

By: _____

Printed Name: John Frazer, Esq.

Position/Title: Secretary; General Counsel

Date: March 14, 2022

Counsel for NRA

By: _____

Printed Name: Cecelia L. Fanelli, Esq.

Position/Title: Partner
                Brewer Attorneys & Counselors

Date: March 14, 2022

Ackerman McQueen, Inc.

By: _____

Printed Name: William Winkler, CFO

Date: March 11, 2022

9

**Appendix - Page 39**

*Executed Version*

Mercury Group, Inc.

By: _____

Printed Name: William Winkler

Position/Title: Chief Financial Officer

Date: March 11, 2022

William Winkler

By: _____

Printed Name: William Winkler

Date: March 11, 2022

**Melanie Montgomery**

By: _____

Printed Name: Melanie Montgomery

Date: March 11, 2022

**Henry Martin**

By: _____

Printed Name: Henry Martin

Date: March 11, 2022

**Counsel for the Ackerman Parties**

By: _____

Printed Name: Brian Mason, Esq.

Date: March 11, 2022

10

*Executed Version*

**Mercury Group, Inc.**

By:_____

Printed Name: William Winkler_____

Position/Title: Chief Financial Officer_____

Date: March 11, 2022_____

**William Winkler**

By:_____

Printed Name: William Winkler_____

Date: March 11, 2022_____

**Melanie Montgomery**

By:_____

Printed Name: Melanie Montgomery_____

Date: March 11, 2022_____

**Henry Martin**

By:_____

Printed Name: Henry Martin_____

Date: March 11, 2022_____

**Counsel for the Ackerman Parties**

By:_____

Printed Name: Brian Mason, Esq._____

Date: March 11, 2022_____

10

**Appendix - Page 41**

*Executed Version*

Mercury Group, Inc.

By:_____

Printed Name: William Winkler_____

Position/Title: Chief Financial Officer_____

Date: March 11, 2022_____

William Winkler

By:_____

Printed Name: William Winkler_____

Date: March 11, 2022_____

Melanie Montgomery

By:_____

Printed Name: Melanie Montgomery_____

Date: March 11, 2022_____

Henry Martin

By:_____

Printed Name: Henry Martin_____

Date: March 11, 2022_____

Counsel for the Ackerman Parties

By:_____

Printed Name: Brian Mason, Esq._____

Date: March 11, 2022_____

10

**Appendix - Page 42**

# EXHIBIT M

## Skyler Peacock

| From: | Skyler Peacock <speacock@dyciolaw.com> |
|-------|------------------------------------------|
| Sent: | Thursday, June 1, 2023 1:14 PM |
| To: | 'Ramon Hernandez' |
| Cc: | 'Mark Dycio'; twbiggs@dyciolaw.com |
| Subject: | NRA v. Ackerman McQueen, Inc., et al. - Demand to Withdraw Subpoenas |

Mr. Hernandez:

This email concerns the subpoenas National Rifle Association of America ("NRA") issued and served upon attorneys Wayne Biggs and Mark Dycio, summoning them to produce documents and appear for remote depositions in the matter of *National Rifle Association of America v. Ackerman McQueen, Inc. , et al.*, Civil Action No. 3:22-CV-1944-G (N.D. TX) on June 20, 2023, and June 22, 2023, respectively.

As you are well aware, Mr. Dycio and Mr. Biggs have for years represented, and continue to represent, Anthony Makris, a named defendant in the aforementioned lawsuit. For the reasons summarized below, among others, the subpoenas are improper, objectionable, and plainly designed to harass Mr. Makris, Mr. Dycio, and Mr. Biggs. Accordingly, Mr. Dycio and Mr. Biggs insist that NRA withdraw the subpoenas and cease all further efforts to annoy, oppress, and harass Mr. Makris and his attorneys. Should NRA fail to do so, Mr. Dycio and Mr. Biggs will promptly move to quash the subpoenas in the United States District Court for the Eastern District of Virginia, Alexandria Division, and will seek an award of attorneys' fees against NRA and its counsel.

The two subpoenas are essentially identical and purport to seek deposition testimony on the following documents:

1. All documents relating to the Declaration of Thomas Wayne Biggs submitted to the Texas District Court in support of: (i) Anthony Makris' Motion to Dismiss and (ii) the Motion for Summary Judgment filed by Ackerman McQueen, Inc. ("AMc") and Mercury Group, Inc. ("Mercury");

   a. The subpoena directed to Mr. Dycio additionally seeks "all communications with Biggs regarding his declarations."

2. All documents relating to the claims and defenses raised in the UWS Litigation, the documents produced in discovery conducted in the UWS Litigation, and the deposition and trial testimony presented in the UWS Litigation; and

3. All documents relating to the Confidential Settlement Agreement between NRA and AMc/Mercury (the "CSA"), including but limited to the negotiation and execution of the CSA.

At the outset, NRA's attempt to depose and compel the production of documents from attorneys representing an opposing party is an extraordinary and disfavored litigation tactic. Indeed, on a motion to quash the subpoenas, NRA—not Mr. Dycio or Mr. Biggs—will bear the burden of demonstrating that no other means exist to obtain the information sought, the information sought is relevant and nonprivileged, and the information is crucial to NRA's preparation of its case. NRA can demonstrate neither.

Moreover, the documents and information sought by subpoena must be more than minimally relevant to the pending litigation and must not impose undue burden or expense on the responding party. In the context of Rule 45 subpoenas directed to third-parties, the relevance standard governing the scope of discovery is especially stringent. Under these circumstances, NRA falls far short of meeting that heightened standard.

Here, NRA unquestionably has other means to obtain the information sought, which, in most instances, is entirely irrelevant to the claims or defenses at issue in the pending lawsuit or is privileged from disclosure.

For example, NRA already has possession of the entire trial court record, including discovery and testimony transcripts, from the UWS Litigation. It is unfathomable that NRA could only obtain those documents from Mr. Makris's and UWS's attorneys. Insofar as the request seeks all documents merely *relating to* the UWS Litigation, the request is overbroad and patently designed to impose undue burden and expense upon Mr. Makris, Mr. Dycio, and Mr. Biggs. To the extent NRA intends to depose Mr. Dycio and Mr. Biggs on any potentially responsive documents, any such testimony would be either irrelevant, privileged, or otherwise protected from disclosure.

As for the documents related to Mr. Biggs's declarations, NRA already has the declarations and supporting exhibits. And, again, the request for all documents that merely relate to the declarations is so overbroad that compliance with the demand would necessarily impose undue burden and expense. Additionally, any possible testimony regarding the requested documents—which speak for themselves—would be irrelevant, privileged, or otherwise protected from disclosure.

The request for documents relating to the CSA is equally improper. As NRA knows, neither Mr. Dycio nor Mr. Biggs possess any personal knowledge of the negotiation and execution of the CSA. And the only document related to the CSA in their possession is a heavily redacted copy of the CSA that NRA itself produced in the UWS Litigation. Moreover, it is a far reach to believe that two disinterested attorneys situated in Northern Virginia would have any unique, relevant testimony regarding an agreement negotiated and executed by three stranger entities in Texas and Oklahoma.

It is evident from the face of the subpoenas that NRA is engaging in its ordinary practice of "scorched earth" litigation, with no consideration for the restrictions imposed under the Federal Rules of Civil Procedure, or any other law for that matter. The instant subpoenas constitute nothing more than another chapter in NRA's campaign of harassment against any perceived adversary. If and when Mr. Dycio and Mr. Biggs file their motions to quash, I have no doubt the court will see it that way as well.

Please confirm by no later than 12:00 pm ET on June 2, 2023, that NRA will withdraw the subpoenas or Mr. Dycio and Mr. Biggs will proceed to file motions to quash.

I look forward to your prompt response.

Regards,

Skyler R. Peacock
Associate
Dycio & Biggs
10533 Main Street
Fairfax, Virginia 22030
O: +1 703.383.0100
F: +1 703.383.0101

www.dyciobiggs.com



This message contains information which may be confidential and/or privileged. Unless you are the addressee (or authorized to receive email on behalf of the addressee), you may not use, copy or disclose to anyone the message or any information contained within the message.  If you have received this message in error, please advise the sender by reply e-mail @dyciobiggs.com and delete the message immediately. Thank you.

# EXHIBIT N

DALLAS | NEW YORK

# B R E W E R
ATTORNEYS & COUNSELORS

June 1, 2023

**VIA EMAIL**

Skyler R. Peacock, Esq.
Dycio & Biggs
10533 Main Street
Fairfax Virginia 22030
speacock@dyciolaw.com

> **Re:     National Rifle Association of America v. Ackerman McQueen, Inc., et. al.**
> **Civil Action No. 3:22-CV-1994-G**

Dear Counsel:

We are in receipt of your email dated June 1, 2023, in which you "insist" that the NRA withdraw the subpoenas issued to Messrs. Biggs and Dycio. The NRA disputes your mischaracterization of legitimate discovery conducted pursuant to the Federal Rules of Civil Procedure as annoyance, oppression and harassment, as well as your demand that it withdraw the subpoenas that it properly served on Messrs. Biggs and Dycio.

Although you assert that "Mr. Dycio and Mr. Biggs have for years represented, and continue to represent, Anthony Makris, a named defendant in the aforementioned litigation," Biggs and Dycio are not counsel of record in the above-captioned litigation in which they were subpoenaed.

Moreover, you ignore that their own purported client, Makris, recently served his Rule 26(a)(1) initial disclosures in which he identified both Biggs and Dycio as "individual[s] likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Rule 26(a)(1)(A)(i). The NRA is entitled to take depositions to discover the information that Makris himself states that Biggs and Dycio have.

Further, and significantly, Biggs made himself a fact witness here when he submitted a declaration in support of Makris' Motion to Dismiss, as well as a declaration in support of Makris' co-Defendants' Motion for Summary Judgment. He is the chief witness for all Defendants with respect to the pending dispositive motions.

Despite the foregoing, you repeatedly and erroneously refer to Biggs and Dycio as attorneys representing an opposing party and "disinterested." That is incorrect. You also conclude that the NRA has the burden to demonstrate that the depositions are necessary but cite no law in support of your assertion. In fact, any burden-shifting only applies, if at all, to litigation counsel representing a party. Biggs and Dycio do not represent Makris in the litigation in which they were subpoenaed and Biggs is a primary fact witness.

# B R E W E R

Skyler R. Peacock, Esq.
June 1, 2023
Page 2

Where an attorney is a fact witness, "his or her deposition may be 'both necessary and appropriate.'" *Carr v. Double T. Diner*, 272 F.R.D. 431, 435 (D. Md. 2010) (quoting *N.F.A. Corp. v. Riverview Narrow Fabrics*, 117 F.R.D. 83, 85 (M.D.N.C. 1987)). *See, also, Cunagin as Next friend of J.C. v. Cabell Huntington, Hosp., Inc.*, No. 3:19-CV-00250, 2021 WL 1518877, at *5 (S.D.W. Va. Apr. 16, 2021). Biggs and Dycio, as fact witnesses, are required to comply with the subpoenas and sit for their depositions.

To the extent counsel for Biggs and Dycio believes any of the questions asked of them at their respective depositions impinge on attorney work product or the attorney-client privilege, they may make an objection at that time. But concerns about privilege do not provide Biggs or Dycio with an excuse to avoid deposition altogether.

The NRA views your email and threat of sanctions as attempted intimidation of the NRA into withdrawing valid and enforceable depositions subpoenas. If Biggs and Dycio file a motion to quash and/or a motion for sanctions, the NRA reserves its right to seek its attorneys' fees and/or other sanctions for Makris', as well as Biggs' and Dycio's, interference with discovery and frivolous motion practice.

Suffice it to say that the NRA disagrees with the entirety of your letter, including your comments about the documentation sought. The NRA reserves all of its rights and waives none.

Of course, we are willing to meet and confer with you about the substance of your email.

Sincerely,

*Cecelia L. Fanelli*

Cecelia L. Fanelli

Cc: Wayne Biggs, Esq.

Mark Dycio, Esq.

# EXHIBIT O

FOR THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | Civil Action No. 3:22-CV-1944-G |
| *Plaintiff,* | § § § | The Honorable A. Joe Fish, presiding |
| vs. | § § | |
| ACKERMAN McQUEEN, INC. and MERCURY GROUP, INC., et al. | § § § | **FILED UNDER SEAL** |
| *Defendants.* | § § | |

## DEFENDANT ANTHONY MAKRIS' INITIAL DISCLOSURES UNDER RULE 26(A)(1)

TO:     Plaintiff, NATIONAL RIFLE ASSOCIATION OF AMERICA, by and through its attorneys-of-record, Cecelia L. Fanelli and Ramon Hernandez, BREWER, ATTORNEYS & COUNSELORS, 1717 Main Street, Suite 5900, Dallas, TX 75201.

Defendants, ACKERMAN McQUEEN, INC. and MERCURY GROUP, INC., by and through their attorneys-of-record, Jay J. Madrid and Brian Vanderwoude, DORSEY & WHITNEY LLP, 200 Crescent Court, Suite 1600, Dallas, TX 75201.

Defendant, ANTHONY "TONY" MAKRIS ("Tony Makris" or "Defendant"), makes the following disclosures as required by Federal Rule of Civil Procedure 26(a)(1):

### A.     Individuals Having Discoverable Information [FED. R. CIV. P. 26(a)(1)(A)(i)]

The names, address and telephone number of each individual likely to have discoverable information — along with the subjects of that information — that Defendant may use to support his defenses or any counter-claims he might assert, other than solely for impeachment, are as shown in the table below.

Case 3:22-cv-01944-K Document 154-3 Filed 07/24/23 Page 190 of 213 PageID 4832

| NAME | ADDRESS AND TELEPHONE NUMBER | SUBJECT MATTER OF INFORMATION |
|---|---|---|
| Anthony "Tony" Makris | c/o James S. Robertson, III<br>GLAST, PHILLIPS & MURRAY, P.C.<br>14801 Quorum Drive, Suite 500<br>Dallas, TX 75254-1449<br>972-419-7136 | Tony Makris is a defendant in this case. He has knowledge of his relationships, personal and business, with Plaintiff and representatives of Plaintiff and the alleged facts and circumstances on which Plaintiff bases its claims and on which the defendants based their defenses including the events and communications relevant to the supplemental invoices at issue in this case. |
| James S. Robertson, III | GLAST, PHILLIPS & MURRAY, P.C.<br>14801 Quorum Drive, Suite 500<br>Dallas, TX 75254-1449<br>972-419-7136 - Telephone<br>469-206-5048 – Fax | Counsel for Defendant Anthony Makris; has knowledge of the attorney fees and expenses incurred by Anthony Makris in this lawsuit and may opine of any claim for attorney fees presented by Plaintiff |
| National Rifle Association of America ("NRA" or "Plaintiff"), through its designated representatives and custodians of records. | c/o Ramon Hernandez<br>Cecelia L. Fanelli<br>BREWER, ATTORNEYS & COUNSELORS<br>1717 Main Street, Suite 5900<br>Dallas, TX 75201<br>214-653-4000 - Telephone<br>214-653-1015 – Facsimile | NRA is the plaintiff in this lawsuit and is believed to have knowledge of the events and circumstances leading to the Confidential Settlement Agreement at issue in this case (the "CSA") and the facts, circumstances and communications relative to the supplemental invoices at issue in this case. |
| Ramon Hernandez, Cecelia L. Fanelli and William Brewer | BREWER, ATTORNEYS & COUNSELORS<br>1717 Main Street, Suite 5900<br>Dallas, TX 75201<br>214-653-4000 - Telephone<br>214-653-1015 – Facsimile | Counsel for Plaintiff and involved in CSA and that case styled *Under Wild Skies, Inc. v. National Rifle Association of America* and filed under Case No. CL-2019-12530 in the Circuit Court of Fairfax County, Virginia (the "Virginia Case"). |
| Ackerman McQueen, Inc., through its designated representatives and custodians of records. | c/o Jay J. Madrid<br>Brian Vanderwoude<br>DORSEY & WHITNEY LLP<br>200 Crescent Court, Suite 1600<br>Dallas, TX 75201<br>214-981-9900 - Telephone<br>214-981-9901 – Facsimile | Ackerman McQueen, Inc. is a defendant in this case and is believed to have knowledge of the alleged facts and circumstances on which Plaintiff bases its claims and on which the defendants based their defenses including the business relationships among the parties and the events leading to the Confidential Settlement Agreement at issue in this case. |

DEFENDANT ANTHONY MAKRIS' INITIAL DISCLOSURES UNDER RULE 26(a)(1)     Page 2
8478432_2 – GPM File No. 130822.20

| NAME | ADDRESS AND TELEPHONE NUMBER | SUBJECT MATTER OF INFORMATION |
|---|---|---|
| Mercury Group, Inc., through its designated representatives and custodians of records. | c/o Jay J. Madrid<br>Brian Vanderwoude<br>DORSEY & WHITNEY LLP<br>200 Crescent Court, Suite 1600<br>Dallas, TX 75201<br>214-981-9900 - Telephone<br>214-981-9901 – Facsimile | Mercury Group, Inc. is a defendant in this case and is believed to have knowledge of the alleged facts and circumstances on which Plaintiff bases its claims and on which the defendants based their defenses including the business relationships among the parties and the events leading to the Confidential Settlement Agreement at issue in this case. |
| Revan McQueen | c/o Jay J. Madrid<br>Brian Vanderwoude<br>DORSEY & WHITNEY LLP<br>200 Crescent Court, Suite 1600<br>Dallas, TX 75201<br>214-981-9900 - Telephone<br>214-981-9901 – Facsimile | Revan McQueen is the Chief Executive Officer of Ackerman McQueen, Inc. and is believed to have knowledge of the alleged facts and circumstances on which Plaintiff bases its claims and on which the defendants based their defenses including the business relationships among the parties and the events leading to the Confidential Settlement Agreement at issue in this case. |
| Wayne Biggs and Mark Dycio | DYCIO & BIGGS<br>10533 Main Street<br>Fairfax, Virginia 22030<br>T: (703) 383-0100 - Telephone<br>F: (703) 383-0101 - FAX | Wayne Biggs and Mark Dycio represented Under Wild Skies, Inc. ("UWS") in the Virginia Case and they have knowledge of the claims and defenses raised in that case, the documents produced in discovery conducted in that case and the deposition and trial testimony presented in that case. |
| Susan LaPierre | c/o Ramon Hernandez<br>Cecelia L. Fanelli<br>BREWER, ATTORNEYS & COUNSELORS<br>1717 Main Street, Suite 5900<br>Dallas, TX 75201<br>214-653-4000 - Telephone<br>214-653-1015 – Facsimile | Susan LaPierre is the wife of Wayne LaPierre and has knowledge of the relationship, business and personal, between herself and/or Wayne LaPierre, on the one hand, and Makris and/or his wife, Warner Loughlin, on the other hand. |
| Josh Powell | Address Unknown<br>269-405-3368 - Telephone | Josh Powell was Wayne LaPierre's Chief of Staff. He has knowledge of the business relationship between Makris and/or UWS and the NRA. |

Defendant also identifies the persons Plaintiff has identified in its Initial Disclosures under Rule 26(a)(1), in particular: Andrew Arulanandam, Andra Fischer, Wayne LaPierre, Tyle Schropp, Craig Spray, Lisa Supernaugh, Wilson "Woody" Phillips, Melanie Montgomery, Stephanie West, Brandon Winkler and William Winkler.

In addition, Defendant anticipates that other, unknown individuals, may have discoverable information that Defendant may use to support its defenses and any counter-claims it might later assert. Moreover, Defendant incorporates by reference any other individuals disclosed by other parties in this matter and reserves the right to supplement this disclosure pursuant to Federal Rule of Civil Procedure 26(e).

## B.     Documents, Electronically Stored Information and Tangible Things Supporting Defendant's Claims/Defenses [FED. R. CIV. P. 26(a)(1)(A)(ii)]

The following is a description by category and location of all documents, electronically stored information, and tangible things that Defendant has in his, custody, or control and may use to support his defenses and/or any claims, unless the use would be solely for impeachment:

| DESCRIPTION | LOCATION |
|---|---|
| The Confidential Settlement Agreement and drafts of same. | Copies of these documents are believed to be in Plaintiff's possession. |
| The Supplemental Invoices. | Copies of these documents are in Plaintiff's possession. |
| Relevant communications between Defendant and Plaintiff and between and among persons identified as having knowledge of relevant facts. | Copies of these documents are believed to be in Plaintiff's possession. |
| To the extent not otherwise listed above, documents produced in discovery in that case styed *Under Wild Skies, Inc. v. National Rifle Association of America* and filed under Case No. CL-2019-12530 in the Circuit Court of Fairfax County, Virginia (the "Virginia Case"). | Copies of these documents are in Plaintiff's possession. |
| Transcripts of deposition and trial testimony in the Virginia case. | Copies of these documents are in Plaintiff's possession. |
| Pleadings and other documents filed in the Virginia case. | Copies of these documents are in Plaintiff's possession. |

## C.     Calculation of Damages [FED. R. CIV. P. 26(a)(1)(A)(iii)]

Defendant has not, at least as of yet, asserted a damages claim against Plaintiff.

D.   **Insurance [FED. R. CIV. P. 26(a)(1)(A)(iv)]**

Defendant has not identified any policies of insurance that would be available to satisfy all or part of a possible judgment against it in this action or to indemnify or reimburse it for payments made to satisfy a judgment against. If any such policy is later identified, this response will be supplemented accordingly and a copy of such policy will be made available for inspection and copying.

Respectfully submitted,

/s/ *James S. Robertson, III*

James S. Robertson, III
State Bar No. 17061075
GLAST, PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254-1449
972-419-7136
469-206-5048 – Telecopier
jrobertson@gpm-law.com

ATTORNEY FOR DEFENDANT
ANTHONY MAKRIS

## CERTIFICATE OF SERVICE

I certify that on May 16, 2023 a copy of the foregoing was served on the following persons by first class mail and by email in accordance with FED. R. CIV. P. 5:

Ramon Hernandez
BREWER, ATTORNEYS & COUNSELORS
1717 Main Street, Suite 5900
Dallas, TX 75201
214-653-4000
214-653-1015 – Facsimile
rxh@brewerattorneys.com

*Attorney for Plaintiff*

Jay J. Madrid
Brian Vanderwoude
Monica Niewiarowski
DORSEY & WHITNEY LLP
200 Crescent Court, Suite 1600
Dallas, TX 75201
214-981-9900
214-981-9901 – Facsimile
madrid.jay@dorsey.com
vanderwoude.brian@dorsey.com
niewiarowski.monica@dorsey.com

*Attorneys for Ackerman McQueen, Inc.
and Mercury Group, Inc.*

Cecelia L. Fanelli
BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, NY 10022
212-224-6329
clf@brewerattorneys.com

*Attorney for Plaintiff*

/s/ *James S. Robertson, III*
James S. Robertson, III

# EXHIBIT P

## Skyler Peacock

| From: | Wayne Biggs <twbiggs@dyciolaw.com> |
|---|---|
| Sent: | Thursday, June 8, 2023 1:15 PM |
| To: | clf@brewerattorneys.com; 'Ramon Hernandez'; 'Will Brewer' |
| Cc: | speacock@dyciolaw.com |
| Subject: | Subpoenas for Dycio and Biggs and Motions to Quash |

Counsel:

As a follow up to our meet and confer yesterday, here is the status of the issues we discussed as I understand them:

1.  As to the deposition of Mark Dycio, as we discussed yesterday, you stated that deleting me from the Rule 26 disclosures would obviate most of your concerns regarding the need to depose me, except for issues which you contend are presented by the declaration I provided. I pointed out that Mr. Dycio provided no such declaration and queried whether or not his deletion from the disclosures would obviate all concerns regarding Dycio. You indicated you would discuss that internally. You should now have received an amended or supplemented Rule 26 disclosure from Texas counsel which deletes both Mr. Dycio and myself from the list of persons with discoverable information. As Mr. Dycio has been deleted, please advise of your position regarding withdrawing his subpoena.

2.  As to the deposition of Biggs, as noted, I have also been removed from the Rule 26 disclosures. That said, I do not believe that the remaining fact of the declaration or its contents make any difference to the Shelton analysis. Summarized, the NRA's claims in the 2nd Amended Complaint are that the CSA had the effect of releasing the NRA from UWS's claims and it was a breach of contract for the Virginia case to go forward. The breach of contract claim is against all defendants. The NRA further asserts breach of fiduciary duty and fraud claims against Makris individually, based on the Supplemental Invoices. As we discussed yesterday, there is a 7,000-page record in the UWS litigation that includes the full transcript of the multi-day jury trial. The four corners of the CSA either do or do not effect a release of the NRA. The record of the Virginia case is the best evidence of whether or not NRA's claims based on the Supplemental Invoices were "actually litigated." These are questions of law to be determined by the court. Even if the declaration, for the sake of argument only, characterizes the documents it authenticates or is otherwise argumentative, such argument or characterization is wholly irrelevant to the issues asserted by the 2nd Amended Complaint. Nor would such argument or characterization constitute cognizable evidence. The Court will ultimately decide the motions at issue on a legal basis.

3.  Accordingly, the Shelton standard would still apply to seeking to depose a party's attorney. We have received no proffer as to what information you would seek in my deposition that is not privileged, is not obtainable elsewhere, and is crucial to your case. All this said, I did indicate that consideration would be given to amending the declaration. I am not confident that I will have an answer on that before the time period expires under which a Motion to Quash should be filed. I will follow up on this point as soon as possible.

4.  Finally, we did not really have an extended discussion regarding the documents which I see as a related, but still separate, issue from the depositions themselves. You did not seem to refute my point that the subpoena, read literally, seems to require me to appear, in person, at the place of deposition having printed out and brought with me, not just the 7,000 page record, but all other discovery exchanged between the parties, deposition transcripts, hearing transcripts, etc.—All totaled about 10,000 pages and all of which is already in the NRA's possession. Frankly, this would be patently absurd and even the exercise of sending to you electronically what the NRA already has in its possession would be a needless exercise. In fact, all three of the document requests seek the production of documents already plainly in the NRA's possession. This is not to mention that the scope

1

of all three of the document requests is overly broad and clearly would encompass attorney-client privilege and work product materials. I don't think any measure of narrowing of these requests or other alteration would address these concerns. We are not going to undertake the time to compile and send what the NRA already has. Nor do we intend to go through the massive burden and expense of compiling a privilege log for every item in our possession that is obviously protected from disclosure—which, after accounting for the materials already in NRA's possession, is all the requests seek.

5.  Please let us know your final position on withdrawing either or both subpoenas, as well as withdrawal of the document requests, by 1:00 p.m. tomorrow. We will need to proceed to file the Motions to Quash if we have not heard from you by then. Although I mentioned setting the Motions for June 23, 2023, I can agree to setting them for June 30, 2023. I don't think the Court will consider that too far out and this will allow additional time to resolve any remaining issues.

T. Wayne Biggs, Esq.
Dycio & Biggs
10533 Main Street
Fairfax, Virginia 22030
T: (703) 383-0100
F: (703) 383-0101
=============================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @dyciolaw.com and delete the message. Thank you very much.

# EXHIBIT Q

FOR THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § | |
| | § | |
| | § | Civil Action No. 3:22-CV-1944-G |
| *Plaintiff*, | § | |
| | § | The Honorable A. Joe Fish, presiding |
| vs. | § | |
| | § | |
| ACKERMAN McQUEEN, INC., | § | **FILED UNDER SEAL** |
| MERCURY GROUP, INC., and | § | |
| ANTHONY MAKRIS, | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANT ANTHONY MAKRIS' FIRST SUPPLEMENT TO
## INITIAL DISCLOSURES UNDER RULE 26(A)(1)

TO:  Plaintiff, NATIONAL RIFLE ASSOCIATION OF AMERICA, by and through its attorneys-of-record, Ramon Hernandez, BREWER, ATTORNEYS & COUNSELORS, 1717 Main Street, Suite 5900, Dallas, TX 75201 and Cecelia L. Fanelli, BREWER, ATTORNEYS & COUNSELORS, 750 Lexington Avenue, 14th Floor, New York, NY 10022.

Defendants ACKERMAN McQUEEN, INC. and MERCURY GROUP, INC. by and through their attorneys-of-record, Jay J. Madrid and Brian Vanderwoude, DORSEY & WHITNEY LLP, 200 Crescent Court, Suite 1600, Dallas, TX 75201.

Defendant, ANTHONY "TONY" MAKRIS ("Makris"), supplements his initial disclosures under Federal Rule of Civil Procedure 26(a)(1) by deleting from the list of individuals likely to have discoverable information that Makris may use to support his defenses or any counter-claims he might assert, other than solely for impeachment, [FED. R. CIV. P. 26(a)(1)(A)(i)] the following persons:

> Wayne Biggs and
> Mark Dycio
> DYCIO & BIGGS
> 10533 Main Street
> Fairfax, Virginia 22030
> T: (703) 383-0100 - Telephone
> F: (703) 383-0101 – FAX

Messrs. Biggs and Dycio represent Under Wild Skies, Inc. in litigation in Virginia state court that is now on appeal by both parties. They also represent Makris, individually. They were identified because they were counsel in the Virginia litigation and because they could potentially authenticate documents from the Virginia litigation. Any other information they might possess is protected by the attorney-client privilege and/or as attorney work-product. Documents from the Virginia litigation can be authenticated by other methods. Likewise, what happened in the Virginia courts can be established by other methods. Specifically, among other documents from the Virginia litigation that are already in the possession of both parties, it is noted that both the NRA and Under Wild Skies, Inc. possess a full electronic record of the proceedings in the Virginia case which was prepared by the Fairfax County Circuit Court and transmitted to the Virginia Court of Appeals as part of the parties' appeals. Accordingly, both parties are possessed of the full record of proceedings in the Virginia litigation.

As such, Makris withdraws and deletes Messrs. Biggs and Dycio from his disclosures under Federal Rule of Civil Procedure 26(a)(1)(A)(i).

Respectfully submitted,

/s/ *James S. Robertson, III*
James S. Robertson, III
State Bar No. 17061075
GLAST, PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254-1449
972-419-7136
469-206-5048 – Telecopier
jrobertson@gpm-law.com

ATTORNEY FOR DEFENDANT
ANTHONY MAKRIS

## CERTIFICATE OF SERVICE

I certify that on June 8, 2023 a copy of the foregoing was served on the following persons by first class mail and by email in accordance with FED. R. CIV. P. 5:

Ramon Hernandez
BREWER, ATTORNEYS & COUNSELORS
1717 Main Street, Suite 5900
Dallas, TX 75201
214-653-4000
214-653-1015 – Facsimile
rxh@brewerattorneys.com

Cecelia L. Fanelli
BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, NY 10022
212-224-6329
clf@brewerattorneys.com

*Attorney for Plaintiff*

*Attorney for Plaintiff*

Jay J. Madrid
Brian Vanderwoude
Monica Niewiarowski
DORSEY & WHITNEY LLP
200 Crescent Court, Suite 1600
Dallas, TX 75201
214-981-9900
214-981-9901 – Facsimile
madrid.jay@dorsey.com
vanderwoude.brian@dorsey.com
niewiarowski.monica@dorsey.com

*Attorneys for Ackerman McQueen, Inc.*
*and Mercury Group, Inc.*

/s/ *James S. Robertson, III*
James S. Robertson, III

# EXHIBIT R

## Skyler Peacock

| From: | Cecelia Fanelli <clf@brewerattorneys.com> |
|---|---|
| Sent: | Friday, June 9, 2023 12:53 PM |
| To: | twbiggs@dyciolaw.com; Ramon Hernandez; Will Brewer |
| Cc: | speacock@dyciolaw.com |
| Subject: | RE: Subpoenas for Dycio and Biggs and Motions to Quash |

Counsel:

We have reviewed your email below and suggest that you set your motion for June 30, 2023 to allow for further negotiation regarding the amendment of your Declaration.

Cecelia L. Fanelli | Partner
Brewer, Attorneys & Counselors
750 Lexington Avenue, 14th Floor
New York, New York 10022
Office Direct: 212.224.6329
Office Main: 212.489.1400
Cell: 347.612.9312 I Fax: 212.751.2849
clf@brewerattorneys.com I www.brewerattorneys.com

This communication (including any attachments) is intended for the sole use of the intended recipient, and may contain material that is confidential, privileged, attorney work product, and/or subject to privacy laws. If you are not the intended recipient, you are hereby kindly notified that any use, disclosure, or copying of this communication or any part thereof is strictly prohibited. If you have received this communication in error, please delete this communication, including any copies or printouts, and notify us immediately by return email or at the telephone number above. Brewer, Attorneys and Counselors asserts in respect of this communication all applicable confidentiality, privilege, and/or privacy rights to the fullest extent permitted by law. Thank you.

**From:** Wayne Biggs <twbiggs@dyciolaw.com>
**Sent:** Thursday, June 8, 2023 1:15 PM
**To:** Cecelia Fanelli <clf@brewerattorneys.com>; Ramon Hernandez <rxh@brewerattorneys.com>; Will Brewer <wbb@brewerattorneys.com>
**Cc:** speacock@dyciolaw.com
**Subject:** Subpoenas for Dycio and Biggs and Motions to Quash

Counsel:

As a follow up to our meet and confer yesterday, here is the status of the issues we discussed as I understand them:

1. As to the deposition of Mark Dycio, as we discussed yesterday, you stated that deleting me from the Rule 26 disclosures would obviate most of your concerns regarding the need to depose me, except for issues which you contend are presented by the declaration I provided. I pointed out that Mr. Dycio provided no such declaration and queried whether or not his deletion from the disclosures would obviate all concerns regarding Dycio. You indicated you would discuss that internally. You should now have received an amended or supplemented Rule 26 disclosure from Texas counsel which deletes both Mr. Dycio and myself from the list of persons with

1

discoverable information.  As Mr. Dycio has been deleted, please advise of your position regarding withdrawing his subpoena.

2.  As to the deposition of Biggs, as noted, I have also been removed from the Rule 26 disclosures.  That said, I do not believe that the remaining fact of the declaration or its contents make any difference to the Shelton analysis.  Summarized, the NRA's claims in the 2nd Amended Complaint are that the CSA had the effect of releasing the NRA from UWS's claims and it was a breach of contract for the Virginia case to go forward.  The breach of contract claim is against all defendants.  The NRA further asserts breach of fiduciary duty and fraud claims against Makris individually, based on the Supplemental Invoices.  As we discussed yesterday, there is a 7,000-page record in the UWS litigation that includes the full transcript of the multi-day jury trial.  The four corners of the CSA either do or do not effect a release of the NRA.  The record of the Virginia case is the best evidence of whether or not NRA's claims based on the Supplemental Invoices were "actually litigated."  These are questions of law to be determined by the court. Even if the declaration, for the sake of argument only, characterizes the documents it authenticates or is otherwise argumentative, such argument or characterization is wholly irrelevant to the issues asserted by the 2nd Amended Complaint. Nor would such argument or characterization constitute cognizable evidence.  The Court will ultimately decide the motions at issue on a legal basis.

3.  Accordingly, the Shelton standard would still apply to seeking to depose a party's attorney.  We have received no proffer as to what information you would seek in my deposition that is not privileged, is not obtainable elsewhere, and is crucial to your case.  All this said, I did indicate that consideration would be given to amending the declaration.  I am not confident that I will have an answer on that before the time period expires under which a Motion to Quash should be filed.  I will follow up on this point as soon as possible.

4.  Finally, we did not really have an extended discussion regarding the documents which I see as a related, but still separate, issue from the depositions themselves.  You did not seem to refute my point that the subpoena, read literally, seems to require me to appear, in person, at the place of deposition having printed out and brought with me, not just the 7,000 page record, but all other discovery exchanged between the parties, deposition transcripts, hearing transcripts, etc.—All totaled about 10,000 pages and all of which is already in the NRA's possession.  Frankly, this would be patently absurd and even the exercise of sending to you electronically what the NRA already has in its possession would be a needless exercise.  In fact, all three of the document requests seek the production of documents already plainly in the NRA's possession.  This is not to mention that the scope of all three of the document requests is overly broad and clearly would encompass attorney-client privilege and work product materials.  I don't think any measure of narrowing of these requests or other alteration would address these concerns.  We are not going to undertake the time to compile and send what the NRA already has. Nor do we intend to go through the massive burden and expense of compiling a privilege log for every item in our possession that is obviously protected from disclosure—which, after accounting for the materials already in NRA's possession, is all the requests seek.

5.  Please let us know your final position on withdrawing either or both subpoenas, as well as withdrawal of the document requests, by 1:00 p.m. tomorrow.  We will need to proceed to file the Motions to Quash if we have not heard from you by then.  Although I mentioned setting the Motions for June 23, 2023, I can agree to setting them for June 30, 2023.  I don't think the Court will consider that too far out and this will allow additional time to resolve any remaining issues.

T. Wayne Biggs, Esq.
Dycio & Biggs
10533 Main Street
Fairfax, Virginia 22030
T: (703) 383-0100
F: (703) 383-0101
==============================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @dyciolaw.com and delete the message. Thank you very much.

CAUTION: This email is from outside the organization. DO NOT CLICK a link or open an attachment unless you know the content is safe and are expecting it from the sender. If in doubt, contact the sender separately to verify the content.
========================

# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| | § | Civil Action No. 3:22-CV-1944-G |
| Plaintiff, | § § | |
| | § | The Honorable A. Joe Fish, presiding. |
| v. | § | |
| | § | |
| ACKERMAN McQUEEN, INC. and MERCURY GROUP, INC. | § § | FILED UNDER SEAL |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |
| | § | |

PLAINTIFF THE NATIONAL RIFLE ASSOCIATION OF AMERICA'S RULE 26(a)(1)
INITIAL DISCLOSURE STATEMENT

Pursuant to the Court's Status Report Order dated September 29, 2022, and Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff the National Rifle Association (the "NRA" or "Plaintiff") makes its initial disclosures relating to its causes of action against Defendants Ackerman McQueen, Inc. ("AMc"), Mercury Group, Inc. ("Mercury Group"), and Anthony Makris ("Makris") (collectively, "Defendants"), as stated below.

The NRA makes these initial disclosures subject to, and without waiving, its right to protect from disclosure any and all documents and communications protected by the attorney-client privilege, attorney-work product doctrine, and any other applicable privilege or exemption from discovery.

In addition, the NRA makes these initial disclosures without waiving any argument it may have concerning the relevancy or admissibility of, or proper weight to be accorded to, any of the materials or information disclosed or referenced herein. The NRA reserves the right to

1

amend or supplement this Initial Disclosure based upon further investigation, further development of applicable facts, or receipt and review of Defendants' responses or other information.

## I.
## DISCLOSURE PURSUANT TO RULE 26(a)(1)(A)(i)

The following individuals are likely to have discoverable information that Plaintiff may use to support Plaintiff's claims and defenses in this action, as follows:

1. Current and former employees, agents, attorneys, representatives, and custodian(s) of records of the NRA, including, but not limited to:

   Arulanandam, Andrew
   Erstling, Michael
   Fischer, Andra
   Frazer, John
   LaPierre, Wayne
   Padilla, Portia
   Rowling, Sonya
   Schropp, Tyler
   Spray, Craig
   Supernaugh, Lisa
   c/o BREWER, ATTORNEYS & COUNSELORS
   1717 Main Street, Suite 5900
   Dallas, Texas 75201

   Wilson Phillips
   c/o Mark Werbner
   WINSTON & STRAWN LLP
   2121 N. Pearl Street, Suite 900
   Dallas, Texas 75201

   The NRA is believed to have knowledge relating to the claims and defenses in this case, including but not limited to its decades long relationship with the Defendants; the Confidential Settlement Agreement, dated March 11, 2022 (the "CSA"), drafts of the CSA (the "CSA drafts"); the Advertising and Sponsorship Agreements between Under Wild Skies, Inc. ("UWS") and the NRA (the "UWS Agreements"); the services provided pursuant to the UWS Agreements; the UWS Supplemental Invoices submitted to the NRA between the years 2010 and 2018 (the "Supplemental Invoices"); and the invoicing practices of UWS.

2. Current and former employees, agents, attorneys, representatives, and custodian(s) of records of AMc, Mercury, UWS, and Makris, including but, not limited to:

2

Laughlin, Warner
Makris, Anthony
Martin, Henry
Schropp, Tyler
Montgomery, Melanie
West, Stephanie
Winkler, Brandon
Winkler, William
c/o DORSEY & WHITNEY LLP
300 Crescent Ct. Ste. 400
Dallas, TX 75201
(214) 981-9929

AMc, Mercury, UWS, and Makris are believed to have knowledge relating to the claims and defenses in this case, including but not limited to their decades long relationships with the NRA; the CSA; the CSA drafts; the UWS Agreements; the services provided pursuant to the UWS Agreements; the Supplemental Invoices; the invoicing practices of UWS; the corporate form, structure, and governance of AMc; the corporate form, structure, and governance of Mercury; the corporate form, structure, and governance of UWS; and the corporate control of UWS.

3. Current and former employees, agents, attorneys, representatives, custodian(s) of records of Winnercomm, Inc.:

Winnercomm, Inc.
c/o Mary Quinn Copper, Esq.
McAfee & Taft
Williams Center Tower II
Two W. Second Street, Suite 1100
Tulsa, OK 74103
(918) 574-3065

Winnercomm, Inc. is believed to have knowledge relating to the claims and defenses in this case, including but not limited to: the Agreements; their relationship with UWS as the production company for the Show; whereabouts of the Show and/or archives of same; and ownership of the Show.

In addition, Plaintiff anticipates that other, unknown individuals may have discoverable information that Plaintiff may use to support its claims or defenses. Plaintiff incorporates by reference any other individuals disclosed by other parties in this matter and reserves the right to supplement this disclosure pursuant to Federal Rule of Civil Procedure 26(e).

3

Plaintiff also reserves the right to obtain discovery in support of its claims or defenses

from any witness identified in any other party's Rule 26(a)(1) disclosure.

## II.
## DISCLOSURE PURSUANT TO RULE 26(a)(1)(A)(ii)

Plaintiff submits the following description of documents, electronically stored

information or tangible things in its personal possession, custody or control that Plaintiff may use

to support its claims or defenses, by category:

a. The Confidential Services Agreement, dated March 11, 2022 (the "CSA"), including drafts of the CSA, (copies of these documents are in the possession of the opposing party);

b. The UWS Agreements (copies of these documents are in the possession of the opposing party);

c. The Supplemental Invoices (copies of these documents are in the possession of the opposing party);

d. Relevant communications between individuals identified as persons with knowledge (FED. R. CIV. P. 26(a)(1)(A)) (copies of these documents are in the possession of the opposing party);

e. Documents previously provided and that will be provided to the Defendants demonstrating the falsity of the Defendants' claims and defenses;

f. In addition to the above-listed documents, Plaintiff may use any and all other documents, data compilations, and other tangible things produced or identified by any other party herein the course of discovery to support Plaintiff's claims and defenses.

## III.
## DISCLOSURE PURSUANT TO RULE 26(a)(1)(A)(iii)

Pursuant to the First Amended Complaint, Plaintiff seeks the following damages,

including but not limited to:

1. Damages for breach of the CSA against all Defendants including but not limited to:

   a. Attorneys' fees and costs incurred by the NRA since March 11, 2022 in defending the vexatious UWS Litigation, which was settled by the CSA;

   b. Any and all judgments or court orders issued against Plaintiff in the UWS Litigation, including without limitation, those relating to the jury verdict of $550,000 plus interest;

2. Damages for fraud against Makris in an amount to be determined at trial, including but not limited to the amount of the fifty-four (54) Supplemental Invoices submitted to and paid by the NRA, for $97,500 each, for a total of $5,265,000;

3. Declaratory judgment that Makris is precluded from claiming that claims against him are released under the CSA;

4. Declaratory judgment that Makris is precluded from claiming that payments on the Supplemental Invoices were connected to the UWS Agreements and/or were legally procured;

5. Punitive damages against Makris in an amount to be determined at trial;

6. As to all Defendants and claims, pre-judgment interest and post-judgment interest from the date of entry until the date of satisfaction at the highest rates permitted by applicable law;

7. As to all Defendants and claims, reasonable attorneys' fees, expert witness fees, costs for copies of depositions, and any such other fees and/or costs permitted by applicable law;

8. Such other and further relief to which Plaintiff may be justly entitled.

Plaintiff reserves the right to supplement these Initial Disclosures throughout and upon the conclusion of discovery and with the benefit of expert analysis and review. Plaintiff will provide Defendants with expert damages reports as to certain of the claims in the First Amended Complaint, in accordance with the scheduling order entered in this case.

## IV.
## DISCLOSURE PURSUANT TO RULE 26(a)(1)(A)(iv)

Rule 26(a)(1)(A)(iv) is not applicable because Defendants have not asserted any claims for which the NRA would incur liability.

5

Dated: October 31, 2022                    Respectfully submitted,

                                           **BREWER, ATTORNEYS &
                                           COUNSELORS**

                                       By:   *s/ Cecelia L. Fanelli*
                                           Konstantin Parkhomenko
                                           State Bar No. 24074854
                                           knp@brewerattorneys.com
                                           1717 Main Street, Suite 5900
                                           Dallas, Texas 75201
                                           Telephone: (214) 653-4827
                                           Facsimile: (214) 653-1015

                                           Cecelia L. Fanelli, Esq.
                                           *Pro Hac Vice*
                                           750 Lexington Avenue, 14th Floor
                                           New York, New York 10022
                                           clf@brewerattorneys.com
                                           Telephone: (212) 224-6329

                                           **ATTORNEYS FOR PLAINTIFF THE
                                           NATIONAL RIFLE ASSOCIATION OF
                                           AMERICA**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon

counsel of record in accordance with the Federal Rules of Civil Procedure.

/s/ Cecelia L. Fanelli
Cecelia L. Fanelli